WGB/lmm/#1624895

6975-06008

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| WILLIAM JARRETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:06-cv-03143-RM-BGC |
| | ) | |
| FORTIS INSURANCE COMPANY, | ) | Judge Richard Mills |
| | ) | Magistrate Judge Byron G. Cudmore |
| Defendant. | ) | |

## MOTION OF DEFENDANT, FORTIS INSURANCE COMPANY, FOR SUMMARY JUDGMENT

NOW COMES the defendant, FORTIS INSURANCE COMPANY (now known as Time Insurance Company, and sometimes referred to herein as "Fortis"), by and through its attorney, William G. Beatty; Johnson & Bell Ltd., of counsel, and pursuant to the provisions of F.R.C.P. 56, Local Rule 7.1(D)(1) and the Court's Scheduling Order in this cause, here moves this Honorable Court for the entry of an order granting summary judgment in favor of this defendant and against the plaintiff, William Jarrett, on plaintiff's Complaint as well as on Fortis' Counterclaim for Declaratory Judgment, in support of which the defendant respectfully states as follows:

### I.    Introduction.

Plaintiff, William Jarrett, has heretofore filed a two-count Complaint against defendant, Fortis Insurance Company, seeking declaratory relief (under Count I) and both contractual and extra-contractual relief under theory of breach of contract (under Count II) relative to the declination of benefits by defendant Fortis regarding certain claims for medical care costs

incurred by the plaintiff in conjunction with treatment rendered to him in January of 2005 for his coronary artery disease.

Plaintiff's Complaint, which was originally filed in the Circuit Court of the Fourth Judicial Circuit, Christian County, Illinois under Case No. 06 L 16, was timely removed by defendant Fortis to this Court on the basis of the Court's diversity jurisdiction, insofar as the plaintiff and defendant are citizens of Illinois and Wisconsin, respectively, and the plaintiff's claims exceed the sum of $75,000, exclusive of interest and costs.

Following removal of the case to this Court, defendant Fortis filed its Answer to the plaintiff's Complaint, denying any and all liability for the damages sought by the plaintiff, and denying plaintiff's entitlement to declaratory relief, while also asserting several Affirmative Defenses, among them the exclusion of coverage existing under plaintiff's Certificate of Health Insurance for costs associated with preexisting conditions (that being the basis for the defendant's declination of the plaintiff's benefit claims).

Along with its Answer and Affirmative Defenses, Fortis also filed a Counterclaim for Declaratory Judgment, asking the Court to determine and declare that the medical condition for which the plaintiff obtained treatment, and now seeks benefits, was a "preexisting condition" within the meaning of the plaintiff's Certificate of Insurance; that defendant therefore owes no benefits to the plaintiff for the costs associated with the treatment of that condition; and that defendant's conduct in denying plaintiff's claims was not vexatious or unreasonable within the meaning of the Illinois Insurance Code (215 ILCS 5/155), under which the plaintiff seeks extra-contractual damages.

Based upon the admissions of the plaintiff, as contained in his deposition testimony, and based upon the Affidavit of the defendant's Medical Director, Dr. Raymond Scott Brumblay, Fortis here seeks summary judgment in its favor and against the plaintiff, both with regard to the

plaintiff's Complaint as well as the defendant's Counterclaim for Declaratory Judgment, on the basis that the plaintiff's condition of coronary artery disease was a preexisting condition, as a matter of law, within the meaning of plaintiff's Certificate of Insurance, for which no benefits are owed to the plaintiff by defendant Fortis.

## II.    Statement of Uncontested Facts.

The following uncontested facts derive from the deposition testimony of the plaintiff, William Jarrett. All page references below relate to the transcript of Mr. Jarrett's deposition, pertinent pages of which are appended as Exhibit A to this Motion.

1.    In December of 2004, Mr. Jarrett applied for health insurance coverage with Fortis Insurance Company for himself and his wife (p.16);

2.    Plaintiff acknowledged Exhibit 1 to his deposition as being a copy of the application (known as an Enrollment Form) for his coverage with Fortis (p.18);

3.    Having presented Fortis with what appeared to be a clean bill of health in his Enrollment Form, Fortis issued to Mr. Jarrett a Certificate of Health Insurance, a copy of which he acknowledged as Exhibit 2 to his deposition (pp.37-38);

4.    Mr. Jarrett acknowledged that his Certificate of Insurance contained a coverage exclusion for preexisting conditions for the first 12 months of coverage, with the preexisting condition exclusion being set forth on page 19 of his Certificate (pp.38-39);

5.    Mr. Jarrett acknowledged that under the language of the preexisting condition exclusion, there are two sets of circumstances that can render a condition as "preexisting" within the meaning of the Certificate: one is where the condition was diagnosed or treated by a doctor within 24 months of the effective date of coverage, and the other circumstance being where the condition produced symptoms within 12 months prior to the effective date of coverage that

would have cause an ordinarily prudent person to seek medical diagnosis or treatment (pp.39-40);

6.    In this case, the effective date of coverage under Mr. Jarrett's Certificate of Insurance was January 15, 2005 (p.41);

7.    Less than a week later, on January 21, 2005, Mr. Jarrett went to the emergency room of St. John's Hospital in Springfield, Illinois where he came under the care of a Dr. Kallookulangara (pp.41-44); (*see* also Exhibit 3 which Mr. Jarrett acknowledged as the Admitting Note for said emergency room visit);

8.    Mr. Jarrett, then 52 years of age, complained of chest pain, which is documented in Exhibit 3 as pain in the upper anterior (*i.e.* front) area of his chest, along with a "tugging" sensation in his chest, shortness of breath, pain radiating into his left arm or shoulder and a tingling sensation in his left hand (p.46);

9.    The Admitting Note (Exhibit 3 to Mr. Jarrett's deposition) reflects a history of similar episodes of chest pain during the past three to four months, with Mr. Jarrett admitting to having related such a medical history to his doctors (pp.46-47);

10.    Mr. Jarrett recalled telling his doctors that his prior chest pains occurred with exertion (p.47);

11.    An EKG was performed, and Mr. Jarrett was admitted to the hospital under the care of Dr. Marc Shelton, a cardiologist (pp.49-50);

12.    Mr. Jarrett stated that Dr. Shelton took a history from him which is recorded in Exhibit 6 to Mr. Jarrett's deposition wherein Dr. Shelton noted that Mr. Jarrett had come to the emergency room with substernal chest pressure and a squeezing type of pain radiating into his left shoulder, all of which symptoms Mr. Jarrett admitted to having described to Dr. Shelton (p.52 and Exhibit 6 to plaintiff's deposition);

13.     Mr. Jarrett also told Dr. Shelton that he had experienced severe pains, on and off, for three or four months, usually worse with exertion, and usually better with rest (p.52);

14.     Dr. Shelton performed a cardiac catheterization the following morning, January 22, 2005 which showed three blocked coronary arteries (pp.53-54);

15.     Mr. Jarrett then came under the care of Dr. William Pyle, a cardiac surgeon, who prepared a consultation report that Mr. Jarrett identified as Exhibit 5 to his deposition (pp.55-56);

16.     Dr. Pyle's report stated that Mr. Jarrett is a 52-year-old man who has had discomfort in his chest and left shoulder for several months with exertion (*see* Exhibit 5 to plaintiff's deposition);

17.     Mr. Jarrett believes that the aforementioned entry in the record is based upon information that he had provided to Dr. Kallookulangara and to Dr. Shelton (p.56);

18.     Mr. Jarrett acknowledged that Dr. Pyle's report states that on January 21, 2005, Mr. Jarrett came to the emergency room because of significant symptoms of the same kind that he had experienced previously (p.57);

19.     Plaintiff believes that this entry is also based upon information that he had previously provided to Dr. Kallookulangara and to Dr. Shelton (p.58);

20.     Mr. Jarrett underwent triple bypass surgery to address the three coronary arteries that were found to be occluded, with the cardiac catheterization report having shown a 100% occlusion of the right coronary artery; and 100% occlusion of the circumflex artery and a 60% occlusion of the left main coronary artery (pp.58-59);

21.     Medical bills in excess of $100,000 were submitted to Fortis Insurance Company for the cost of the aforementioned medical and surgical treatment (p.59);

22.     Mr. Jarrett was advised by Fortis that benefits for his treatment were being declined on the basis of a preexisting condition (p.62):

- 5 -

23.     Mr. Jarrett contested the preexisting condition determination because he had not been diagnosed or treated for his coronary artery disease prior to his emergency room visit of January 21, 2005, but acknowledged in his deposition that regardless of any prior diagnosis or treatment, his insurance Certificate's definition of preexisting condition also includes situations wherein the illness or condition produces symptoms within the 12 months prior to the effective date of coverage that would have cause an ordinarily prudent person to seek diagnosis or treatment (pp.67-68);

24.     Mr. Jarrett acknowledged that under the language of his Certificate of Insurance he did not have to have an actual prior diagnosis or actual treatment of his condition during the pre-coverage period in order for the condition to be preexisting.  All that was required was the presence of symptoms during the year preceding the effective date of coverage that would have caused an ordinarily prudent person to seek medical diagnosis or treatment (p.68);

25.     Mr. Jarrett again acknowledged that he told his doctors that for the three to four months prior to his emergency room visit in January of 2005 he had experienced chest pain upon exertion, of the same or similar kind as he experienced on the evening of his emergency room visit on January 21, 2005 (pp.68-69), and that sometimes the chest pain would be accompanied by shortness of breath and radiation of pain into the left shoulder (pp.70-71).

## III.    Argument.

### A.    Summary judgment standard.

A motion for summary judgment must be granted "if the pleadings, depositions . . . and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F.R.C.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552,

91 L.Ed.2d 265 (1986); see also Herman v. National Broadcasting Co., Inc., 744 F.2d 604, 607

(7th Circuit 1984), cert. denied, 470 U.S. 1028, 84 L.Ed.2d 782, 105 S.Ct. 1393 (1985).

The "mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 1505, 1510, 91 L.Ed.2d 202 (1986).

The Court's function in assessing a party's entitlement to summary judgment is to

determine whether there exists any material disputed facts which would require a trial, i.e. those

"that might affect the outcome of the suit under governing law," in the absence of which, the

Court is to render summary judgment if the moving party demonstrates its entitlement to same.

Id. 477 U.S. 428-29; Winter v. Minnesota Mutual Life Ins. Co., 199 F.3d 399, 408 (7th Cir.

1999).

Summary judgment "is appropriately entered 'against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial.'" See McKenzie v. Illinois Department of

Transportation, 92 F.3d 473, 479 (7th Cir. 1996) (quoting Celotex 477 U.S. at 322, 106 S.Ct. at

2552 (1986)).

In opposing a motion for summary judgment, the non-moving party must do more

than raise a "metaphysical doubt" as to the material fact. See Matsushita Electric Industrial Co.

v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986).

Rather, he "must come forward with 'specific facts showing that there is a genuine issue for

trial.'" Id. at 587, 106 S.Ct. at 1356 (quoting F.R.C.P. 56(e)). "Where the record taken as a

whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

issue for trial.'" Id. Finally, "although [the Court] must, for purposes of summary judgment

review, draw any inferences from the record in favor of [the plaintiff, it is] not required to draw

every conceivable inference from the record.  [It] need draw only reasonable ones." *See* <u>Tyler v. Runyon</u>, 70 F.3d 458, 467 (7th Cir. 1995).

> **B.  Plaintiff's coronary artery disease was a preexisting condition as a matter of law, and therefore no benefits are owed.**

This case calls upon the Court to consider the language of the insurance Certificate's coverage exclusion for preexisting conditions in light of the admissions contained in the plaintiff's deposition testimony concerning his history of chest pains and related symptoms, as well as the facts set forth in the Affidavit of the defendant's Medical Director, who is the only medical witness to have been formally disclosed in this case by either side.  Case law concerning the construction of insurance contracts in general, and preexisting condition clauses in particular, authorize the Court to grant the relief the defendant seeks in this Motion.

> **(1)  The interpretation of an insurance policy, including any exclusions to coverage, is a question of law.**

As this Court ruled in <u>Indiana Ins. Co. v. Pana Comm. Unit School Dist. No. 8</u>, 173 F.Supp.2d 835 (C.D. Ill. 2001), under Illinois law (applicable to this diversity case) the interpretation of an insurance policy "presents questions of law that are appropriately resolved by summary judgment."   173 F.Supp.2d at 840, citing <u>West Suburban Bank of Darien v. Badger Mut. Ins. Co.</u>, 141 F.3d 720, 723-24 (7th Cir. 1980).

When the provisions of an insurance policy are unambiguous, they are to be afforded their plain, ordinary and popular meaning, even if such a construction results in a limitation of the insurer's liability. *See* <u>Employers Ins. v. James McHugh Const. Co.</u>, 144 F.3d 1097 at 1104 (7th Cir. 1998); <u>Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.</u>, 40 F.3d 146 at 151 (7th Cir. 1994).

Under the second of the two tests set forth in the plaintiff's Certificate of Insurance to determine the presence of a preexisting condition, said coverage exclusion is

- 8 -

properly invoked when the condition produced symptoms within 12 months prior to the effective date of coverage that would have caused an ordinarily prudent person to seek medical diagnosis or treatment.   (*See* page 19 of plaintiff's Certificate of Insurance).

In the case at bar, there are no ambiguities present, or claimed to be present, in the preexisting condition exclusion found in the plaintiff's Certificate of Insurance.   Therefore the Court is respectfully urged to apply the plain, ordinary and popular meaning of the preexisting condition exclusion to the uncontested facts of this case, and in so doing, to determine, as a matter of law, that the plaintiff's condition of coronary artery disease preexisted his effective date of coverage because the disease manifested itself in symptoms occurring in the three- to four-month period prior to the commencement of plaintiff's coverage.   The Court is likewise asked to determine, as a matter of law, that said symptoms manifested themselves in such a way as would have caused an ordinarily prudent person to seek medical diagnosis or treatment.

**(2)     Plaintiff's admissions regarding his history of chest pains and related symptoms demonstrate the preexisting nature of his condition beyond any genuine issue of material fact.**

Plaintiff William Jarrett was as candid and clear in his deposition testimony in this case as he was in speaking to his doctors at the St. John's Hospital emergency room on the evening of January 21, 2005.   In both instances he admitted to a three- to four-month history, prior to his emergency room visit, of pains in his chest, radiating into his left arm, accompanied by shortness of breath, occurring with exertion. (*See* paragraphs 8 through 10 and 11 through 13 of the Statement of Uncontested Facts, above, and the corresponding pages of plaintiff's deposition testimony, pp.46, 47, as well as 52, and Exhibits 3 and 6 to the plaintiff's deposition).

It is uncontested that plaintiff's coverage had commenced on January 15, 2005, only six days before the emergency room visit during which he admitted to a three- to four-month history of the same symptoms that prompted his trip to the emergency room on January 21, 2005. (*See* paragraphs 6, 9, 18 and 25 of the Statement of Uncontested Facts, and the corresponding pages of the plaintiff's deposition testimony, being pp.41, 46-47, 57 and 68-69. *See also* Exhibits 3, 5 and 6 to the plaintiff's deposition).

Plaintiff's admissions, combined with the remaining information found in plaintiff's medical records (as discussed in Dr. Brumblay's Affidavit and as summarized in the following section of this Motion) make it clear beyond any genuine issue of material fact that the plaintiff demonstrated symptoms of his coronary artery disease within the 12 months prior to the effective date of his coverage. Equally clear is the fact that the nature of said symptoms, combined with such additional medical factors as the plaintiff's obesity and his family history of premature coronary artery disease (including his father's history of a myocardial infarction at age 62), all of which are referenced in the medical records which plaintiff acknowledged at his deposition, (*see* Exhibits 3, 5 and 6 to plaintiff's deposition), would have caused an ordinarily prudent person to seek medical diagnosis or treatment for said symptoms.

> **(3)      The question of whether the plaintiff's pre-coverage symptoms would have caused an ordinarily prudent person to seek medical diagnosis or treatment can be property decided as a matter of law.**

As is demonstrated in the preceding section of this Motion, the plaintiff's three- to four-month history of chest pains, radiating into his left shoulder, and accompanied by shortness of breath, which plaintiff himself described as being the same symptoms which prompted him to visit the emergency room less than a week after his

coverage began, squarely satisfies the "symptom" criteria of the insurance Certificate's definition of a preexisting condition (*i.e.* that the condition "produced symptoms within 12 months prior to the effective date of coverage).

As to the "ordinarily prudent person" criteria (*i.e.* that the symptoms associated with the condition would have caused an ordinarily prudent person to seek medical diagnosis or treatment), case law demonstrates that this determination (*i.e.* whether a given set of symptoms would have caused an ordinarily prudent person to seek medical diagnosis or treatment) can be decided as a matter of law. *See* Golden Rule Ins. Co. v. Atallah, 45 F.3d 512 (1st Cir. 1995) (reversing a jury verdict for the plaintiff and granting judgment for the defendant-insurer, and holding as a matter of law that a reasonable person afflicted with the plaintiff's symptoms prior to the policy's effective date of coverage would have sought diagnosis or treatment); *see also* Clark v. Golden Rule Ins. Co., 887 F.2d 1276 (5th Cir. 1989) (wherein the Court of Appeals affirmed the insurer's denial of benefits for coronary bypass surgery for an insured who had experienced chest pains or tightness in the chest a few months before purchasing insurance).

The Affidavit of Raymond Scott Brumblay, M.D. which is summarized in the following section of this Motion, attests to the fact that both the "symptom" requirement and the "ordinarily prudent person" criteria, both of which are necessary to establish a preexisting condition, are fully satisfied in this case beyond any genuine issue of material fact.

(4)    **The Affidavit of the only medical witness formally disclosed in this case demonstrates defendant's entitlement to judgment as a matter of law.**

Attached hereto and incorporated as Exhibit B to this Motion for Summary Judgment is the Affidavit of defendant's Medical Director, Raymond Scott Brumblay, M.D., a duly-licensed physician, board certified in the field of internal medicine, who is the only medical witness having been formally disclosed by either party to this case. Defendant Fortis has previously submitted, pursuant to F.R.C.P. Rule 26, a signed report listing Dr. Brumblay's opinions in this matter along with a statement of his credentials, and a description of the materials which he relied upon informing his opinions. (*See* Exhibit B to Dr. Brumblay's Affidavit).

In summary, Dr. Brumblay was asked to review the medical records of plaintiff William Jarrett from St. John's Hospital in order to determine whether Mr. Jarrett's condition of coronary artery disease constituted a "preexisting condition" within the meaning of the plaintiff's Certificate of Health Insurance. (*See* Brumblay Affidavit, paragraph 18).

Having reviewed the plaintiff's records from St. John's Hospital, including the Admission Note dated January 21, 2005 and the Consultation Reports of Dr. Marc Shelton (the plaintiff's cardiologist) and Dr. William Pyle (the plaintiff's cardiac surgeon), both reports bearing the date of January 22, 2005, Dr. Brumblay noted a significant history of chest pains having been reported by Mr. Jarrett to his doctors, of three to four months' duration, occurring upon exertion, with pain radiating into the plaintiff's left shoulder, accompanied by shortness of breath. (*See* paragraphs 20, 21 and 22 of Dr. Brumblay's Affidavit).

Mr. Jarrett was variously described in the aforementioned medical records as being "overweight," "obese" and even "morbidly obese," "hypertensive," with a significant family history of premature coronary artery disease with both a father and a brother having experienced myocardial infarctions, and the plaintiff himself having EKG evidence of a prior inferior infarct (*id.*).

Dr. Brumblay notes that the plaintiff's physicians reported that he presented to the emergency room of St. John's Hospital on January 21, 2005, only six days after his effective date of coverage, complaining of the same kind of symptoms of radiating chest pain and shortness of breath that he had been experiencing during the preceding three to four months. (*See* paragraphs 20 and 22 of Dr. Brumblay's Affidavit).

Dr. Brumblay states that the nature and extent of the blockages found in three of the plaintiff's coronary arteries as a result of the cardiac catheterization procedure performed on January 22, 2005 (100%, 100% and 60%) demonstrates beyond any question of fact that Mr. Jarrett's coronary artery disease process undoubtedly predated the commencement of his coverage with Fortis, said coverage having begun only a week prior to plaintiff's hospitalization. In other words, the coronary occlusions found to exist in the January 22, 2005 cardiac catheterization study did not just form during the six-day period between the effective date of the plaintiff's coverage and his hospitalization, but instead substantially predated the plaintiff's coverage with the defendant. This preexisting coronary artery disease was also, according to Dr. Brumblay, a competent cause of the chest pains and related symptoms which the plaintiff had been experiencing during the three- to four-month period which preceded both the commencement of his insurance coverage with Fortis (on January 15, 2005) and the

ensuing medical treatment which he sought less than a week later. (*See* paragraphs 25 and 26 of Dr. Brumblay's Affidavit).

Lastly, Dr. Brumblay opines that Mr. Jarrett's coronary artery disease squarely fits within the Certificate's definition of a preexisting condition, for which no coverage is afforded, since the condition clearly produced symptoms within the 12 months prior to Mr. Jarrett's effective date of coverage, and which, given Mr. Jarrett's age, physical condition, family history of heart disease, and recent episodes of chest pain, radiating into the shoulder and accompanied by shortness of breath, would have caused an ordinarily prudent person to seek medical diagnosis or treatment. (*See* paragraph 23 of Dr. Brumblay's Affidavit).

**C.  Fortis is entitled to summary judgment on the plaintiff's extra-contractual damages claim.**

In addition to his claim for compensatory damages under a breach of contract theory, as set forth in Count II of his Complaint, plaintiff also seeks extra-contractual damages from defendant Fortis in the same Count pursuant to Section 155 of the Illinois Insurance Code (215 ILCS 5/155), which allows for the imposition of such damages against an insurer whose conduct in denying or delaying the payment of a meritorious claim is adjudged to have been "vexatious and unreasonable."

Since the Insurance Code provides that such a determination is to be made by the Court, rather than by the jury (*see* Howard Foundry Co. v. Hartford Fire Ins. Co., 222 F.2d 767 (1955)), a claim for extra-contractual damages under Section 155 of the Code is ripe for summary disposition, where it is apparent from the uncontested facts that the insurer's conduct does not rise to the level of culpability required for the imposition of such damages. *See* Denari v. Genesis Ins. Co., 2003 U.S. Dist. LEXIS 23527 (N.D. Ill. 2003).

- 14 -

Section 155 is considered penal in nature and must be construed strictly. *See* Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co., 138 F.Supp.2d 1088, 1102 (N.D. Ill 2001).

Penalties under the statute can be imposed "only against insurers who act vexatiously and unreasonably in delaying or denying a claim, [and] wrongful denial of coverage by itself is not enough" to impose extra-contractual damages. *See* Knoll Pharm. Co. v. Auto. Ins. Co., 210 F.Supp.2d 1017, 1028 (N.D. Ill. 2002).

When a bona fide dispute concerning coverage exists, or where the insurer asserts a legitimate policy defense in denying coverage, the insurer's conduct is not vexatious or unreasonable. *See* Spearman, 138 F.Supp.2d at 1102; Knoll, 210 F.Supp.2d at 1028.

Here, Fortis' determination that the plaintiff's coronary artery disease was a preexisting condition, for which no benefits are payable, was based squarely upon the plaintiff's own medical history as he related it to his doctors, as reflected in the medical records reviewed by the defendant, which demonstrate a three- to four-month period of chest pains radiating into the left shoulder, accompanied by shortness of breath. These symptoms are characterized by the plaintiff himself as being the same or similar symptoms that prompted his emergency room visit six days after the commencement of his coverage. (*See* pp.46, 47 and 52 to plaintiff's deposition testimony along with Exhibits 3, 5 and 6 to his deposition wherein such history of recurring symptoms is recorded).

Dr. Brumblay's review of the plaintiff's history and symptoms, as recorded in Mr. Jarrett's medical records, led him to the conclusion that the plaintiff's symptoms demonstrated a pattern that is classical for coronary artery disease (*see* Affidavit of Dr. Brumblay). No other medical experts have been disclosed in this case to rebut that opinion.

- 15 -

Federal trial courts, as well as the Seventh Circuit Court of Appeals, have consistently held that a plaintiff's claims for extra-contractual damages can be disposed of by summary judgment where the uncontested facts demonstrate that the insurer's conduct was not vexatious and unreasonable. *See* Goldstein v. Fidelity and Guaranty Ins. Underwriters, Inc., 86 F.3d 749 (7th Cir. 1996) (affirming a *sua sponte* entry of summary judgment by the trial court in favor of the defendant-insurer); *see also* Stowe v. Security Life Ins. Co. of America, 1996 U.S. Dist. LEXIS 1893 (N.D. Ill. 1996) and Smith v. Metropolitan Life Ins. Co., 550 F.Supp. 896 (N.D. Ill. 1982) (both granting summary judgment in favor of the insurer on the insured's Section 155 claims).  That is the case here.

**D.** **Fortis is entitled, as a matter of law, to the declaratory relief it seeks in its Counterclaim.**

In addition to its Answer denying liability for the plaintiff's claims for medical benefits, and its Affirmative Defenses including the preexisting nature of plaintiff's condition of coronary artery disease, defendant Fortis also filed a Counterclaim for Declaratory Judgment, requesting the Court to determine and declare, *inter alia*, that the preexisting condition exclusion set forth in the plaintiff's insurance Certificate is applicable to the facts and circumstances of this case; that plaintiff's condition of coronary artery disease constituted a preexisting condition within the meaning of the plaintiff's Certificate of Insurance; that Fortis is therefore not liable for the benefits which plaintiff has claimed; and that under the facts of this case, and pursuant to applicable law, plaintiff is not entitled to declaratory or monetary relief (either contractual or extra-contractual) from this defendant.

In this regard, defendant Fortis respectfully contends that the same uncontested facts, and the same legal principles, that entitle it to summary judgment in its favor and against the plaintiff on the plaintiff's two-count Complaint likewise entitle defendant Fortis to judgment

in its favor and against the plaintiff, as a matter of law, on Fortis' Counterclaim for Declaratory Judgment.

WHEREFORE, the defendant, FORTIS INSURANCE COMPANY (now known as Time Insurance Company), respectfully prays for the entry of an order granting summary judgment in favor of this defendant and against the plaintiff, William Jarrett, as to both the plaintiff's Complaint and the defendant's Counterclaim for Declaratory Judgment, pursuant to the provisions of F.R.C.P. 56 and Local Rule 7.1 of this Court. Defendant Fortis likewise prays for recovery of its costs of suit.

Respectfully submitted,

**s/ William G. Beatty**
William G. Beatty Bar Number: 03121542
Attorney for Defendant and Counter-Plaintiff
    Fortis Insurance Company n/k/a
    Time Insurance Company
Of counsel
Johnson & Bell, Ltd.
33 West Monroe Street, Suite 2700
Chicago, IL 60603
Telephone: (312) 372-0770
Fax: (312) 372-2881
E-mail: beattyw@jbltd.com

- 17 -

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2007, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

**s/ William G. Beatty**
William G. Beatty Bar Number:  03121542
Attorney for Defendant and Counter-Plaintiff
    Fortis Insurance Company n/k/a
    Time Insurance Company
Of counsel
Johnson & Bell, Ltd.
33 West Monroe Street, Suite 2700
Chicago, IL 60603
Telephone:  (312) 372-0770
Fax:  (312) 372-2881
E-mail:  beattyw@jbltd.com

**ORIGINAL** E-FILED
Thursday, 31 May, 2007 10:48:08 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

SPRINGFIELD DIVISION

WILLIAM JARRETT,                    )
                                    )
            Plaintiff,              )
                                    )
vs.                                 )        No. 3:06-CV-03143-RM-BGC
                                    )
FORTIS INSURANCE COMPANY,           )
                                    )
            Defendant.              )


DEPOSITION OF

WILLIAM JARRETT

TAKEN ON:  APRIL 30, 2007



Sara Jane Mayberry, CSR

Illinois #084-003369

**EXHIBIT**
tabbies
*A*
To Motion for S.J.

STIPULATION

IT IS STIPULATED AND AGREED by and between
Counsel for the Plaintiff and Counsel for the Defendant
that the deposition of WILLIAM JARRETT, may be taken
pursuant to Rule 26 (a) of the federal rules of Civil
Procedure on behalf of the Defendant, on April 30, 2007, at
Scott & Scott, 611 East Monroe Street, Suite 200,
Springfield, Illinois, before Sara Jane Mayberry, Certified
Shorthand Reporter of the State of Illinois and Notary
Public; that the issuance of notice and dedimus is waived,
and that this deposition may be taken with the same force
and effect as if all federal rules and statutory
requirements had been complied with.

IT IS FURTHER STIPULATED AND AGREED that any and
all objections to all or any part of this deposition,
except objections as to the form of questions asked or
answers given, are hereby reserved and may be raised on the
trial of this cause; and that the signature of the deponent
is waived.

```
 1   APPEARANCES:
 2   Scott & Scott
 3   611 East Monroe Street, Suite 200
 4   Springfield, Illinois  62701
 5     By:  James R. Enlow, Esq.
 6
               Appearing on behalf of the Plaintiff
 7
 8   Johnson & Bell
     33 West Monroe Street, Suite 2700
 9   Chicago, Illinois  60603-5404
       By:  William G. Beatty, Esq.
10
               Appearing on behalf of the Defendant
11
12
13
14
15
16                           INDEX
17
     Examination by Mr. Beatty. . . . . . . . . . . . .Page  4
18
19                       EXHIBIT INDEX
20   Defendant's Deposition Exhibit Number 1. . . . . .Page  4
21   Defendant's Deposition Exhibit Numbers 2 - 6 . . . .Page 35
22   Defendant's Deposition Exhibit Number 7. . . . . .Page 63
23
24
25
```

1

2

3              (Defendant's Deposition Exhibit Number 1 was

4    marked by the Court Reporter and has been attached hereto.)

5                        WILLIAM JARRETT

6    having first been duly sworn upon oath by the Court

7    Reporter, testified as follows:

8

9                          EXAMINATION

10   BY MR. BEATTY:

11        Q    Good afternoon, Mr. Jarrett.  Would you state

12   your full name for the record, please, and spell your last

13   name for us?

14        A    William Lee Jarrett, J-A-R-R-E-T-T.

15        MR. BEATTY:  Thank you, sir.  Let the record show

16   that this is the deposition of plaintiff William Jarrett

17   taken pursuant to notice and set to today's time, date, and

18   place by agreement of parties.  The deposition is being

19   conducted in accordance with the Federal Rules of Civil

20   Procedure and the applicable local rules of the United

21   States District Court, the Central District of Illinois.

22        Q    (By Mr. Beatty) Mr. Jarrett, my name is Bill

23   Beatty, and I represent the defendant in this case, a

24   company called Fortis Insurance Company.  It's now known as

25   Time Insurance Company, but at the time of your application

1   your self-employment?

2          A    No.  It -- it was self-employed insurance, yes.

3          Q    Okay.  When you became insured with American

4   Republic, you were self-employed with Bill's Automotive --

5   Bill's Safety and Automotive?

6          A    Yes.

7          Q    Okay.  Did the company, that is, your sole

8   proprietorship, pay the premiums for that coverage?

9          A    Yes.

10         Q    Okay.  And who else was covered under that policy

11  besides yourself?

12         A    Well, at that particular time, my wife and my

13  youngest daughter.

14         Q    Okay.  And I think you said that the company paid

15  the premiums?

16         A    Yes.

17         Q    All right.  When you switched over to Fortis

18  Insurance Company, was that the same arrangement?  The

19  company paid the premium?

20         A    Yes.

21         Q    Okay.  Back at the time that you applied for the

22  Fortis insurance coverage -- and according to the paperwork

23  that I have, sir, that looked to be in December of 2004.

24  Does that sound right?

25         A    Yes.

1   Exhibit Number 1 to your deposition, sir.  And I'd like you

2   to take a look at it.  You can -- you can skim through it,

3   if you'd like.  Take your time.  And just -- the first

4   question I'll ask you about the document is if you

5   recognize it.

6       A    Yes.

7       Q    Okay.  And can you identify what it is for the

8   record, please?

9       A    Yes.  It's an application for medical insurance.

10      Q    Okay.  And is this the application that you

11  completed to obtain medical insurance coverage with Fortis

12  Insurance Company?

13      A    Yes.

14      Q    Okay.  I just have a couple of quick questions

15  about some of the information here on the form, if you can

16  help me with that.  This identifies both yourself and your

17  wife as people to be covered under the terms of this

18  insurance, as you've already told me?

19      A    Yes.

20      Q    Correct.  Okay.  And it is on the second page

21  that I see reference to American Republic.  And do you see

22  that, sir?  About halfway down the page.

23      A    Yes.

24      Q    And then it says type of coverage.  It looks like

25  it says hospital and surgical?

1    Q    All right.  We had indicated -- I think you had

2    told me that with regard to the yes answers that were shown

3    on pages three and four, those yes answers related only to

4    your wife?

5    A    Yes.

6    Q    So as far as the enrollment form, Exhibit Number

7    1, is concerned, it appears that you presented Fortis

8    Insurance Company with a clean bill of health.  Would you

9    agree?

10    A    Yes.

11    Q    Okay.  And as a result of your enrollment form,

12    they issued a certificate of insurance; is that correct?

13    A    Yes.

14    Q    Okay.  How did you receive that certificate of

15    insurance?

16    A    Miss Loveless brought it -- brought the policy to

17    us.

18    Q    Okay.  I'm going to show you what's been marked

19    as Exhibit Number 2 to your deposition, and I would ask you

20    to take a look at that, please.  And can you identify it

21    for the record?  I will represent to you that it came as an

22    exhibit to the complaint that your attorney filed in court,

23    and you can tell that because he has taken care to redact

24    your Social Security Number, as you'll see here.  Have you

25    seen this before?

1      A     Yeah.   This is the policy.

2      Q     Okay.   And I think you said you got it -- was it

3   delivered to your office or your home?

4      A     I'm sure it was at the office.

5      Q     Okay.

6      A     That's where I was most of the time.

7      Q     Okay.   And on the front of this -- and I'm

8   looking at page one of Exhibit Number 2 -- it -- there's a

9   phrase that says right to examine for ten days, and it's in

10  capital letters and bold print.   Do you see that?

11     A     Yes.

12     Q     Under that, it says plead -- please read your

13  certificate carefully.   If you are not satisfied, return

14  the certificate to us or our agent within ten days after

15  you have received it.   All premium will be refunded and

16  your coverage will be void.   Do you see that?

17     A     Yes.

18     Q     Did you examine the policy after you received it?

19     A     No.

20     Q     Okay.   There are certain coverages and exclusions

21  and conditions throughout the policy or the certificate of

22  insurance, and I would like to -- if you could turn your

23  attention -- you'll find a -- find a page that says

24  Pre-existing Condition Limitation at the top of it.

25     A     Nineteen?

Q    Yeah.  It says page nineteen.  Although these pages don't appear to be strictly in order, but if you can find it, let me know.

A    Yes.  Okay.

Q    All right.  Before this lawsuit was filed, sir, had you ever seen that page before?

A    No.

Q    Okay.  Is it your understanding about how the -- this particular coverage worked that if something is a pre-existing condition, that the policy wouldn't pay for that condition until twelve months has gone by from the effective date of coverage?

A    That's the way it reads, yes.

Q    Okay.  So under Pre-existing Condition Limitation, there's two paragraphs there, and the first paragraph essentially says that in order for a pre-existing condition to be covered, twelve months have to have gone by since the effective date of coverage.  Is that your understanding of how it works?

A    Yes.

Q    Okay.  And then it goes on to define what a pre-existing condition or pre-existing illness is, and there's actually a couple of parts to it.  I'll read it into the record and you make sure that I read it correctly. It says a pre-existing illness, parenthesis, condition,

1    closed parenthesis, means any condition that was diagnosed

2    or treated, parenthesis, to include the taking of

3    prescription drugs, closed parenthesis, by a physician

4    within twenty-four months prior to the effective date of

5    coverage or produced symptoms within twelve months prior to

6    the effective date of coverage that would have caused an

7    ordinarily prudent person to seek medical diagnosis or

8    treatment.  Did I read that correctly?

9        A    Yes.

10        Q    Okay.  Would you agree with me then that there

11    are two sets of circumstances that can render a condition

12    pre-existing within the meaning of this policy?  The first

13    one is if -- if the condition was diagnosed or treated by a

14    doctor within twenty-four months of the effective date of

15    coverage?

16        A    Yes.

17        Q    The other -- the other circumstance is if the --

18    if the condition produced symptoms within twelve months

19    before the effective date of coverage that would have

20    caused an ordinarily prudent person to seek medical

21    diagnosis or treatment?

22        A    Yes.

23        Q    Okay.  You understand that's how the pre-existing

24    condition clause works under this certificate?

25        A    Yes.

1    Q    Okay.  Now, as I understand, this coverage took

2  effect -- and you can flip to the second page of Exhibit

3  Number 2 to confirm this.  My understanding is that the

4  effective date of this coverage was January 15 of 2005.  Is

5  that correct?

6    A    Yes.

7    Q    And is that your understanding of when this

8  coverage went into effect?

9    A    Yes.

10    Q    Okay.  And it appears that the week after this

11  coverage went into effect, you went to the emergency room

12  of one of the hospitals here in the Springfield area with a

13  medical problem; is that correct?

14    A    Yes.

15    Q    Okay.  I'm going to show you what's been marked

16  as Exhibit Number 3 to your deposition.  It's a little hard

17  to read up at the top, but it says St. John's Hospital,

18  Springfield, Illinois, and that's up toward the top left.

19  Do you see that, sir?

20    A    Yes.

21    Q    And is -- is that the hospital where you went for

22  your medical problem?

23    A    Yes.

24    Q    Okay.  Tell me, Mr. Jarrett, what the nature

25  of -- and I know you're not a doctor and I'm not asking you

1    to give me a doctor's version of this, but you were the one

2    that went through it.  So in laymen's terms, sir, can you

3    tell me what the nature of your medical problem was in

4    January of '05?

5         A    Yeah.  We -- I had -- I worked all day, which I

6    did every day, but we had a very -- it was a very

7    unordinary day, very stressful.  We had cars that was just

8    really giving us a problem.  We had one car in particular

9    that filled the car -- or filled the shop up with fumes.

10   Just one thing after another, all day long.  And at the end

11   of the day, I felt really -- really bad.

12        Q    In what way, sir?

13        A    Well, I was -- I had a headache.  Just really

14   felt bad in general.  And I really contributed it to the

15   problems with the cars, you know, and the fumes.

16        Q    Okay.  Now, are we talking about stress, or are

17   we talking about fumes, exhaust fumes?

18        A    I'm talking about exhaust fumes.

19        Q    Okay.

20        A    Because they were pretty horrendous in the shop

21   that day because this car really had a problem.  I went

22   home, showered, took a couple of Tylenol and decided that

23   maybe that would, you know, alleviate some of the problem.

24   And then I decided that -- after talking to my wife, that

25   maybe I should go to the hospital and just be looked at,

1    just to make sure everything was okay, that I didn't have

2    some kind of a poisoning from the exhaust or something of

3    that nature.  So we -- we went to the hospital.

4         Q    Okay.

5         A    And was -- you know, went to the ER.

6         Q    Okay.  And that was the ER of St. John's Hospital

7    here in Springfield?

8         A    Yes.

9         Q    According to this note, this indicates that you

10   went to the hospital on January 21 of 2005.  Is that --

11   does that sound right?

12        A    Yes.  Yes.

13        Q    Okay.  And there's a 2045 underneath where it

14   says 1/21/05.  Do you see that, sir?

15        A    Yes.

16        Q    And I presume that's military time for 8:45 p.m.

17   in the evening.  Does that sound about the time that you

18   went there?

19        A    That's probably -- yeah, that's probably right.

20        Q    All right.  And you went there with your wife?

21        A    Yes.

22        Q    Okay.  Do you remember the name of the doctor

23   that you saw in the emergency room?

24        A    Dr. K.

25        Q    Okay.  I don't blame you.

1    A    I can't pronounce his name.

2    Q    Kallookulangara?

3    A    That sounds right.

4    Q    Okay.  Just like it sounds.

5    A    Dr. K.

6    Q    K-A-L-L-O-O-K-U-L-A-N-G-A-R-A.  No, I read it.

7    He's got to have a name tag this big.  (Indicating)

8    A    Yes.

9    Q    All right.  Had you treated with or seen Dr. K

10   before your emergency room visit on January 21 of '05?

11   A    No.

12   Q    Okay.  I'm going to ask you a little detailed

13   information about how the procedure went in the hospital.

14   A    Okay.

15   Q    You and your wife went into the emergency room.

16   I presume they asked you for your insurance information and

17   got some basic information from you.  What -- what happened

18   when you walked in?

19   A    I -- when I walked in, the -- the admitting

20   person, nurse, whatever, asked me what the nature of my

21   problem was and I told her that -- that I was -- that I

22   wasn't feeling well, that I had -- I had severe headache,

23   kind of nauseous, you know, told her what the symptoms or

24   what the conditions was.  So at that point, they asked me

25   if I had health insurance, which I give them my card.  They

1    took the information and they brought a wheelchair over,

2    put me in a wheelchair and took me back to one of the

3    rooms.

4         Q    Okay.  Did you make a complaint of chest pain?

5         A    Yes, I did.

6         Q    Okay.  This starts off with -- and I don't intend

7    to have you try to decipher this handwriting, but it says

8    fifty-two year old male.  Were you fifty-two at the time?

9         A    Yes.

10        Q    Okay.  It says who presents with CO, which is

11   complaint of, chest pain, and then it says states that

12   chest pain started at 3:00 p.m.  Is that your understanding

13   of the -- of the history that you gave?

14        A    Yes.

15        Q    Okay.  Dr. K -- when Dr. K attended to you, did

16   he ask you for a history about what -- how you were feeling

17   and when you first started feeling bad and what the problem

18   was?

19        A    Yes.

20        Q    Okay.  And it says that you took four baby

21   aspirin in response to that pain?

22        A    Yes.

23        Q    It also goes on to say pain in upper anterior,

24   meaning front, of the chest.  Is that what you told Dr. K

25   you had?

1          A      Yes.

2          Q      And then it says tugging feeling.  Did you

3    describe to him a tugging feeling?

4          A      Yes.

5          Q      Okay.  Can you explain to me what you meant by

6    that?

7          A      Well, it just -- it felt more like a strain to me

8    than anything, because, you know, when you pry a motor or

9    lift a motor or lift a tranney, you get the same feeling.

10         Q      Okay.  And then there's a plus sign with a circle

11   in it and it says SOB.  In this case, that means shortness

12   of breath?

13         A      Yes.

14         Q      Did you complain of shortness of breath?

15         A      Yes.

16         Q      Okay.  And then it says radiation to -- into left

17   arm.  Do you remember pain radiating into your left arm?

18         A      Shoulder area, yeah.

19         Q      Okay.  And then it says tingling in the left

20   hand.  Do you remember also complaining of tingling in the

21   left hand?

22         A      Yes.

23         Q      Okay.  A little later in the report, it says has

24   had similar episodes of CP, for chest pain, in past three

25   to four months.  Do you remember telling him of a history

1    of similar chest pains in the past three to four months?

2       A    Yes.

3       Q    Okay.  And then it says occurred with exertion

4    every time.  When -- in the past, sir, during those three

5    to four months period -- during that three to four month

6    period before your emergency room visit, you had had

7    similar episodes of chest pain?

8       A    Under heavy exertion.

9       Q    Okay.  And it says occurred with exertion every

10   time?

11      A    Yeah.

12      Q    Okay.  And when you stopped the exertion, did the

13   chest pain usually go away?

14      A    Yeah.

15      Q    Okay.  What else, if anything, did they do for

16   you in the emergency room?

17      A    In the emergency room, they -- they just -- they

18   done bloodwork, they took my blood pressure, naturally,

19   put -- what do you want to call it?

20      Q    Did they do an EKG?

21      A    They did, yeah.  They did an EKG.

22      Q    They put the sticky things on the chest?

23      A    Yeah.  They did an EKG.  They did all that -- all

24   that kind of stuff.

25      Q    Okay.  Did they then decide to admit?

```
 1          A     No.

 2          Q     What happened after -- what happened that evening

 3    in the emergency room?

 4          A     After -- I was in the ER for several hours.

 5    Exact time frame, I'm not sure of.  But after all the

 6    tests, they pretty much concluded that there really wasn't

 7    anything wrong with me.  And then somehow, and I'm not -- I

 8    don't have a total recollection of everything that went on,

 9    because I was in the room, but they decided that maybe that

10    I should have a -- a catheter, you know.  And at that

11    point, that's -- they decided to do that with my

12    permission, and then they admitted me for the next day.

13          Q     Okay.  So they did an EKG first?

14          A     Uh-huh.

15          Q     And then later, there was some discussion about a

16    catheter?

17          A     Yes.

18          Q     All right.  Now, when you -- tell me what you

19    mean by a catheter in your circumstance.

20          A     Well, the -- the heart catheter.

21          Q     Okay.

22          A     They just run the tube up in you and look and see

23    if you have any blocked veins, any of that kind of stuff.

24          Q     All right.  Now, when did they decide to do that?

25          A     That was -- that was later on in the evening in
```

1    the ER.

2         Q    Okay.  So they didn't -- you didn't go home?

3         A    No.

4         Q    Did you?

5         A    No.  No.

6         Q    Okay.  So you were in the emergency room for a

7    while.  And then I -- and then I asked if they decided to

8    admit you and I thought you said no, but it's my

9    understanding you stayed in the hospital, didn't you?

10        A    Well, at one point in time, they were not going

11   to admit me.  They were going to -- Dr. K was going to

12   release me.

13        Q    Okay.

14        A    And upon Dr. Shelton, his inquiries, they decided

15   that they would admit me.

16        Q    Okay.  And who is Dr. Shelton?

17        A    He was the cardiologist.

18        Q    Okay.  Had you ever seen him before?

19        A    No.

20        Q    Okay.  And it appears that there was another

21   doctor involved by the name of Pyle, P-Y-L-E?

22        A    Dr. Pyle.

23        Q    Okay.  And who is Dr. Pyle?

24        A    Surgeon.

25        Q    Okay.  Okay.  I'm going to show you what's been

1    marked as Exhibit Number 4 to your deposition, sir.   This

2    purports to be an emergency department report from

3    St. John's Hospital.   It's three pages, and it looks like

4    it shows an admission date of January 21, 2005.   Do you see

5    that there up at the top?

6         A    Yes.

7         Q    Okay.   And it says ADM, which I think is your

8    admitting physician, and that's Dr. K, correct?

9         A    Yes.

10        Q    There is a reference on the third page of this

11   report to a Dr. Nate Blaustein, and I'll spell that for the

12   record.   It's B-L-A-U-S-T-E-I-N.   Do you know who that is?

13        A    No, I don't.

14        Q    Okay.   Does that ring a bell with you at all?

15        A    No.

16        Q    Okay.

17        A    No.

18        Q    Okay.   I'm going to show you what's been marked

19   as Exhibit Number 6 to your deposition, sir.   You'd

20   mentioned a minute ago -- when we were talking about the

21   events of that evening of January 21, you mentioned a Marc

22   Shelton?

23        A    Yes.

24        Q    And you said that he was a cardiologist?

25        A    Yes.

1    Q    Okay.  And had -- I may have asked you this and
2    I'm sorry if I'm repeating myself.  Did -- had you ever
3    seen Dr. Shelton before?
4    A    No.  No.
5    Q    Okay.  When you saw Dr. Shelton, do you recall if
6    you were still in the emergency room or if you had been
7    admitted to the regular part of the hospital?
8    A    When I talked to him?
9    Q    Yes.
10    A    I was in -- I was in the regular --
11    Q    You were in a room?
12    A    I was in a room.
13    Q    Okay.
14    A    Regular admittance.
15    Q    Okay.  You talked to Dr. K in the emergency room,
16    correct?
17    A    Yes.
18    Q    Do you remember talking to any other doctors
19    whose name you remember in the emergency room?
20    A    No.
21    Q    Okay.  Okay.  Just as Dr. K had taken a -- what's
22    called a history from you where he asks you what -- you
23    know, what your complaints are, how you're feeling, when it
24    started, if you've had it before, or how long it's lasted,
25    things like that, did Dr. Shelton take a similar history

1    from you?

2        A    Yes.

3        Q    Okay.  He asked you questions about how you were

4    feeling and how long it's -- how long it's been going on

5    and why you were there; is that correct?

6        A    Yes.  Yeah.

7        Q    Okay.  And there is a section where it says

8    history of present illness.  And what's the sticker on

9    that?  Is that Exhibit what, sir?

10       A    6.

11       Q    6?

12       A    Yes, sir.

13       Q    Fair enough.  All right.  And it says that you

14    were -- that you were in the emergency room with what's

15    called substernal chest pressure, and it talks about a

16    squeezing type of pain with some radiation into the left

17    shoulder.  Is that what you recall telling Dr. Shelton?

18       A    Yes.

19       Q    Okay.  And Dr. Shelton goes on to say that he,

20    meaning you, sir, has had it off and on for three to four

21    months, usually with exertion, usually better with rest.

22    Is that what you told Dr. Shelton?

23       A    Yes.

24       Q    Okay.  And the chest pain that you had had off

25    and on for three to four months with exertion, was that the

```
 1    same type of pain that you were feeling when you went to

 2    the emergency room?

 3         A    Not really.

 4         Q    Okay.  How was it different?

 5         A    Just -- it's hard to describe.  Just -- I -- I

 6    didn't feel quite the same.

 7         Q    Okay.  But you had told Dr. Shelton, as you had

 8    told Dr. K, that you had had chest pain on and off for

 9    three to four months, usually with exertion?

10         A    Yes.

11         Q    Okay.  And what did Dr. Shelton tell you about

12    what your course of treatment was going to be?

13         A    Well, that's when he told me that the best thing

14    would be to do -- would be to do a heart cath, and at that

15    point, he would be able to tell me if, in fact, there was

16    anything wrong or if there was nothing wrong, but based on

17    the information that he had from the ER, he said I think

18    that it will just be an in and out procedure.  We'll go in,

19    look, you'll be fine, we'll -- you'll go home.

20         Q    Okay.  Was it your understanding that the purpose

21    of the heart cath, as you called it, was to determine

22    whether or not there were blockages of any coronary

23    arteries?

24         A    Yes.

25         Q    Okay.  And did you consent to that procedure?
```

1      A    Yes.

2      Q    And they went ahead and did it?

3      A    Yes.

4      Q    Okay.  And did they do it that night, or did they

5  do it the following morning, if you know?

6      A    The following morning.

7      Q    Okay.  So that would be the 22nd?

8      A    Yes.

9      Q    January 22nd, 2005?

10      A    Yes.

11      Q    Do you know who performed the heart cath?

12      A    Yes.  Dr. Shelton.

13      Q    Dr. Shelton did.  Okay.  Did Dr. Shelton speak to

14  you about the results of the heart cath?

15      A    Yes.

16      Q    What did he say?

17      A    He said I had three -- three blocked arteries.

18      Q    And having found those three blocked arteries,

19  what did he discuss with you about your course of

20  treatment?

21      A    Actually, he said that he would discuss it later

22  in my room with Dr. Pyle, which was the surgeon.

23      Q    Okay.

24      A    Which I -- at that point, I -- I had never met.

25      Q    Okay.  Okay.  You had never seen Dr. Pyle before

1  this?

2       A    No, never.

3       Q    All right.  Let me show you what's been marked as

4  Exhibit Number 5 to your deposition, sir.  And as you'll

5  see on page two of Exhibit Number 5, this appears to be a

6  record from Dr. Pyle, a consultation report.  Does that

7  appear to be what it is?

8       A    Yes.

9       Q    Okay.  And after Dr. Shelton talked to you about

10 the fact that the cardiac catheterization had shown three

11 blocked arteries, did you then have an occasion to speak

12 with Dr. Pyle, the surgeon?

13      A    Yes.

14      Q    Okay.  And did Dr. Pyle take a history from you

15 as well, talking to you about what you'd been through and

16 how you were feeling and things like that?

17      A    No.

18      Q    He didn't?

19      A    No.

20      Q    Okay.  Where it says clinical summary on Dr.

21 Pyle's record and talks about discomfort in the chest and

22 left shoulder for several months with exertion, do you know

23 where he got that information?

24      A    Probably would have got it from either Dr. K or

25 Dr. Shelton.

1    Q    Okay.  Because that's what you had told Dr. K and

2    Dr. Shelton?

3    A    Yeah.

4    Q    All right.  And it says on January 21, 2005, he

5    came to the emergency room because of significant symptoms

6    of the same kind he has had previously.  Do you see that,

7    sir?  I'm looking where it says clinical summary.

8         MR. ENLOW:  Page one.

9    Q    (By Mr. Beatty) I'm sorry.

10    A    That's okay.

11    Q    Page one.

12    A    Yes.

13    Q    And that's Exhibit -- is that Exhibit 5?

14    A    Yes.

15    Q    Okay.  Do you see where it says clinical summary?

16    A    Yes.

17    Q    And it says patient is a fifty-two year old man

18    who's had discomfort in his chest and left shoulder for

19    several months with exertion.  Do you see that?

20    A    Yes.

21    Q    And you think that that entry is based upon the

22    information that you had provided to Dr. K and Dr. Shelton?

23    A    Yes.

24    Q    Okay.  And then there is something about an

25    episode last fall where he had an episode of severe nausea

1    and vomiting of relatively brief duration.  Do you know

2    what he's talking about there?

3        A    Yeah, because, I mean, they ask you everything.

4        Q    Sure.

5        A    And you try and help them out as best you can

6    with the knowledge, but that particular incident didn't

7    have anything to do with -- with any kind of chest pain or

8    any of that.

9        Q    Okay.

10       A    It was due to something else.

11       Q    Okay.  So that episode of nausea, as far as you

12   know, didn't have anything to do with this?

13       A    No.  No.

14       Q    All right.  But then it goes on to say that on

15   January 21, 2005, he came to the emergency room because of

16   significant symptoms of the same kind he has had

17   previously.  Do you see that?

18       A    Yes.

19       Q    And it also says that he was admitted to the

20   hospital after nitroglycerin was found to relieve his

21   discomfort.  Do you remember getting nitroglycerin?

22       A    Yes.  They did give it to me, yes.

23       Q    They did give it to you under your tongue?

24       A    No.

25       Q    How did they give it to you?

1        A      Through a drip.

2        Q      IV.  Okay.

3        A      IV.

4        Q      All right.  When it says that you came to the

5    emergency room because of significant symptoms of the same

6    kind he had previously, do you think that entry is based

7    upon information that you had provided to Dr. K and Dr.

8    Pyle -- I'm sorry, Dr. Shelton?

9        A      Yes.

10       Q      Okay.  And then it goes on to talk about the

11   results of the cardiac cath showing a one hundred percent

12   occlusion of the right coronary artery, one hundred percent

13   occlusion of the circumflex artery, sixty percent occlusion

14   of the left -- left main artery stenosis.  So then did Dr.

15   Pyle perform the heart surgery?

16       A      Yes.

17       Q      And I've seen the term in your medical records of

18   three-vessel bypass?

19       A      Yes.

20       Q      Is that the nature of the surgery?

21       A      Yes.

22       Q      To the best of your knowledge?

23       A      Yes.

24       Q      Okay.

25       A      It was a triple bypass.

1      Q    Okay.  So those three arteries that they found to

2  be clogged were bypassed?

3      A    Yes.

4      Q    And the surgery was a success, to the best of

5  your knowledge?

6      A    I'm here.

7      Q    Yep.  All right.  And then as I understand it, at

8  some point in time, either you or somebody on your behalf

9  submitted claims to Fortis Insurance Company for the cost

10  of the treatment we've just discussed?

11      A    Yes.

12      Q    Okay.  And I imagine that was quite a bunch of

13  bills?

14      A    Yes.

15      Q    Do you have any idea the -- and I'm not going to

16  hold you to it.  I just want a ball park, your best

17  estimate, subject to confirmation with the actual records,

18  but do you have any idea how much bills we're talking about

19  for your hospitalization and treatment at St. John's in

20  January of 2005?

21      A    In excess of a hundred thousand.

22      Q    Okay.  And is it correct, sir, that after you

23  were discharged from the hospital, that you went through

24  some sort of a cardiac rehabilitation program?

25      A    No, I did not.

1    coverage.

2         Q    Okay.

3         A    The first correspondence we had with them said

4    that -- and I'm not exactly sure how they worded it, but it

5    was just like that everything was being looked at.

6         Q    Okay.  Did you eventually get some sort of

7    notification from Fortis that the bills were not going to

8    be paid?

9         A    Yes.  We just -- we started getting denials.

10        Q    Okay.  What was the reason for the denial?

11        A    Pre-existing condition.

12        Q    Okay.  And did they say why -- did the company

13   say why it considered your treatment to be a

14   pre-existing -- for a pre-existing condition?

15        A    No.

16        Q    Okay.  Once you started -- and this

17   communication, did this come in the form of a letter?

18        A    Yes.

19        Q    Okay.  Once you got the letter saying that they

20   were going to deny your claim on the basis of pre-existing

21   condition, what, if anything, did you do in response to

22   that letter?

23        A    Well, we -- I -- I contacted Fortis Insurance by

24   telephone.

25        Q    Do you remember who you spoke to?

1    Q    Okay.  Okay.

2    A    Yeah.  Never been treated.

3    Q    Right.  Do you recall, when we were looking at

4    the definition of pre-existing condition on page nineteen

5    of your certificate, that one of the ways that the policy

6    defines a pre-existing condition is if you were diagnosed

7    or treated by a physician within twenty-four months prior

8    to the effective date of coverage?

9    A    Yes.

10    Q    Okay.  And, in fact, according to your testimony

11    and according to what you told Fortis, you had not been

12    treated by a physician or diagnosed with any sort of heart

13    condition within twenty-four months, within the two years

14    prior to the effective date of coverage?

15    A    Right.  Yes.

16    Q    And it was for that reason that you told Fortis

17    in your letter to them, Exhibit Number?

18    A    7.

19    Q    -- 7, that it was not a pre-existing condition?

20    A    Yes.

21    Q    Okay.  Is it also your understanding, from what

22    we had read about the policy definition of pre-existing

23    condition, that regardless of diagnosis or treatment, if

24    the illness or condition produces symptoms within twelve

25    months prior to the effective date of coverage that would

1    have caused an ordinarily prudent person to seek medical

2    diagnosis or treatment, that that is also pre-existing

3    condition?

4        A    Yes.

5        Q    Okay.  So you don't have to have diagnosis or

6    treatment in order for a condition to be pre-existing,

7    correct?

8        A    The way it reads, yes.

9        Q    Yes.  You have to have a symptom during the year

10   preceding the effective date of coverage that would have

11   caused an ordinarily prudent person to seek medical

12   diagnosis or treatment?

13       A    Yes.

14       Q    Okay.  And you had told Dr. K as well as Dr.

15   Shelton that for three to four months prior to your

16   emergency room visit in January of 2005, that you had had

17   complaints of -- you had -- you had experienced chest pain

18   upon exertion?

19       A    Yes.

20       Q    Okay.  But as I also understand it, when you had

21   experienced those chest pains during that three to four

22   month period prior to January 21 of 2005, you had not gone

23   to the doctor?

24       A    No.

25       Q    Okay.  When you had experienced those chest pains

1  during that three to four month period prior to January 21

2  of 2005, was there any reason why you didn't go to the

3  doctor?

4      A    Didn't seem bad enough.

5      Q    Okay.

6      A    I mean, I'm -- like I said, I was -- I was in my

7  fifties.  I lift motors, I lift transmissions.  I exert.

8  Just, I mean, never felt like that I ever was having any

9  kind of a heart problem, you know.

10     Q    Okay.

11     A    If you jumped up and lifted up this table, you

12  might be short of breath, mightn't you?

13     Q    Probably so.

14     A    Okay.  That's what I'm getting at.

15     Q    All right.  You had told Dr. K and also Dr.

16  Shelton that the pain that you were experiencing on the

17  evening of January 21, 2005 was of the same kind that you

18  had had previously, correct?

19     A    Similar, yes.

20     Q    Okay.  Did Dr. Shelton or Dr. Pyle tell you how

21  long they thought, or either one of them thought, that your

22  arteries had been blocked or occluded?

23     A    No.

24     Q    Okay.  Did they express any opinion to you about

25  how long this process takes to get a one hundred percent

1    occlusion of the arteries that were clogged?

2        A    No.

3        Q    Okay.  During that three to four month period

4    prior to January of 2005, when you would experience

5    these -- these chest pains, how long would they last?

6        A    Not very long.

7        Q    Can you give me a more definite idea about how

8    long that was?

9        A    Sometimes just a couple of minutes.  I mean --

10       Q    Okay.

11       A    -- nothing -- that's why I didn't think anything

12   was significant.  I mean --

13       Q    When you would experience those chest pains

14   during that three to four month period prior to January 21

15   of 2005, did you -- were you also occasionally short of

16   breath when you were experiencing those chest pains?

17       A    Not every time.

18       Q    Sometimes?

19       A    Yes.

20       Q    Okay.  During that period of time three to four

21   months before January 22 -- January 21 of 2005, did you

22   ever have pain that radiated into the left shoulder?

23       A    I -- yeah, probably, yes.

24       Q    Okay.  There's a fancy term in these records

25   called diaphoresis, which as far as I know just means

1   sweating, and according to these records, you didn't have

2   the sweating?

3       A    No, I never had sweating.

4       Q    And so would that be -- would that be also true

5   during the three to four months, that there was no

6   sweating?

7       A    Yes.

8       Q    Okay.  But during the three to four month period

9   prior to January 21, 2005, when you had chest pains, it

10  would sometimes go into the left shoulder?

11      A    Yes.

12      Q    And you would sometimes experience shortness of

13  breath?

14      A    Yes.

15      Q    Now, Mr. Jarrett, during that three to four month

16  period prior to January 21, 2005, when you experienced

17  these chest pains, what, if anything, did you do about

18  them?  In other words, did you take aspirin?  Did you lay

19  down?  How did you deal with it?

20      A    Most of the time, they just went away.

21      Q    Okay.

22      A    I mean, I didn't do -- I didn't do anything out

23  of the ordinary.

24      Q    Okay.

25      A    I mean, they -- because, like I said, most of the

ST JOHN'S HOSPITAL
Springfield, IL

01/21/05

PROGRESS RECORD

# H&P'S

Sarrett, William

Date                Providers

1/21/05   IM R3 Admit Note
2045   .... 52 y/o ♂ ‾c no significant PMHx who presents ‾c c/o
CP. States that CP started @ 3pm, took 4 baby ASA 30min later
but ∅ relief. Was exerting self when started. Pain on upper
ant. chest, "tugging feeling", ⊕ SOB, ⊕ radiation to ⊕ arm, ⊕ tingling
⊕ hand. ∅ Diaphoresis ∅ N/V. ⊕ fatigue. Has had similar episodes
of CP in past 3-4 mos. Occurred ‾c exertion everytime. Pt had
not seen MD x 10-12 yrs. Pain was 7-8/10. No CP now. Did improve
prior to presentation ∓ stopped exerting but 2hrs later still had
CP. ∅ orthopnea ∅ PND.

PMHx: ∅                          All: NKDA

Meds: ASA prn                    Surg: ∅

FamHx: Dad - MI age 62 _____ ROS: ⊕ "dizzy" spells;
Mom - Alzheimer's died age 68
3 sisters ‾c CABG age 48
4 Brothers - stent/MI age 55     Social Hx: TOB: ∅
                                 EtOH: "very moderate"
                                 illicit: ∅
                                 Works as mechanic. Lives in Kincheid
                                 ‾c wife + Daughter

Defendant's Exhibit
3
S. Mayberry

#53  PROGRESS RECORD

| | NAME: | Jarrett, William L |
|---|---|---|
| **ST. JOHN'S HOSPITAL** | ROOM: | CRUE11 |
| Springfield, IL | DOB: | 04/15/1952 |
| 217-544-6464 | MRN: | 00277641 |
| **CONSULTATION REPORT** | ACCOUNT #: | 002776411004 |
| Adm: Mathew Kallookulangara, M.D. | ADMITTED: | 01/21/2005 |
| Signing: William Pyle, M.D. | DISCHARGED: | |
| Consult: William Pyle, M.D. | DATE OF CONSULT: | 01/22/2005 |
| Date/Time Dictated | 01/23/2005  1:31 P | 000187136 |
| Transcribe Date/Time: | 01/23/2005  8:00 P | msb |
| Page 1 of 2 | | |

cc    Mathew Kallookulangara, M.D.
      William Pyle, M.D.

**REASON FOR CONSULTATION**
Consideration for coronary artery bypass grafting.

**CLINICAL SUMMARY**
The patient is a 52-year-old man who has had discomfort in his chest and left shoulder for several months with exertion. He did have one episode last fall where he had an episode of severe nausea and vomiting of relatively brief duration. He has never been diagnosed with having a myocardial infarction. On January 21, 2005, he came to the emergency room because of significant symptoms of the same kind he has had previously. He was admitted to the hospital after nitroglycerin was found to relieve his discomfort.

The patient was evaluated by Dr. Marc Shelton. It was felt that his symptoms were compatible with coronary artery disease. He was taken the cardiac catheterization laboratory on January 22, 2005, and he was found to have 100 percent occlusion of his right coronary artery, 100 percent occlusion of a circumflex artery and a 60 percent left main stenosis. An electrocardiogram taken in the emergency room revealed evidence of prior inferior infarct. The patient does not see doctors. He is not being treated for anything. He does not take any medications, but the status of his lipids is unknown. His blood pressure has been elevated each time it has been checked since he has been in the hospital so he is hypertensive. He is obese. He has very poor dentition. He has no knowledge of having diabetes. He denies being a smoker.

**ALLERGIES**
None known.

**MEDICATIONS**
None prior to being admitted to the hospital. Since being admitted, he has been started on intravenous fluids, beta blockers, anticoagulation, aspirin, nitroglycerin drip.

**PRIOR OPERATIONS**
None.

**CONSULTATION REPORT**
ORIGINAL

Defendant's Exhibit

5

S. Mayberry

| | | NAME: | Jarrett, William L |
|---|---|---|---|
| **ST. JOHN'S HOSPITAL** | | ROOM: | CRUE11 |
| Springfield, IL | | DOB: | 04/15/1952 |
| 217-544-6464 | | MRN: | 00277641 |
| **CONSULTATION REPORT** | | ACCOUNT #: | 002776411004 |
| Adm: Mathew Kallookulangara, M.D. | | ADMITTED: | 01/21/2005 |
| Signing: William Pyle, M.D. | | DISCHARGED: | |
| Consult: William Pyle, M.D. | | DATE OF CONSULT: | 01/22/2005 |
| Date/Time Dictated | | 01/23/2005  1:31 P | 000187136 |
| Transcribe Date/Time: | | 01/23/2005  8:00 P | msb |
| Page 2 of 2 | | | |

## REVIEW OF SYSTEMS
The patient is overweight. He denies a history of any medical problems, but he has not sought any medical attention. He is overweight. He has not had any neurologic symptoms. No recent weight loss or gain. No change in bowel or bladder habits. No history of bleeding tendencies.

## SOCIAL HISTORY
The patient has many family members. He is married, mechanic and lives in Kincaid, Illinois.

## PHYSICAL EXAMINATION
GENERAL: Mentally alert and oriented man with very poor dentition.
VITAL SIGNS: Blood pressure has always been in the 150-160 range when it has been checked. Heart rate is sinus rhythm in the 80s.
NECK: No carotid bruits. No lymphadenopathy.
LUNGS: Clear.
HEART: Regular rhythm. No murmurs or rubs.
ABDOMEN: Protuberant, but benign.
EXTREMITIES: No venous stasis changes, ulcerations or edema. His pulses are hard to feel, however.

## IMPRESSION
Overweight man who has been hypertensive with every measurement who has an abnormal electrocardiogram consistent with an inferior infarct. Symptoms suggestive of angina and found to have significant left main stenosis with surprisingly 100 percent of the circumflex and the right coronary artery proximally, diminished left ventricular function with an ejection fraction of approximately 35 percent.

## RECOMMENDATIONS
Coronary artery bypass grafting. Risks and rationale were discussed with the patient and multiple family members on the early afternoon of January 22, 2005. Their questions were answered. He was agreeable to proceed. Surgery is scheduled for January 23, 2005.

William Pyle, M.D.


**CONSULTATION REPORT**
ORIGINAL

| | NAME: | Jarrett, William L |
|---|---|---|
| **ST. JOHN'S HOSPITAL** | ROOM: | 0554AA |
| Springfield, IL | DOB: | 04/15/1952 |
| 217-544-6464 | MRN: | 00277641 |
| **CONSULTATION REPORT** | ACCOUNT #: | 002776411004 |
| Adm: Mathew Kallookulangara, M.D. | ADMITTED: | 01/21/2005 |
| Signing: Marc E. Shelton, M.D. | DISCHARGED: | |
| Consult: Marc E. Shelton, M.D. | DATE OF CONSULT: | 01/22/2005 |
| Date/Time Dictated | 01/22/2005 6:50 A | 000186947 |
| Transcribe Date/Time: | 01/22/2005 7:05 A | rr |
| Page 1 of 3 | | |

cc    Mathew Kallookulangara, M.D.
      Marc E. Shelton, M.D.

**CHIEF COMPLAINT**
Chest pain.

**HISTORY OF PRESENT ILLNESS**
The patient is a pleasant 52-year-old who presented to the emergency room with substernal chest pressure. The pain is a squeezing type pain with some radiation to the left shoulder. No real associated shortness of breath. Nitroglycerin seemed to help. He had no clear diaphoresis. It lasted minutes, not hours. He has had it off and on for 3 to 4 months, usually with exertion, usually better with rest. Family history is markedly positive for coronary disease. He doesn't smoke. No recent syncope or near syncope. Denies recent nausea, vomiting, melena, paroxysmal nocturnal dyspnea, or orthopnea. He is currently pain free.

**PAST MEDICAL HISTORY**
Remarkable for the above plus:

**ALLERGIES**
No known drug allergies.

**MEDICATIONS**
None at home.

**FAMILY HISTORY**
Positive for premature coronary artery disease.

**PAST SURGICAL HISTORY**
No recent surgeries.

**SOCIAL HISTORY**
He is a nonsmoker.

**REVIEW OF SYSTEMS**
No changes except for as above.

Defendant's Exhibit
6
S. Mayberry

**C O N S U L T A T I O N   R E P O R T**
**ORIGINAL**

| ST. JOHN'S HOSPITAL | NAME: | Jarrett, William L . |
| --- | --- | --- |
| Springfield, IL | ROOM: | 0554AA |
| 217-544-6464 | DOB: | 04/15/1952 |
| | MRN: | 00277641 |
| CONSULTATION REPORT | ACCOUNT #: | 002776411004 |
| Adm: Mathew Kallookulangara, M.D. | ADMITTED: | 01/21/2005 |
| Signing: Marc E. Shelton, M.D. | | |
| Consult: Marc E. Shelton, M.D. | DISCHARGED: | |
| Date/Time Dictated | DATE OF CONSULT: | 01/22/2005 |
| Transcribe Date/Time: | 01/22/2005  6:50 A | 000186947 |
| Page 2 of 3 | 01/22/2005  7:05 A | rr |

CONSTITUTIONAL: Denies recent weight gains/losses.
EYES: Denies recent vision loss.
ENT: Denies recent hearing loss.
CARDIOVASCULAR: Cardiovascular review of systems as noted above.
RESPIRATORY: Denies chronic cough or hemoptysis.
GASTROINTESTINAL: Denies melena.
GENITOURINARY: Denies dysuria.
MUSCULOSKELETAL: Denies joint stiffness/joint pain.
SKIN: Denies presence of rash.
ENDOCRINE: Denies heat/cold intolerance or increased hunger/thirst.
NEUROLOGIC: Denies numbness/tingling/weakness of extremities.
HEMATOLOGIC: Denies easy bruising/bleeding.

PHYSICAL EXAMINATION
VITAL SIGNS:  Blood pressure 160/70, heart rate 80 and regular, respirations 12.
GENERAL: Well-developed, well-nourished, in no apparent distress.
EYES: There are no xanthelasma.
ENT: Oral mucosa is without pallor or cyanosis.
NECK: Supple, without jugulovenous distention. Carotids are 2+ bilaterally, without bruits.
RESPIRATORY: No intercostal retractions noted. Chest clear to auscultation.
CARDIOVASCULAR: The point of maximal impulse is of normal size and nondisplaced. Normal S1 and S2, without S3 or S4 gallop. No significant murmur is present.
ABDOMEN: Benign, without hepatosplenomegaly, mass or tenderness. The abdominal aorta is not palpably enlarged. No abdominal bruit present.
EXTREMITIES: Without cyanosis, clubbing, or edema. The femoral and pedal pulses are 2+ bilaterally.
MUSCULOSKELETAL: No severe kyphoscoliosis noted.
SKIN: Without evidence of xanthoma.
NEUROLOGIC: Alert and oriented x3, affect appropriate. Neurologic examination grossly normal.

His CK-MB and troponin are negative thus far. Electrocardiogram shows nonspecific ST and T-wave changes. Cannot rule out inferior myocardial infarction, age undetermined.

ASSESSMENT
At this point, the patient is presenting with what sounds like unstable angina. I have discussed the situation with the patient. He is currently pain free. I am recommending further evaluation be done with diagnostic cardiac catheterization. He may need stenting or bypass. We discussed the potential risks, and he voices understanding and is willing to proceed. With his multiple risk factors including the early

CONSULTATION REPORT
ORIGINAL

| ST. JOHN'S HOSPITAL | NAME: | Jarrett, William L |
|---|---|---|
| Springfield, IL | ROOM: | 0554AA |
| 217-544-6464 | DOB: | 04/15/1952 |
| **CONSULTATION REPORT** | MRN: | 00277641 |
| Adm: Mathew Kallookulangara, M.D. | ACCOUNT #: | 002776411004 |
| Signing: Marc E. Shelton, M.D. | ADMITTED: | 01/21/2005 |
| Consult: Marc E. Shelton, M.D. | DISCHARGED: | |
| Date/Time Dictated | DATE OF CONSULT: | 01/22/2005 |
| Transcribe Date/Time: | 01/22/2005  6:50 A | 000186947 |
| Page 3 of 3 | 01/22/2005  7:05 A | rr |

family history, pretest likely to find significant coronary artery disease is substantial. Therefore, I do not believe that current stress testing is safe. Further risk factor modification efforts will be underway. He is morbidly obese. Will monitor his blood pressure, monitor his rhythm. Please see my note and orders in the chart as well.


Document SIGNED by Physician
Marc E. Shelton, M.D. 02/08/2005 14:09

_____

Marc E. Shelton, M.D.

**CONSULTATION REPORT**
**ORIGINAL**

E-FILED
Thursday, 31 May, 2007  10:48:45 AM
Clerk, U.S. District Court, ILCD
6975-06008

WGB/lmm/#1624583

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| WILLIAM JARRETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:06-cv-03143-RM-BGC |
| | ) | |
| FORTIS INSURANCE COMPANY, | ) | Judge Richard Mills |
| | ) | Magistrate Judge Byron G. Cudmore |
| Defendant. | ) | |

## AFFIDAVIT OF RAYMOND SCOTT BRUMBLAY, M.D.

Your Affiant, Raymond Scott Brumblay, M.D., being first duly sworn upon oath, states and deposes as follows:

1.     I, Raymond Scott Brumblay, M.D., am a Medical Director for Assurant Health, under which the defendant, Fortis Insurance Company (now known as Time Insurance Company) operates as a duly licensed insurance company issuing policies and certificates of medical insurance coverage throughout the state of Illinois and elsewhere.

2.     I am of legal age, and am competent, qualified and authorized to make and execute this Affidavit in support of the motion of defendant, Fortis Insurance Company, for summary judgment in the above-captioned matter.

3.     I have personal knowledge of the facts and circumstances recited herein, and if called as a witness in this regard, my testimony would be the same as that which is set forth in this Affidavit.

4.     A true and correct copy of my Curriculum Vitae is attached to this Affidavit as Exhibit A.



EXHIBIT

B

To Motion for S.J.

5.     A true and correct copy of my signed Report, previously submitted in this matter pursuant to F.R.C.P. 26, is attached to this Affidavit as Exhibit B.

6.     My educational background includes an M.D. degree which was conferred by the University of Wisconsin Medical School in 1972, after which I completed a three-year residency in internal medicine at Abbott-Northwestern Hospital in Minneapolis. I am board certified in the field of internal medical and have been so accredited since 1975.

7.     Following the completion of my residency I entered into the private practice of medicine with the Milwaukee Medical Clinic, a multi-specialty medical group where I practiced internal medicine for 13 years, after which I was a solo practitioner in the same field of medicine in Milwaukee for another four years until 1992.

8.     Beginning in 1992 I was employed as an Associate Medical Director with The Mutual Group (U.S.) – Employee Benefits, performing administrative functions with regard to health insurance programs.

9.     Beginning in January of 1997 I worked as the Medical Director for Health Risk Management, and in August of that year I began my employment as an Associate Medical Director with Fortis Health which encompasses the operations of the defendant, Fortis Life Insurance Company.

10.     I subsequently became the Medical Director for the same company which is now commonly known as Assurant Health. I am currently licensed to practice medicine in the states of Wisconsin, North Carolina and Kentucky.

11.     A true and correct copy of the Certificate of medical insurance issued by Fortis Insurance Company to William Jarrett for himself and his covered dependant(s) is attached to this Affidavit as Exhibit C.

12.    The effective date of Mr. Jarrett's coverage under the aforementioned Certificate of medical insurance was January 15, 2005.

13.    Pursuant to the Certificate, covered charges are limited to those arising from an "Illness" or "Injury" of the types which are not listed in the "Exclusions" section of the Certificate, and which are otherwise covered by the terms of the Certificate.

14.    In order for an "Illness" to be considered a covered sickness, disease or condition, it must first manifest itself while coverage is in effect, in other words, it must first demonstrate signs and symptoms of its presence after the effective date of insured's coverage.

15.    The Certificate of insurance issued by Fortis Insurance Company to William Jarrett contains a limitation or exclusion of coverage for preexisting conditions.

16.    Specifically, the Certificate provides that Fortis "will not pay benefits for Covered Charges incurred due to a pre-existing condition until 12 months after Your effective date of coverage." (*See* page 19 of Exhibit C).

17.    The term "pre-existing condition" is defined in the Certificate to include either or both of the following:  (1) "Any condition that was diagnosed or treated (to include the taking of prescription drugs) by a Physician within 24 months prior to the effective date of coverage" or (2) one which "produced symptoms within 12 months prior to the effective date of coverage that would have caused an ordinarily prudent person to seek medical diagnosis or treatment." (*See* page 19 of Exhibit C).

18.    In March of 2005 I was requested to review the medical records of the plaintiff, William Jarrett, to determine whether his coronary artery disease, for which he had 3-vessel bypass surgery in January of 2005, was a preexisting condition within the meaning of his Certificate of insurance.

19.    I examined Mr. Jarrett's medical records from St. John's Hospital in Springfield, Illinois, which included an Admission Note dated January 21, 2005; a Consultation Report dated January 22, 2005 from Dr. Marc E. Shelton, the plaintiff's cardiologist; and another Consultation Report, also dated January 22, 2005, this one from Dr. William Pyle, the plaintiff's heart surgeon. True and correct copies of the aforementioned medical records are attached hereto collectively as Exhibit D to this Affidavit.

20.    The Admitting Note of January 21, 2005 shows that the plaintiff, William Jarrett, was at that time a 52-year-old male with complaints of pain in the upper front area of his chest, described as a "tugging feeling," with pain radiating into his left shoulder and tingling in his left hand. He also complained of shortness of breath and fatigue. The Admitting Note states that Mr. Jarrett gave a history of similar episodes of chest pain over the past three to four months which occurred with exertion. The Admitting Note also shows a family history of heart ailments, with plaintiff's father having experienced a myocardial infarction at age 62, along with reference to a brother having a myocardial infarction at age 55.

21.    The Consultation Report of Mr. Jarrett's cardiologist, Marc E. Shelton, M.D., shows a consultation having been performed on January 22, 2005 in which the plaintiff gave Dr. Shelton a health history of a "squeezing-type" of chest pain, with some radiation into the left shoulder, which he had experienced "off and on 3 to 4 months, usually with exertion, usually better with rest." Dr. Shelton's Consultation Report reflects a family history which "is markedly positive for coronary disease," and he characterizes the plaintiff as having "multiple risk factors," including being "morbidly obese."

22.    The Consultation Report of the plaintiff's cardiac surgeon, William Pyle, M.D., shows a consultation having been performed on January 22, 2005 which reflected that Mr. Jarrett

"is a 52-year-old man who has had discomfort in his chest and left shoulder for several months with exertion." The report of Dr. Pyle goes on to state that: "On January 21, 2005, he came to the emergency room because of significant symptoms of the same kind he has had previously." (*Emphasis added*).    Mr. Jarrett is variously described in Dr. Pyle's report as "obese," "overweight" and "hypertensive," with EKG evidence of a "prior inferior infarct." Cardiac catheterization studies showed a 100% occlusion of Mr. Jarrett's right coronary artery; a 100% occlusion of his circumflex artery; and a 60% occlusion of his left main coronary artery.

23.    Based upon my review of the aforementioned medical records, and based upon my medical training, education, experience and practice in both clinical and corporate medicine, it is my opinion that Mr. Jarrett's coronary artery diseased produced symptoms within 12 months prior to the effective date of his coverage (January 15, 2005).  It is also my opinion that given the nature and duration of Mr. Jarrett's pre-coverage symptoms (chest pain with exertion, radiating into his left shoulder, accompanied by shortness of breath), coupled with his physician condition and his family history of heart disease, that the symptoms which Mr. Jarrett  experienced during the three to four months prior to the commencement of his coverage on January 15, 2005, and his hospitalization six days later, would have caused an ordinarily prudent person to seek medical diagnosis or treatment.

24.    Mr. Jarrett's 3- to 4-month history of chest pain and related symptoms, as recorded by his physicians, presents a pattern that is classical for coronary artery disease, with chest pains occurring during exertion and resolving with rest.

25.    The symptoms of which Mr. Jarrett complained during his emergency room visit of January 21, 2005 and subsequent admission to the hospital were consistent with his prior pattern of symptoms, and is attributable to his preexisting condition of coronary artery disease.

26.    Due to the nature and extent of the occlusions found in Mr. Jarrett's coronary arteries during the cardiac catheterization procedure performed on January 22, 2005, it is my opinion that Mr. Jarrett's coronary artery disease process undoubtedly pre-dated his insurance coverage, and was a competent cause of the chest pains and related symptoms which he had been experiencing during the 3- to 4-month period which preceded both the commencement of his coverage with Fortis on January 15, 2005, and his hospitalization for cardiac care six days later.

27.    Based upon the foregoing, Mr. Jarrett's claims for benefits associated with his medical and surgical care for the period of January 21 through January 27, 2005 were denied on the basis of the preexisting nature of his condition.

28.    All of my opinions, as expressed above, as well as those set forth in my Rule 26 Report, are based upon a reasonable degree of scientific and medical certainty, and are declared by me to be true and correct.

Further the Affiant saith not.


Raymond Scott Brumblay, M.D.


STATE OF WISCONSIN          )
                            )
COUNTY OF MILWAUKEE         )


SUBSCRIBED and SWORN to
BEFORE me on this 29 day
of Maey , 2007.

NOTARY PUBLIC

- 6 -

## CURRICULUM VITAE

Raymond Scott Brumblay, M.D.
Assurant Health
501 W. Michigan
P.O. Box 3050
Milwaukee, WI 53201-3050

**Summary of Experience:**
Seventeen years of private practice in the specialty of Internal Medicine: thirteen of the years in Milwaukee Medical Clinic (a multispecialty clinic), and four years in a sole proprietorship. Four and one-half years as Associate Medical Director of The Mutual Group (US) - Employee Benefits. Medical Director of the Health Risk Management office in Milwaukee for 6 months. Since August 1997 employed with Fortis Health (now called Assurant Health), first as Associate Medical Director, now Medical Director.

**Medical Licensure:**
| | |
|---|---|
| State of Wisconsin | #18334 |
| State of North Carolina | #200400104 |
| State of Kentucky | #39386 |

**Education:**
| | |
|---|---|
| College: | University of Wisconsin- Madison, BA (Zoology) 1968 |
| Medical School: | University of Wisconsin Medical School, MD 1972 |
| Residency: | Abbott-Northwestern Hospital, Minneapolis, MN 1972-1975, Internal Medicine |
| Board Certification: | American Board of Internal Medicine 1975 |

**Experience:**
| | |
|---|---|
| 1975-1988 | Milwaukee Medical Clinic, S.C. |
| 1988-1992 | Sole Proprietor |
| 1992 | Medical Director: CNR Health |
| 1992-96 | Associate Medical Director:  The Mutual Group (U.S.) - Employee Benefits |
| 1997 | Medical Director: Health Risk Management - Milwaukee office |
| 1997-98 | Associate Medical Director: Fortis Health |
| 1999- | Medical Director: Fortis Health |

**Affiliations:**
| | |
|---|---|
| 1975-92 | Columbia Hospital (Milwaukee, WI) |
| 1977-89 | St. Michael Hospital (Milwaukee, WI) |
| 1989-90 | Columbia Independent Physicians Association board of directors |
| 1988-1992 | Medical Director: Silver Spring Convalescent Center |
| 1987-1989 | Consultant: Associates for Health Care |



EXHIBIT
A
to Brumblay App.

# REPORT OF RAYMOND SCOTT BRUMBLAY, M.D.

I, Raymond Scott Brumblay, M.D., am a Medical Director for Assurant Health/Time Insurance Company, formerly known as Fortis Insurance Company, and hereby submit this report pursuant to the provisions of F.R.C.P. 26(a)(2)(B).

## Statement of Qualifications

A true and correct copy of my current curriculum vitae, setting forth my educational background, employment history, and other pertinent information, is attached to this report.

As reflected in the attached C.V., my educational background includes an M.D. degree which was conferred by the University of Wisconsin Medical School in 1972, after which I completed a three-year residency in internal medicine at Abbott-Northwestern Hospital in Minneapolis. I am board certified in the field of internal medicine, and have been so accredited since 1975.

Following the completion of my residency I entered into the private practice of medicine with the Milwaukee Medical Clinic, S.C., a multi-specialty medical group where I practiced in the field of internal medicine for 13 years after which I was a solo practitioner in the same field of medicine in Milwaukee for another four years, until 1992.

Beginning in 1992 I was employed as an Associate Medical Director with The Mutual Group (U.S.) Employee Benefits, performing administrative functions with regard to health insurance programs. Beginning in January of 1997, I worked as the Medical Director for the Milwaukee office of Health Risk Management, and in August of that year I began my employment as an Associate Medical Director with Fortis Health which encompassed the operations of Fortis Insurance Company, which is presently known as Time Insurance Company.

I subsequently became a Medical Director for the same company which operates under the trade name of Assurant Health. I am presently licensed to practice medicine in the States of Wisconsin, North Carolina and Kentucky.

As an employee of Assurant Health/Time Insurance Company, I am not being separately compensated for my study or for testifying in this case. I have attached hereto a listing of other cases in which I have testified as an expert at trial or by deposition within the preceding four years.

## Data or Other Information Considered in Forming Opinions

My first contact with the claim of William Jarrett for benefits associated with the hospitalization and surgical treatment of his coronary artery disease in late January, 2005 occurred on or about March 25, 2005 when I was asked to determine whether the aforementioned disease constituted a pre-existing condition within the meaning of the Certificate of Medical Insurance issued by Fortis Insurance Company to William L. Jarrett, having an effective coverage date of January 15, 2005.

EXHIBIT

B

to Brumblay Aff.

In conjunction with my consideration of the question of whether or not the aforementioned disease, for which treatment was rendered, and for which benefits were sought, constituted a pre-existing condition, I examined the language of the Certificate of Insurance issued by Fortis Insurance Company to William L. Jarrett which contains an express limitation in the coverage of pre-existing conditions. In that regard, the Certificate provides that:

"We [Fortis Insurance Company] will not pay benefits for Covered Charges incurred due to a pre-existing condition until 12 months after Your effective date of coverage. After this 12-month period, benefits will be paid for a pre-existing condition on the same basis as any other condition unless the condition has been specifically excluded from coverage.

A pre-existing illness (condition) means any condition that was diagnosed or treated (to include the taking of prescription drugs) by a Physician within 24 months prior to the effective date of coverage, or produced symptoms within 12 months prior to the effective date of coverage that would have caused an ordinarily prudent person to seek medical diagnosis or treatment."

I also examined Mr. Jarrett's medical records. The records from St. John's Hospital in Springfield, Illinois show that on January 21, 2005, six days after his effective date of coverage (January 15, 2005), Mr. Jarrett presented at the emergency room to seek medical care for his chest pain symptoms. He complained of pain in the upper anterior region of his chest following exertion, which radiated into his left arm, along with shortness of breath. He reported that he had experienced similar episodes of chest pain in the preceding three to four months which occurred with exertion.

Mr. Jarrett's consulting cardiologist, William Pyle, M.D., saw Mr. Jarrett on January 22, 2005, the day after his admission to St. John's Hospital, and Dr. Pyle recorded a history that the patient is a 52-year-old man who has had discomfort in his chest and left shoulder for several months with exertion.

A previous consultation performed by Dr. Marc Shelton on January 22, 2005 showed that Mr. Jarrett had complained of sub-sternal chest pressure and a squeezing type of pain that radiated into his left shoulder. Dr. Shelton's history of Mr. Jarrett's condition showed that Mr. Jarrett had reportedly had these symptoms off and on for three to four months, usually with exertion, usually better with rest.

### Opinions to be Expressed

Based upon my education, training, background and experience, both in the private practice of medicine and in the field of administrative medicine, and to a reasonable degree of scientific and medical certainty, I have formed the following opinions based upon my review of the aforementioned data, information and materials:

1.     The recorded medical history of William Jarrett, as documented by his physicians, shows the occurrence of chest pains for three to four months prior to Mr. Jarrett's effective date

- 2 -

of coverage in a pattern that is classical for coronary artery disease, *i.e.* chest pains occurring with exertion and resolving with rest;

2.    Mr. Jarrett's condition of coronary artery disease, for which he sought and obtained medical and surgical treatment in January of 2005, meets with the definition of a "pre-existing condition" as set forth in his Certificate of Insurance in that the condition produced symptoms within the 12-month period preceding Mr. Jarrett's effective date of coverage that would have caused an ordinarily prudent person to seek medical diagnosis or treatment;

3.    Based upon the foregoing, the declination by Fortis Insurance Company of Mr. Jarrett's claims for benefits associated with his January, 2005 hospitalization, care and treatment of his coronary artery disease was medically sound and correct, and consistent with the limitations on benefits for pre-existing conditions as set for in his Certificate of Insurance;

4.    Subsequent to the formation of my initial opinion, as expressed in my HMS notes dated March 28, 2005, Mr. Jarrett's claim was independently examined in June of 2005 by Michael Kyle, M.D., who concurred with my opinion, and who concluded that: "Based upon the medical records provided, [Mr. Jarrett's] cardiac condition produced symptoms within 12 months prior to the effective date of coverage that would have caused an ordinarily prudent person to seek medical diagnosis or treatment. The condition meets the criteria for Pre-existing [conditions] as defined in the contract language [of Mr. Jarrett's Medical Certificate].";

5.    Subsequently, Mr. Jarrett's claim was again independently reviewed by another Medical Director, Dr. Charlotte Heidenreich, who concluded, in July of 2005, that: "[b]ased on the documentation [medical records] provided, coronary artery disease and related diagnoses are pre-existing. The patient presented six days after the effective date of coverage with a significant history of symptoms of coronary artery disease within 12 months prior to the effective date of coverage that would have caused an ordinarily prudent person to seek medical diagnosis or treatment".

I reserve the right to express further opinions based upon the results of ongoing discovery and investigation in this case.

Raymond Scott Brumblay, M.D.
Medical Director
Time Insurance Company

#1588077

- 3 -

CURRICULUM VITAE

Raymond Scott Brumblay, M.D.
Assurant Health
501 W. Michigan
P.O. Box 3050
Milwaukee, WI 53201-3050

**Summary of Experience:**
Seventeen years of private practice in the specialty of Internal Medicine: thirteen of the years in Milwaukee Medical Clinic (a multispecialty clinic), and four years in a sole proprietorship. Four and one-half years as Associate Medical Director of The Mutual Group (US) - Employee Benefits. Medical Director of the Health Risk Management office in Milwaukee for 6 months. Since August 1997 employed with Fortis Health (now called Assurant Health), first as Associate Medical Director, now Medical Director.

**Medical Licensure:**
| | |
|---|---|
| State of Wisconsin | #18334 |
| State of North Carolina | #200400104 |
| State of Kentucky | #39386 |

**Education:**
| | |
|---|---|
| College: | University of Wisconsin- Madison, BA (Zoology) 1968 |
| Medical School: | University of Wisconsin Medical School, MD 1972 |
| Residency: | Abbott-Northwestern Hospital, Minneapolis, MN 1972-1975, Internal Medicine |
| Board Certification: | American Board of Internal Medicine 1975 |

**Experience:**
| | |
|---|---|
| 1975-1988 | Milwaukee Medical Clinic, S.C. |
| 1988-1992 | Sole Proprietor |
| 1992 | Medical Director: CNR Health |
| 1992-96 | Associate Medical Director: The Mutual Group (U.S.) - Employee Benefits |
| 1997 | Medical Director: Health Risk Management - Milwaukee office |
| 1997-98 | Associate Medical Director: Fortis Health |
| 1999- | Medical Director: Fortis Health |

**Affiliations:**
| | |
|---|---|
| 1975-92 | Columbia Hospital (Milwaukee, WI) |
| 1977-89 | St. Michael Hospital (Milwaukee, WI) |
| 1989-90 | Columbia Independent Physicians Association board of directors |
| 1988-1992 | Medical Director: Silver Spring Convalescent Center |
| 1987-1989 | Consultant: Associates for Health Care |

## LIST OF PRIOR TESTIMONY

Dr. Brumblay has testified, either at deposition or at trial, in the following matters within the preceding four years:

Keri Buntyn, Individually and as Mother and Next Friend of Kinsey Buntyn v. Fortis Insurance Company
In the District Court of Oklahoma County, State of Oklahoma
Case No. CJ-2001-690

Thaddeus G. Baker, Jr., Parent of Grant Baker, a Minor v. Fortis Insurance Company
In the District Court of the United States in and for the State of Arizona
Case No. CIV-02-224-TUC-CKJ

Maureen Brown v. Assurant, Inc. d/b/a Assurant Health; Fortis Insurance Company; and Time Insurance Company
In the United States District Court for the Western District of Oklahoma
Case No. CIV-06-125W

Christ Medical Center v. Landa and Gary Abraham v. Fortis Insurance Company
Circuit Court of Cook County, Illinois
Municipal Department, Fifth District
Case No. 03-M5-001866

Juan Cuellar v. Fortis Insurance Company
In the United States District Court for the Southern District of Texas,
Houston Division
Case No. H-03-5795

Irma Nusret and Yassar Nusret v. John Alden Life Insurance Company and Fortis Insurance Company
Circuit Court of Cook County, Illinois
Municipal Department, Third District
Case No. 04-M3-002986

Gary Scott v. John Alden Life Insurance Company and Fortis Insurance Company
In the United States District Court for the Western District of Oklahoma
Case No. CIV-03-880-T

*#1588012*

CERTIFICATE HOLDER: William L Jarrett
CERTIFICATE NUMBER: 0058353015
Our Telephone Number: 1-800-800-1212

**FORTIS INSURANCE COMPANY**
501 West Michigan
Milwaukee, WI 53203
A Stock Company



**FORTIS**
Solid partners, flexible solutions™

# MEDICAL CERTIFICATE

Fortis Insurance Company has issued a Master Group Policy to the association to insure the Certificate Holder and Covered Dependents named on the Schedule or added by endorsement. This certificate describes the benefits available under the Master Group Policy. However, this certificate is not a legal contract. You may review the Master Group Policy at our office.

Please note that words beginning with capitals have special definitions. See the Definitions section.

Your rates will not change during the first 12 months this certificate is in force unless you change benefits, add or delete Covered Dependents, or move to another ZIP code.

## RIGHT TO EXAMINE FOR TEN DAYS

Please read your certificate carefully. If you are not satisfied, return the certificate to us or our agent within 10 days after you have received it. All premiums will be refunded and your coverage will be void.

This certificate was issued based on the information you gave us on your enrollment form. Omissions or misstatements in the enrollment form can cause claims to be denied or coverage to be rescinded. Please read the enclosed copy of your enrollment form. If any information shown is incorrect, incomplete, or if anything is missing, write to us within 10 days.

**WARNING, LIMITED BENEFITS WILL BE PAID WHEN OUT-OF-NETWORK PROVIDERS ARE USED.** You should be aware that when you elect to utilize the services of an out-of-network provider for a covered service in non-emergency situations, benefit payments to such out-of-network providers are not based upon the amount billed. The basis of your benefit payment will be determined according to your certificate's fee schedule, usual and customary charge (which is determined by comparing charges for similar services adjusted to the geographical area where the services are performed), or other method as defined by the certificate. YOU CAN EXPECT TO PAY MORE THAN THE COINSURANCE AMOUNT DEFINED IN THE CERTIFICATE AFTER THE PLAN HAS PAID ITS REQUIRED PORTION. Out-of-network providers may bill members for any amount up to the billed charge after the plan has paid its portion of the bill. Network providers have agreed to accept discounted payments for services with no additional billing to the member other than co-insurance and deductible amounts. You may obtain further information about the network status of professional providers and information on out-of-pocket expenses by calling the toll free telephone number on your identification card.

Secretary

President

EXHIBIT
C
to Brumblay Aff.

FORM 244.001.IL                    Page 1                    MEDICAL CERTIFICATE

# Table of Contents

Schedule . . . . . . . . . . . . . . . . . . . . . . . . PAGE 3

Definitions . . . . . . . . . . . . . . . . . . . . . . PAGE 5

When Your Coverage Begins and Ends . . . . . . . . . . . . PAGE 9

Health Care Review . . . . . . . . . . . . . . . . . . PAGE 11

How to File a Claim for Benefits . . . . . . . . . . . . . PAGE 12

Covered Medical Services . . . . . . . . . . . . . . . . PAGE 13

Covered Prescription Drug Services . . . . . . . . . . . . PAGE 17

Pre-existing Conditions Limitation . . . . . . . . . . . . PAGE 19

Exclusions . . . . . . . . . . . . . . . . . . . . . . PAGE 19

Coordination of Benefits . . . . . . . . . . . . . . . . PAGE 21

Other Provisions . . . . . . . . . . . . . . . . . . . PAGE 23

# FORTIS INSURANCE COMPANY

## SCHEDULE

Cert Holder:  William L Jarrett                Certificate Number:  0058353015

SSN: ▓▓▓▓▓▓▓                                   Effective Date:  01/15/2005

Type of Plan:  Family Plan

Benefits will be paid for Covered Charges you incur while your coverage is in force. Payment of benefits will be subject to all benefit provisions and other conditions of this plan. After you have paid any Deductible or Copayment, we will pay benefits for Covered Charges at the Rate of Payment up to the Out-of-Pocket Limit and subject to the Calendar Year and Lifetime Maximum Benefit.

For most services the Rate of Payment for a network provider is more than the Rate of Payment for an out-of-network provider. However, if you receive Emergency Treatment from an out-of-network provider when You cannot reasonably reach a network provider, benefits will be paid as if received from a network provider. In these cases, after the insured's condition is stabilized, We reserve the right to condition payment of subsequent charges at the network Rate of Payment upon transfer to a network facility. A network provider is any Health Care Provider or Hospital participating in the network provider plan. The list of network providers is subject to change. You are responsible for calling the network manager to verify the participation status of a provider prior to treatment. Covered Charges incurred after a provider's participation in the network provider plan has terminated will be subject to the normal provisions of this plan, including medical Deductible and out-of-network Rate of Payment.

See the Covered Medical Services and the Covered Prescription Drug Services sections for any limits that apply to benefits.

(Schedule continues on next page.)

| | |
|---|---|
| Calendar Year Maximum Benefit for each Insured | $250,000 |
| Lifetime Maximum Benefit for each Insured | $2,000,000 |

Medical Deductible
Individual medical Deductible each calendar year (January 1–December 31) $ 2,500
Maximum family medical Deductible each *calendar year* $ 7,500

Medical Out-of-Network Deductible (In addition to the plan Deductible)
Individual medical out-of-network Deductible each calendar year (Jan 1–Dec 31) $ 1,000
Maximum family medical out-of-network Deductible each calendar year $ 3,000

Rate of Payment (unless listed elsewhere on this schedule)     Network     75%
Out-of-Network     55%

Medical Out-of-Pocket Limits
Individual Out-of-Pocket each *calendar year* $ 5,500
Family Out-of-Pocket each *calendar year* $ 13,500

Medical Out-of-Network Out-of-Pocket Limits
Individual Out-of-Pocket each *calendar year* $ 10,500
Family Out-of-Pocket each *calendar year* $ 23,500

## Covered Services

Outpatient Services
$ 10,000 Maximum Benefit per Calendar Year for each Insured

Ambulance Servcies
$1000 maximum per trip, limited to one trip per Calendar Year

Physical, Speech and Occupational Therapy
$50 maximum per visit, limited to 2 visits per Calendar Year

Emergency Room
$ 75 Access Fee per emergency room visit. Charges subject to Deductible and Rate of Payment after Access Fee.

Rehabilitation Services
$100 maximum per day, limited to     50 Inpatient days per Calendar Year

## Prescription Drugs
Prescription Drug Calendar Year Maximum Benefit for each Insured     $250,000

Brand Name Prescription Drug Deductible
Individual Brand Name Prescription Deductible each calendar year $ 500
Maximum family Brand Name Prescription Deductible each calendar year $ 1,000

Generic Prescription Drug Deductible     $ 0

Generic Drugs
$ 15 Copayment;     100% Rate of Payment after Copayment
$ 30 Mail Order Prescription Drugs Copayment;     100% Rate of Payment after Copayment

Brand Name Drugs
$ 25 Copayment;     50% Rate of Payment after Copayment
$ 65 Mail Order Prescription Drugs Copayment;     50% Rate of Payment after Copayment

## COVERED DEPENDENTS

Vivian M Jarrett     12/02/1952

## BENEFIT SCHEDULE

FORM          BENEFIT DESCRIPTION

244-1L        Medical Expense Coverage

# Definitions

The capitalized terms used in this certificate are defined below. However, "we," "our," "us," "you" and "your" are defined but not capitalized. Just because a term is defined does not mean it is covered. See the Covered Medical Services, Covered Prescription Drug Services and Exclusions sections.

**Access Fee**  
The dollar amount you pay each time you receive a certain covered service. This amount will not be applied to any Out-of-Pocket Limit or Deductible. Covered Charges are subject to Deductible and Rate of Payment even when an Access Fee is applied.

**Calendar Year Maximum Benefit**  
The maximum amount we will pay for Covered Charges incurred by an Insured in any one calendar year while this coverage is in force.

**Common Accident Deductible**  
If more than one Insured is injured in the same accident, only one individual medical Deductible must be met for all Covered Charges for that accident within 90 days of the accident.

**Copayment**  
The dollar amount you pay each time you receive a covered service. This amount will not be applied to any Out-of-Pocket Limit or Deductible.

**Covered Charges**  
An allowable charge for treatment that we determine is:

- provided by a Health Care Practitioner, facility or supplier,
- Medically Necessary,
- incurred by an Insured for an Illness or Injury,
- listed in the Covered Medical Services or Covered Prescription Drug Services sections, and
- not listed in the Exclusions section.

We will determine how much of a Covered Charge is allowable using the following:

- the actual charge;
- relative value scales which include difficulty, work risk and materials used;
- regional geographic factors for your area or a comparable area; and
- the rate we negotiate with the provider of service.

Treatment is the medical or surgical management of a patient. Treatment includes any prescribed service, supply, test, consultation, advice or Prescription Drug.

**Covered Dependent**  
The Certificate Holder's lawful spouse; or child who is age 18 or less and either a natural child, a child legally adopted or placed for adoption, or a stepchild.

- If an unmarried child is age 23 or less, the child will be considered a Covered Dependent if you submit proof that the child meets the standards for a full-time student at an accredited educational institution. The student will be considered a Covered Dependent until the student is no longer a full-time student, graduates, attains age 24, or marries, whichever occurs first.
- An unmarried child of the Certificate Holder who is Totally Disabled will be considered a Covered Dependent. The child must depend upon the Certificate Holder for financial support or upon other care providers for lifetime care and supervision.

As used here, "depend upon other care providers" means requiring residential services licensed or certified by the State of Illinois. Proof of support must be given to us no later than 31 days after we notify you of this option. Additional proof may be requested annually.

If children only are covered, siblings of the Certificate Holder will be considered Covered Dependents if they meet the above rquirements.

**Custodial Care**
Services that:

- do not contribute substantially to the improvement of a medical condition according to accepted medical standards;

- are provided primarily to assist with daily living activities; and

- are supportive or primarily for the purpose of providing companionship or ensuring safety.

**Deductible**
The amount of Covered Charges you must pay each calendar year before we pay benefits. Once three or more Insureds have collectively met the maximum family medical Deductible, no additional Deductible will be taken during the calendar year.

**Emergency Treatment**
Treatment for an Illness or Injury which presents symptoms of sufficient severity that, in the absence of immediate medical attention, a prudent person would expect serious jeopardy to health, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part.

**Experimental or Investigational Services**
Treatment that, at the time the charges were incurred, we determine was:

- not proven to be of benefit for the diagnosis or treatment of the Illness or Injury; or

- not generally used or recognized by the United States medical community as safe, effective, or appropriate for the Illness or Injury; or

- in the research or investigational stage; or

- not generally accepted throughout the United States as we determine by reference to English language peer review literature, consultation with physicians, authoritative medical compendia, the American Medical Association, and other pertinent professional medical organizations or governmental agencies.

**Health Care Practitioner**
Any person who is state-licensed to treat the Illness or Injury for which a claim is made.

**Hospital**
A state-licensed facility accredited by the Joint Commission on the Accreditation of Healthcare Organizations (JCAHO) that is not primarily a nursing home, convalescent home, a place for the aged, or for Custodial Care.

**Illness**
A sickness, disease or condition that first manifests itself while covered under this plan.

**Injury**
Accidental bodily damage, occurring unexpectedly and unintentionally, and sustained while covered under this plan.

**Inpatient**
Admitted to a Hospital or other state-licensed facility for a stay of at least 24 hours and where a charge is made for room and board or observation.

**Insured**
Any person named on the Schedule or added by endorsement.

**Lifetime Maximum Benefit**
The maximum we will pay for Covered Charges incurred by an Insured while covered under this plan or any other plan we have issued over the lifetime of that person.

| | |
|---|---|
| **Master Group Policy** | The policy which is issued to the association. |
| **Medically Necessary** | Treatment that we determine: |

- is appropriate and consistent with the diagnosis and is in accordance with accepted United States medical practice and federal government guidelines;
- can reasonably be expected to contribute substantially to the improvement of a condition resulting from an Illness or Injury;
- is not for Experimental or Investigational Services;
- is provided in the least intense setting without adversely affecting the condition or the quality of medical care provided; and
- is not primarily for the convenience of you, your family, your Health Care Practitioner, or provider.

<u>Prescription by a Health Care Practitioner does not automatically make treatment Medically Necessary.</u>

| | |
|---|---|
| **Mental Illness** | All conditions classified as mental disorders as shown in the International Classification of Diseases (ICD). |
| **Morbid Obesity** | At least two times normal body weight or a body mass index of 40 or more. |
| **Out-of-Pocket Limits** | The maximum dollar amount you pay each calendar year in Deductible and coinsurance for Covered Charges before we pay 100% of Covered Charges. Once two or more Insureds have collectively met the maximum family Out-of-Pocket limits, we will pay 100% of Covered Charges for all Insureds.<br><br>The following do not count toward any Out-of-Pocket Limit: any Access Fee, any Copayment, any Prescription Drug Deductible, Ancillary Charge, or coinsurance; any penalty applied under the Health Care Review section; and any amount not paid by us due to the difference between the out-of-network benefit and the benefit that would have applied had you used a network provider or pharmacy. |
| **Outpatient** | Services, supplies or treatment received at a Hospital or other licensed medical facility for a stay of less than 24 hours on other than an Inpatient basis. |
| **Prescription Drug** | Any medication that has been fully approved by the Food and Drug Administration (FDA) and that can be legally dispensed only with a Health Care Practitioner's prescription. |
| **Rate of Payment** | The percentage of Covered Charges we will pay. You are responsible for any balance (coinsurance). |
| **Rehabilitation Services** | Acute services provided while confined in a Hospital, a state-licensed rehabilitation facility accredited by the Commission on Accreditation of Rehabilitation Facilities (CARF), or a residential treatment facility that is part of an accredited rehabilitation program. |
| **Serious Mental Illness** | Psychiatric illnesses as defined in the most current edition of the Diagnostic and Statistical Manual (DSM) published by the American Psychiatric Association. Serious Mental Illness include: (a) schizophrenia; (b) paranoid and other psychotic disorders; (c) bipolar disorders (hypomanic, manic, depressive, and mixed); (d) major depressive disorders (single episode or recurrent); (e) schizoaffective disorders (bipolar or depressive); (f) pervasive developmental disorders; (g) obsessive-compulsive disorders; (h) depression in childhood and adolescence; and (i) panic disorder. |

| | |
|---|---|
| **Substance Abuse** | Abuse of, addiction to or dependency on drugs, chemicals or alcohol. |
| **Total Disability** | You are being treated and under the regular care of a Health Care Practitioner for a specific condition and because of that Illness or Injury: |

- are unable to perform all of the essential duties of any occupation you are reasonably fitted for by education, training or experience; or

- you are unable to engage in the normal and customary activities of a person of the same age and sex if you are not employed.

| | |
|---|---|
| **We, Us, Our** | Fortis Insurance Company. |
| **You, Your** | Any person named on the Schedule or added by endorsement. |

# When Your Coverage Begins and Ends

**Eligibility and Effective Date**
To be insured under this plan, the Certificate Holder must be a member of the association and a resident of the state where the certificate is issued. The Insured must complete an enrollment form and a health assessment upon enrollment. You are covered under this plan as of 12:01 a.m. standard time at your residence on the effective date of your certificate or the endorsement date if Covered Dependents are added.

1.  **Adding Newborn and Adopted Children:** A newborn or adopted child will be covered if the child is a Covered Dependent, written enrollment is made to Us, and We receive any required premium within 31 days of birth or adoption.

    If this is an individual plan and these requirements are not met, the child will not be covered from birth or adoption. However, if this is a family plan, the child will be covered for the first 31 days from birth or adoption.

2.  **Adding Any Other Eligible Dependent:** To add any other Covered Dependent, written enrollment with evidence of insurability must be submitted for our approval along with any required premium.

**Termination**
The Certificate Holder may cancel this coverage at any time by sending us written notice. Upon cancellation, we will promptly return the unearned portion of any premium paid.

This certificate will terminate at 12:01 a.m. standard time at the Certificate Holder's residence on the date:

*   requested in writing or the date We receive the request, whichever is later;

*   on which no further premium is received;

*   there is fraud or material misrepresentation made by or with the knowledge of any Insured applying for this coverage or filing a claim for benefits;

*   all certificates with the same form number are non-renewed or cancelled in the state in which Your certificate was issued or the state in which You presently reside;

*   You move outside of the service area, if You have a PPO plan;

*   You become eligible for Medicare, if allowed by federal law; or

*   You are no longer a Covered Dependent.

We will pay benefits to the end of the time for which we have accepted premiums.

**Conversion**
A Covered Dependent who is no longer eligible for coverage under this plan can obtain a conversion policy without evidence of insurability. Written application, signed by one of our licensed agents, must be made within 60 days after the Covered Dependent's coverage terminates.

**Reinstatement**
If any premium is not paid within the time required, your coverage will lapse. We will reinstate your coverage, provided:

*   the lapse was not more than 6 months,

*   your supplemental enrollment form is furnished to us, and

*   we approve your request for reinstatement.

Your coverage will be reinstated on the date we approve the request. If we have not responded to the reinstatement request by the 45th day after it is received by us, your coverage will be reinstated on that date.

After your coverage is reinstated, you and Fortis Insurance Company will have the same rights as existed before your coverage lapsed.

No benefits will be paid for any condition not fully disclosed on the enrollment form for reinstatement if, during the time between the lapse date and the reinstatement date:

- you received medical treatment, diagnosis, consultation, or service, or took Prescription Drugs;
- or the condition produced symptoms or was capable of being diagnosed.

This limitation will apply until coverage has been in force for 12 months after the reinstatement date, unless the condition has been specifically excluded from coverage.

**Extension of Benefits During Total Disability**
If you are Totally Disabled on the date this coverage terminates, we will extend benefits for the Illness or Injury that caused the Total Disability. We will pay benefits subject to the terms, limits and conditions of this plan. Premium payment will not be required during the extension of benefits period.

You will need to submit medical documentation verifying your Total Disability within 60 days of termination. The extension will end when you are no longer totally disabled, or at the end of a 365 day period after the date your insurance terminates, whichever occurs first.

**Renewal**
This Certificate is renewed on each premium due date while coverage is in effect.

**Modification of Your Coverage**
The Master Group Policy may be changed at any time. We will give the association 30 days notice prior to any change. In addition, at renewal, We may uniformly modify benefits for all certificates with Your plan of coverage. You will receive an amendment to Your certificate showing any change.

# Health Care Review

When you need Inpatient treatment or Outpatient surgery, call the toll free number on your identification (ID) card. We will review the proposed medical care with you or your provider to determine the appropriateness of treatment and to assist you with discharge needs. We will notify you and your Health Care Practitioner of the review outcome.  For an Inpatient stay, we will also notify the Hospital.

Contact us for the following:

- **Nonemergency Confinement:**  Call at least 7 days prior to an Inpatient Hospital stay. A nonemergency confinement is an Inpatient stay for an Illness or Injury that is not immediately life-threatening but is Medically Necessary.

- **Emergency Confinement:**  Call within 24 hours, or as soon as reasonably possible, after an Inpatient admission for Emergency Treatment.

- **Emergency Confinement in Non-network Hospital or Facility:**  If You or a Covered Dependent are admitted to a Non-network facility because of an emergency, follow the instructions above for Emergency Confinement.  In these cases, after the insured's condition is stabilized, We reserve the right to condition payment of subsequent charges at the network Rate of Payment upon transfer to a network facility.

- **Maternity:**  Call within the first 12 weeks of confirmation of a pregnancy by a Health Care Practitioner.

- **Organ or Cellular Transplant:**  Call prior to any transplant evaluation, testing, preparative treatment or donor search.

- **Outpatient Procedures:**  Call at least 7 days prior to a scheduled Outpatient procedure.

- **Durable Medical Equipment**

- **Inpatient Rehabilitation Services**

- **Skilled Nursing Facility Confinement**

- **Hospice Care**

- **Parenteral (Intravenous infusion) Therapy**

The review process must be repeated if treatment is received more than 30 days after the review or if a new Health Care Practitioner or facility is used.

The Health Care Review requirements above are included to assist you in obtaining the most appropriate health care. If these guidelines are not followed, your benefits will be reduced by 25% to a maximum of $1,000 for any service requiring Health Care Review.

**Health Care Review is not the same as "verification of benefits" and does not guarantee that benefits will be paid. Health Care Review addresses only the Medical Necessity and appropriateness of the care to be received. Payment of benefits is subject to all the terms, limits, and conditions of this plan.**

# How to File a Claim for Benefits

Most providers will file claims directly with us. You are responsible for filing your claim with us only if the provider does not file it. The following provisions tell you how to file your claims with us.

Notify us in writing within 60 days after receiving a covered service or as soon as reasonably possible. Include your name and certificate number. Sending us a bill satisfies this requirement.

If you are sending bills directly to us please send an itemized bill and not a balance due statement. Include your certificate number or Social Security number.

Unless you are declared incompetent by a court of law, bills must be sent to us within 15 months of the date of loss. To determine our liability, we may request that you furnish proof of benefits from other sources, proof that you have applied for all benefits from other sources, and confirmation that you have furnished all necessary proof to receive them.

### Claim Forms
Upon receipt of a notice of claim, we will furnish you such forms as are usually furnished by us for filing proofs of loss. If such forms are not furnished within 15 days after the giving of such notice you will have complied with the requirements of this policy as to proof of loss upon submitting, within the time fixed in the policy for filing proofs of loss, written proof covering the occurence, the character and the extent of the loss for which claim is made.

### Claim Payment
We pay either you or your provider for covered services. Benefits will be paid within 30 days after receipt of due written proof of loss. You or the provider will be notified within 30 days after receipt of the claim for health care services if additional information is required. Any benefits not paid within these time limits shall entitle the payee to interest at the rate of 9% per year from the 30th day after receipt of such proof of loss to the date of payment. Interest amounting to less than one dollar will not be paid. Upon your death, we will pay benefits at our option to your spouse, the providers of the treatment or your estate.

### Fraud or Misrepresentation
No payments will be made for claims involving fraud or misrepresentation. If benefits are paid for a claim involving fraud or misrepresentation we will be entitled to a refund from you or the provider.

### Overpayment
We make every effort to pay claims promptly and correctly. However, if we make incorrect payments we will be entitled to a refund from you or the provider of the services.

# Covered Medical Services

Covered Medical Services include only Covered Charges for the services and supplies listed in this certificate. Charges are subject to all the terms, limits and conditions of this plan. After you have paid any Deductible or Copayment, we will pay benefits for Covered Charges at the Rate of Payment up to the Out-of-Pocket Limit and subject to the Calendar Year and Lifetime Maximum Benefit.

Preauthorization is required for some services to ensure maximum benefits. Please see the Health Care Review Section.

**Hospital Services** include:

- daily room and board up to the semi-private room rate;

- confinement in a critical care unit; and

- all other Inpatient or Outpatient treatment provided by a Hospital or Ambulatory Surgical Center, including charges incurred and anesthesia provided, in conjunction with dental care that is medically necessary for a child age 6 or under; an individual with a medical condition that requires hospitalization or general anesthesia for the dental care; or the individual is disabled. An Ambulatory Surgical Center is a state-licensed facility, other than a Hospital or Health Care Practitioner's office, providing surgical treatment.

Rehabilitation Services provided while confined in a Hospital are covered under the Rehabilitation Services Section.

**Health Care Practitioner Services** including surgery and anesthesia.

**X-ray and laboratory services,** subject to the Outpatient Calendar Year Maximum.

**Professional ground or air ambulance services** to the nearest Hospital that can provide Emergency Treatment for the Illness or Injury. Other types of transportation will not be covered.

**Supplies and durable medical equipment** for the lesser of the rental or purchase price. This coverage is limited to:

- basic prosthetic devices;

- splints, trusses, crutches and orthopaedic braces;

- oxygen and equipment for its administration;

- one standard non-motorized wheelchair and/or basic hospital bed;

- one newborn phototherapy light and/or one apnea monitor; and

- other durable medical equipment or supplies that we determine to be covered.

Repair, replacement or duplicates are not covered.

Durable medical equipment is equipment that can withstand repeated use and is used primarily to serve a medical purpose. It is generally not useful in the absence of an Illness or Injury, and is appropriate for use in the home. Benefits are subject to the Outpatient Calendar Year Maximum.

**Hospice care services** provided in either an Inpatient or home setting. A state-licensed hospice must be Medicare certified and/or accredited by the Joint Commission on Accreditation of Healthcare Organization (JCAHO).

Hospice care includes two visits for counseling services for you and one visit for bereavement counseling for you after an Insured's death.

**Skilled nursing facility services** up to       30 days each calendar year. Covered services in a state-licensed skilled nursing facility include room and board, nursing and ancillary services. Subacute care provided in a Hospital or state-licensed subacute facility is covered under this provision.




**Rehabilitation Services** includes acute Rehabilitation Services provided while confined in a Hospital or Rehabilitation Facility. Rehabilitation services are no longer covered when we determine measurable progress toward expected otucomes has stabilized or is inconsistent.

**Physical, Speech & Occupational Therapy:** Outpatient physical, speech and occupational therapy services are limited to       2 visits each calendar year, with a maximum payment of $       50. Benefits are subject to the Outpatient Calendar Year Maximum.

**Temporomandibular joint (TMJ) and craniomandibular joint (CMJ) dysfunction:** Benefits for surgical and nonsurgical treatment are limited to a maximum lifetime benefit of $   1,000. Covered Charges for nonsurgical treatment are limited to diagnostic examinations, diagnostic x-rays, injection of muscle relaxants, therapeutic drug injections, physical therapy, diathermy and ultrasound therapy.

TMJ or CMJ is any jaw/joint disorder causing pain, swelling, clicking and difficulties in opening and closing the mouth; and complications including arthritis, dislocation and bite problems of the jaw.

**Transplantation Benefit:** No benefits will be paid for any organ, tissue or cellular transplants not reviewed by us prior to transplantation evaluation, testing or donor search.

Transplant benefits include all related expenses from 14 days before transplant until 365 days after transplant. The maximum benefit for potential donor and donor expenses for an individual that is not an insured is $ 10,000 for each transplant and is applied to the transplant benefit.

All transplant related claims continue to apply to the Calendar Year and Lifetime Maximum Benefit.

When generally accepted indications and standards for transplantation are met and all assessments required by the treating institution are successfully completed, Covered Charges include the following solid organ transplants and marrow reconstitution or support.

Solid Organ Transplants

- heart
- lung
- combined heart/lung
- combined kidney/pancreas
- liver (Candidates for liver transplantation must have abstained from alcohol for one year immediately prior to transplantation.)

Marrow Reconstitution or Support (often called Bone Marrow Transplant or Stem Cell Transplant) is a transplantation procedure in which human blood precursor cells are administered to a patient following myelosuppressive or ablative therapy. Such cells may be derived from bone marrow or circulating blood, obtained from the patient in an autologous harvest, or from a matched donor for an allogenic transplant. The marrow reconstitution and support procedure includes all chemotherapy, the harvesting, and the reinfusion of the marrow or blood precursor cells.

We will not pay for:

- multiple organ, tissue and cellular transplants during one operative session, except for a heart/lung, double lung or simultaneous kidney/pancreas transplant;
- any nonhuman (including animal or mechanical) organ transplant;
- transplants approved for a specific medical condition, but applied to another condition;
- the purchase price of an organ or tissue that is sold rather than donated; or
- any transplants not listed above.

**Wellness services** include services based on the published recommendations of the U.S. Preventive Services Task Force and are subject to change. Coverage herein includes:

- a baseline mammogram for women 35 to 39 years of age and an annual mammogram for women 40 year of age or older;

- an annual cervical smear or Pap smear;

- an annual digital rectal examination and a prostate specific antigen test upon recommendation of a Health Care Practitioner for asymptomatic men age 50 and over, African-American men age 40 and over, and men age 40 and over with a family history of prostate cancer;

- colorectal cancer screening as prescribed by a Health Care Practitioner, in accordance with the published American Cancer Society guidelines or other existing screening guidelines issued by nationally recognized professional medical societies or federal government agencies, including the National Cancer Institute, the Centers for Disease Control and Prevention, and the American College of Gastroenterology.

The maximum benefit payable for each calendar year is $   500.   All benefits are subject to the Outpatient Calendar Year Maximum. Benefits are available after You have been continuously insured under this plan for       12 months.

**Diabetic services** for type I, type II and gestational diabetes mellitus include

- Outpatient self-management training and education, including medical nutrition therapy, and

- 1 routine eye exam each calendar year, and

- Routine foot care exams.

Insulin, syringes and testing agents are covered under Covered Prescription Drug Services. Other equipment will be considered for coverage under the Supplies and durable medical equipment provision. Benefits are subject to the Outpatient Calendar Year Maximum.

**Injectable drugs** which require a written prescription are covered, except for insulin which is covered under Covered Prescription Drug Services. Benefits are subject to the Outpatient Calendar Year Maximum.

**Mastectomy Coverage** includes inpatient care following the surgery for a length of time determined by the Health Care Practitioner and a post-discharge physician office visit or in-home nurse visit to verify the condition of the patient in the first 48 hours after discharge.

**Reconstructive surgery after a mastectomy** includes:

- reconstruction of the breast on which the mastectomy was performed;

- surgery and reconstruction of the other breast to produce a symmetrical appearance; and

- prosthesis and treatment for physical complications at all stages of mastectomy, including lymphedemas.

**Parenteral (intravenous infusion) therapy** includes total parenteral nutrition and other fluids, blood and blood products, and medications requiring a written prescription. Benefits are subject to the Outpatient Calendar Year Maximum.

**Dental injury:** Benefits are payable for an Injury resulting from an accidental blow to the mouth causing trauma to sound teeth, the gums or supporting structures of the teeth. A sound tooth has no decay and has never had a filling, root canal therapy or crown. The treatment must begin within 90 days of the Injury and be completed within 365 days of the Injury.

We will pay benefits for the least expensive procedure that will produce a professionally adequate result. You may submit the dental treatment plan in advance for an estimate of the benefits payable. Benefits are subject to the Outpatient Calendar Year Maximum.

**Serious Mental Illness:** Benefits are payable for Medically Necessary services and treatment of a Serious Mental Illness for 45 days of Inpatient care and 35 visits for Outpatient care including group and individual sessions. Benefits are subject to all Deductibles, maximums, and other limitations of the plan.

**Coverage for Complications of Pregnancy:**  Benefits are payable for conditions such as acute nephritis, hyperemesis gravidarum, pre–eclampsia, eclampsia, premature labor, placenta previa, cardiac decompensation, missed abortion, ectopic pregnancy which is terminated, spontaneous termination of pregnancy, non–elective caesarean section which occurs during a period of gestation in which a viable birth is not possible and similar medical and surgical conditions of comparable severity.  In a Complicated pregnancy, prenatal care and normal delivery are not covered.

**Sterilization** is payable up to a maximum lifetime benefit of $    500 after you have been continuously insured under this plan for     365 days.  Benefits are subject to the Outpatient Calendar Year Maximum.

**Removal of tonsils and adenoids** are payable after you have been continuously insured under this plan for 90 days except for Emergency Treatment. The 90 days will be waived if other health insurance with reasonably similar benefits was shown on the enrollment form and was in force until the effective date of this certificate. Other health insurance includes  our short term medical plan.  Benefits are subject to the Outpatient Calendar Year Maximum.

**Surgical treatment for hernia (except strangulated or incarcerated), bunions, varicose veins and hemorrhoids** are payable after you have been continuously insured under this plan for 180 days except for Emergency Treatment. The 180 days will be waived if other health insurance with reasonably similar benefits was shown on the enrollment form and was in force until the effective date of this certificate. Other health insurance includes our short term medical plan.  Benefits are subject to the Outpatient Calendar Year Maximum.

**World wide coverage** will be provided for any treatment received outside of the United States if such treatment is rendered and covered when provided in the United States.

# Covered Prescription Drug Services

Covered Prescription Drug Services include only Covered Charges for the services and supplies listed in this certificate. Charges are subject to all the terms, limits and conditions of this plan.

## Definitions

| | |
|---|---|
| **Ancillary Charge** | The copay differential or the difference between the actual charge and the MAC list charge or Drug Formulary medication charge. The Ancillary Charge does not count toward any Deductible or Out-of-Pocket Limit. |
| **Brand Name Drug** | A drug for which a pharmaceutical company has received a patent or tradename. Compounded medications are considered to be Brand Name Drugs. |
| **Generic Drug** | A drug that has the same active ingredients as an equivalent Brand Name Drug, does not carry any drug manufacturer's brand name on the label, and is not protected by a patent. It must be listed as a generic drug by our national drug data bank. |
| **Drug Formulary** | A preferred drug list that we approve. We will periodically update the list. |
| **Maximum Allowable Cost (MAC) List** | A list of Prescription Drugs reimbursed at a Generic Drug product level. We will periodically update the list. |

## Prescription Drug Benefits

To obtain benefits at a network pharmacy, present your ID card. Certain drugs require preauthorization prior to dispensing. Once you pay the Prescription Drug Deductible and/or Copayment, any coinsurance and/or any Ancillary Charge, we will pay benefits up to a 30 consecutive day supply for each prescription or up to a 90 consecutive day supply for each prescription from the mail order service unless restricted by the manufacturer's packaging or the prescription order. Some products may be subject to additional supply, duration, lifetime, age, gender or other limits.

For Prescription Drugs and medicines we will pay up to $250,000 each year for the following:

- legend drugs and medicines that by Federal law can only be obtained with a prescription;

- injectable insulin with a prescription; and

- disposable insulin syringes, and disposable blood/urine, glucose/acetone testing agents or lancets.

If you do not use a network pharmacy, or if you do not present your ID card at a network pharmacy, you will have to pay the pharmacy in full and then file a claim form with the prescription card service administrator for reimbursement. You will be reimbursed at the negotiated rate that would have been paid to a network pharmacy for the cost of the drug minus any applicable Prescription Drug Deductible, Copayment, any coinsurance and/or Ancillary Charge.

When a Prescription Drug is available under two or more names or manufacturers' packaging or when more than one covered drug or dosage form may be used to treat a condition, we will cover the least expensive drug according to the provisions and conditions of the plan. Payment for a Prescription Drug does not mean we have any liability under Covered Medical Services. Drugs administered or dispensed by a Health Care Practitioner, Hospital or other state-licensed facility are not payable under this section. They may be covered under the Covered Medical Services section.

**Prescription Drug Exclusions**

In addition to the Exclusions section, we will not pay benefits for any of the following:

- replacement of lost, stolen, destroyed or damaged prescriptions;

- drugs or devices used to treat infertility or to promote conception;

- immunization agents, biological sera, blood, blood plasma or its derivatives;

- drugs containing nicotine or its derivatives;

- injectable drugs which we do not authorize to be paid under this benefit;

- more than we determine is an average quantity of medication required to treat an immediate condition or symptom on an "as needed" basis;

- drugs obtained outside the United States for use inside the United States unless obtained for emergency treatment of a covered Illness or Injury;

- drug delivery implants; dosage forms used primarily for the convenience of the patient;

- Prescription drugs prescribed for a non-covered Illness or Injury;

- charges for sales tax, mailing, sending or delivering of Prescription drugs;

- Prescription drugs to treat Mental Illness, depression, anxiety or other psychiatric disorders when Mental Illness coverage is not in effect;

- over-the-counter medications that can be obtained without a prescription; drugs which we determine have an over-the-counter equivalent or contain the same active ingredient(s) as over-the-counter medication; or compounded medications not containing at least one legend ingredient.

# Pre-existing Conditions Limitation

We will not pay benefits for Covered Charges incurred due to a pre-existing condition until 12 months after Your effective date of coverage. After this 12-month period, benefits will be paid for a pre-existing condition on the same basis as any other condition unless the condition has been specifically excluded from coverage.

A pre-existing illness (condition) means any condition that was diagnosed or treated (to include the taking of prescription drugs) by a Physician within 24 months prior to the effective date of coverage, or produced symptoms within 12 months prior to the effective date of coverage that would have caused an ordinarily prudent person to seek medical diagnosis or treatment.

# Exclusions

We will not pay benefits for any of the following:

- Illness or Injury eligible for benefits under Worker's Compensation, Employers' Liability or similar laws even when you do not file a claim for benefits.

- Illness or Injury caused by or resulting from:
    - war or act of war (declared or undeclared),
    - active duty in the military service of any country,
    - commission of a felony, crime or illegal act,
    - participation in a riot,
    - an Insured over age 19 being under the influence of illegal narcotics or non-prescribed controlled substances, or
    - attempted suicide or self-inflicted Injury.

- Charges that are payable or reimbursable by:
    - a plan or program of any governmental agency (except Medicaid), or
    - Medicare Part A or Part B (where permitted by law). If you do not enroll in Medicare we will estimate benefits.

- Routine hearing care, routine vision care, vision therapy, surgery to correct vision, routine foot care, or foot orthotics.

- Home Health care services

- Services and/or treatment provided by a Chiropractor.

- Cosmetic services including treatment primarily designed to change or improve appearance, self-esteem or body image and/or relieve or prevent social, emotional or psychological distress.

- Not covered services, complications of an excluded or not covered service, or charges for which you are not liable.

- Charges by a Health Care Practitioner or medical provider who is an immediate family member. Immediate family members are you, your spouse, your children, brothers, sisters, parents, their spouses and anyone with whom legal guardianship has been established.

- Custodial Care.

- Growth hormone stimulation treatment including drugs or hormones.

- Dental care not related to a dental Injury.

- Any treatment for correction of malocclusion, protrusion, hypoplasia or hyperplasia of the jaws.

- Charges for which there is automobile or liability insurance providing medical payments.
- Charges for educational testing or training, vocational or work hardening programs, transitional living, or services provided through a school system.
- Diagnosis and treatment of infertility, which is the inability to conceive despite one year without protection from pregnancy or the inability to carry pregnancies to a live birth resulting in 3 or more miscarriages prior to the 20th week of gestation.
- Maternity and routine nursery charges.
- Genetic testing, counseling and services.
- Charges for sex transformation, and treatment of sexual dysfunction or inadequacy or to restore or enhance sexual performance or desire.
- Over-the-counter products; vitamins; dietary or food supplements; herbal and homeopathic medications.
- Treatment of "quality of life" or "lifestyle" concerns including but not limited to: smoking cessation; obesity, except Morbid Obesity; weight control; hair loss; sexual function, dysfunction, inadequacy or desire; or cognitive enhancement; excessive sweating.
- Sales or other taxes.
- Treatment used to improve memory or to slow the normal process of aging.
- Telemedicine or treatment rendered without the Health Care Provider being physically present with a patient.
- Pre-natal related genetic screening or diagnostic testing, including but not limited to maternal serum alphafetoprotein, chorionic villus sampling, ultrasonography, percutaneous umbilical blood sampling, fetal skin sampling, unless maternity coverage is in force.
- Pregnancy, maternity and other expenses related to surrogate pregnancy.
- Alternative Medicine services or supplies.
- Diagnosis or treatment of Mental Illness and/or Substance Abuse, other than treatment of a Serious Mental Illness.

# Coordination of Benefits

**Definitions**

| | |
|---|---|
| **Allowable Charge** | Any charge considered to be a Covered Charge by any Plan. |
| **Plan** | Any plan which provides medical benefits or services. Plan does not include: student accident plans, Medicaid, or any group hospital indemnity plan which pays $100 per day or less. |
| **Primary Plan** | A medical Plan that determines benefits without considering the benefits of any other Plan. |
| **Secondary Plan** | A medical Plan that determines benefits after the primary Plan determines benefits. |

**How Benefits Are Paid**

| If ... | We will... |
|---|---|
| you have another medical Plan in addition to this group Plan | coordinate this group Plan's benefits with the other Plan's benefits so combined benefits do not exceed 100% of the allowable charges incurred in a calendar year. |
| you are eligible for benefits provided by another Plan but do not claim them | consider the benefits for which you are eligible as benefits provided. |
| you receive benefits from another Plan in the form of services instead of cash payments | determine a reasonable cash value for each service which will be considered the amount paid by your other Plan. |
| we are primary (see below) | pay our normal benefits. |
| we are secondary (see below) | pay the lesser of the difference between the allowable charges and the amount paid by the Primary Plan, or our normal benefits. |

When this Plan is secondary, benefits payable will be reduced so that when they are added to the benefits payable under all other Plans, they will not exceed the total Allowable Charges. If both Plans have contractual discount arrangements with a provider, the greater discount will be taken into consideration when making benefit determinations.

**Order of Benefit Determination Rules**
The first applicable rule from the following list determines which Plan pays first.

1. A Plan that does not have a coordination of benefits provision, or has a provision that differs from this one, pays first.

2. A Plan that covers the claimant as the primary Certificate Holder pays before a Plan that covers the claimant as a Covered Dependent.

3. For a child whose parents are not divorced or separated:

   - the Plan of the parent whose birthday (month & day only) is earlier in the year pays first, regardless of which parent is older.

   - if both parents have the same birthday (month & day only), the Plan covering the parent for the longer time pays first.

     If the other Plan does not have this rule, that Plan pays first.

4. For a child whose parents are separated or divorced, the order is:

- first, the Plan of the parent with child custody

- second, the Plan of the spouse of the parent with child custody

- finally, the Plan of the parent without child custody.

  If a court requires one parent to be responsible for the child's medical expenses, that Plan is the Primary Plan. If a court establishes joint custody without stating which parent is responsible for medical expenses, the rules in item #3 of this section apply.

5. If none of the above rules apply, the Plan that has been covering the claimant longer pays first.

**Our Rights Under This Section**
We have the right to release or obtain claim information from any organization or individual and pay our normal benefit to any organization which has paid benefits we should have paid.

# OTHER PROVISIONS

**Conformity With State Statutes**
If this plan is in conflict with any laws of the state where it is issued, this plan is changed to meet the minimum requirement of such laws.

**Consideration**
This certificate is issued based on the statements and agreements in the enrollment form, the exam (if required), any other amendment or supplements, and the payment of the required premium. Each renewal premium is payable on the due date subject to the grace period.

**Plan Changes**
No change in this plan will be valid unless approved by an executive officer of Fortis Insurance Company and attached to this plan. No agent or employee of Fortis Insurance Company has authority to waive or change any plan provision or waive any requirements within the enrollment form.

**Enforcement of Plan Provisions**
Our failure to enforce or require compliance with any provision within this plan will not waive, modify or render any provision unenforceable at any other time, whether the circumstances are the same or not.

**Grace Period**
There is a 31-day grace period for the receipt, at our home office, of any premium due after the first premium. If you have not paid your premium by the end of the grace period, your insurance will stop as of the last day for which premium has been paid.

No coverage will be provided during the grace period if you have similar coverage available through another carrier. Coverage will continue during the grace period unless you give us written, advance notice that coverage is to terminate.

**Grievance Procedure**
A complaint is any dissatisfaction you have regarding the services or benefits you receive from us. Call us with any complaint. We will attempt to resolve the complaint to your satisfaction. If we are unable to resolve the complaint over the phone, you can submit the complaint in writing as a formal grievance. Please contact us for more information about our formal grievance procedure.

We have the option, upon joint agreement, of initiating mediation as a means of resolving a dispute.

**Incontestability**
In the absence of fraud, all statements made on the enrollment form will be deemed representations and not warranties. After coverage has been in force for two years, no statement made in any enrollment form (unless fraudulent) will be used to void your coverage.

**Legal Action**
You cannot file a lawsuit before 60 days or more than 3 years after written proof of loss has been given to us.

**Misstatements**
If any relevant fact about you is found to have been misstated, the true facts will be used to determine if the insurance is in force. If Your age or other material information has been misstated and the premium amount would have been different had the correct information been disclosed, an adjustment in premiums may be made based on the correct information. In addition to adjusting future premiums, We may require payment of past premiums at the adjusted rate in order to continue coverage.

**Physical Exams**
We have the right to have a Health Care Practitioner examine you while a claim is pending. We will pay for the cost of these examinations.

**Premium Payments**
Premium payment on or before the effective date will keep Your coverage in force until the first renewal date. Each renewal premium is due on its due date subject to the grace period. Your premium may change on renewal because a new rate table applies, due to claims experience within Your Class of coverage, due to changes in policyholder expense, when Your age increases, family members are added or deleted, coverage is increased or decreased, if You move to a different ZIP code, or for any other reason permitted by law. Your mode of payment (monthly, quarterly or other) is subject to change at Our discretion.

**Recovery**

1.  **Subrogation Right:** Upon payment of benefits, we will be subrogated to all rights of recovery you may have against any person or organization. This includes recoveries against such third party, against any liability coverage for such third party or against your automobile insurance in the event a claim is made under the uninsured or underinsured motorist coverages. Such right extends to proceeds received by settlement, judgment or otherwise; but is limited to the amount of benefits we have paid. You must

    - do nothing to prejudice any right of recovery;

    - execute and deliver any required instruments or papers; and

    - do whatever else is necessary to secure such rights.

    If we are precluded from exercising our subrogation right, we may exercise our right of reimbursement.

2.  **Right of Reimbursement:** If benefits are paid under this plan, and you recover against any person or organization by settlement, judgment or otherwise, we have a right to recover from you an amount equal to the amount we have paid. This includes recoveries against such third party, against any liability coverage for such third party or against your automobile insurance in the event a claim is made under the uninsured or underinsured motorist coverages.

    Any payment we make prior to determination of a work—related injury must be reimbursed when you receive any payment for such injury from another source. You must notify us of any work—related claim you make and reimburse us even when your recovery is the result of settlement or compromise.

**Rights of Administration**
We maintain our ability to determine our rights and obligations under this plan including, without limitation, the eligibility for and amount of any benefit payable.

**FORTIS INSURANCE COMPANY**
501 West Michigan
P.O. Box 624
Milwaukee, WI 53201-0624



**FORTIS**
Solid partners, flexible solutions™

## Statement of Rights under the Newborns' and Mothers' Health Protection Act

Under federal law, health insurance issuers generally may not restrict benefits for any hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a vaginal delivery, or less than 96 hours following a delivery by cesarean section. However, the issuer may pay for a shorter stay if the attending provider (e.g., your physician, nurse midwife, or physician assistant), after consultation with the mother, discharges the mother or newborn earlier.

Also, under federal law, issuers may not set the level of benefits or out-of-pocket costs so that any later portion of the 48-hour (or 96 hour) stay is treated in a manner less favorable to the mother or newborn than any earlier portion of the stay.

In addition, an issuer may not, under federal law, require that a physician or other health care provider obtain authorization for prescribing a length of stay of up to 48 hours (or 96 hours). However, to use certain providers of facilities, or to reduce your out-of-pocket costs, you may be required to obtain precertification. For information on precertification, contact your issuer.

## Women's Health and Cancer Rights Act Notice

Effective October 21, 1998, the Federal Women's Health and Cancer Rights Act requires all health insurance plans that provide coverage for a mastectomy must also provide coverage for the following medical care:

- Reconstruction of the breast on which the mastectomy has been performed.

- Surgery and reconstruction of the other breast to produce a symmetrical appearance.

- Prostheses and physical complications at all stages of the mastectomy, including lymphedemas.

Covered benefits are subject to all provisions described in your plan including, but not limited to: deductible, copayment, rate of pay, exclusions and limitations.

## Notice of Privacy Practices

**This notice describes how medical information about you may be used and disclosed and how you can get access to this information. Please review it carefully.**
Effective date 4-14-03:

Fortis Health is required by law to maintain the privacy of protected health information and to provide the people we insure with this notice of our legal duties and privacy practices. Fortis Health is required to abide by the terms of the Notice.

**Who We Are**
Fortis Health is a leading national provider of health insurance for individuals, families and small employer groups. Insurance polices are underwritten and issued by Fortis Insurance Company, Fortis Benefits Insurance Company and John Alden Life Insurance Company. In business since 1892, Fortis Health provides health insurance coverage to more than one million people nationwide. Fortis Health is headquartered in Milwaukee, Wisconsin, and has operations offices in Minnesota, Idaho, Florida, Texas and Ohio. Fortis Health is part of Fortis, Inc., a financial services company that, through its operating companies and affiliates, provides specialty insurance and investment products to businesses, associations, financial service organizations and individuals in the United States. Fortis, Inc. is part of the international Fortis group, operating in the insurance, banking and investment arenas worldwide, with headquarters in the Netherlands and Belgium.

**Information We Collect**
To serve your health insurance needs, Fortis Health collects information about you. We may collect this information directly from you orally or on applications or other forms.



We also collect information from third parties such as your agent or broker, your current or former health care providers and consumer reporting agencies. In addition, this information may include your transactions with Fortis Health, its affiliates and others. It is impossible to describe every type of information that we collect, but here are some examples: your name, age, address, Social Security number, telephone number, occupation and other demographic information about you and your family; whether you are a past or present customer with us, or if you ever applied for an insurance product or service from us, as well as your history of other insurance coverage and applications (if you apply online, information is collected through an Internet "cookie" an information–collecting device from a web server); your past, present or future physical, mental or behavioral health or condition; your health care history; your history of insurance coverage, premiums, claims and payments through Fortis Health; information from consumer reporting agencies and date collection agencies.

### How Fortis Health May Use and Disclose Information About You

We use and disclose information about you in serving your health insurance needs. It is impossible to describe every type of information that we use or disclose but we have provided some examples of how we use this information to provide services to you and your dependents:

**Treatment:** Your health care provider may ask us to use or disclose protected health information in connection with treatment, including the provision, coordination, or management of health care and related services.

**Payment:** We may use and disclose protected health information for payment purposes, including billing, review of health care services, determining whether a service is "medically necessary" and for utilization review. For instance, a doctor or health facility involved in your care may forward a claim to us with your protected health information. Fortis Health must have this health information to process your claims.

**Health Care Operations:** Fortis Health may use and disclose protected health information as part of our health care operations. For example, we may use and disclose information in the underwriting process, renewal process, quality assessment activities or accreditation and certification.

**Plan Sponsors:** If you are enrolled in a group health plan, Fortis Health may provide protected health information to the plan sponsor. For instance, we may share enrollment or disenrollment information with your employer.

**Health-related Benefits and Services:** We may, from time to time, contact you about treatment alternatives or other health–related benefits, products or services that may be of interest to you, and for case management or care coordination.

**Business Associates:** Fortis Health works with companies and consultants who perform a wide variety of functions on our behalf. For example, we work with financial institutions such as agents, brokers, insurance distributors, reinsurers and excess loss insurers, non–financial institutions such as health care providers, detectors of fraud, auditors, insurance support organizations, claims handlers, underwriters, and others such as information technology specialists and consultants. At times it may be necessary for us to provide your protected health information to one or more of these outside persons or organizations who assist us with our health care operations. In all cases, we require these business associates to provide written assurances to us that they will appropriately safeguard the privacy of your protected health information.

**Individuals Involved in Your Care or Payment:** We may use or disclose protected health information to you or other family members who are covered under your health insurance policy regarding your care or payment related to your care. If you object to our use or disclosure of your protected health information in communications with other family members covered under your health insurance policy, please contact our customer service department and ask for the *Right to Restrictions* form, or visit our website at **www.fortishealth.com.** This request must be made in writing and signed by you or your legally authorized representative.

**Permitted or Required by Law:** Fortis Health may release information when requested by law enforcement officials or when permitted or required by law. If you are involved in a lawsuit or dispute, Fortis Health may need to disclose protected health information in response to a court or administrative order.

**More Stringent Laws:** Fortis Health offers health coverage in many states across the nation. In some cases we may be required to follow the state law provisions on use and disclosure of your protected health information, which may be more stringent than those outlined in this notice.

**Our Security Safeguards**
Fortis Health has established safeguards to ensure the security and confidentiality of information about you. These safeguards include protection against any anticipated threats or hazards to the security or integrity of the information, as well as protection against the unauthorized access to or use of this information. We restrict access to your information to those employees "who need to know that information" to provide products or services to you or on your behalf. Any other use or disclosure of your protected health information may only be made with your written authorization, which may be revoked under certain circumstances at any time.

**Your Rights Regarding Protected Health Information**
You have the following rights regarding protected health information we maintain about you:

**Right to Access:** You have the right to request to access and/or inspect your protected health information in a designated record set. A designated record set could include information related to enrollment, premium payment, claims adjudication and medical management.
**Right to Amend:** If you feel that the information we have about you is incorrect, you may ask to have protected health information in a designated record set amended. You have the right to request an amendment as long as the information is kept and created by Fortis Health.
**Right to an Accounting of Disclosures:** You have the right to receive an accounting of disclosures made by us of your protected health information after April 14, 2003. The accounting will not include disclosures made for purposes of treatment, payment or health care operations, disclosures permitted or required by law, or disclosures to you or to third parties to whom you have authorized disclosure.
**Right to Request Restrictions:** You have the right to request a restriction or limitation on the health information we use or disclose about you for treatment, payment or health care operations. We are not required to agree to a requested restriction.
**Right to Confidential Communications:** If you feel that your life may be in danger if Fortis Health contacts you at the address or phone number maintained in our records, you may request that we contact you in a different way or at a different location.
**Complaints:** If you believe your privacy rights have been violated, you may file a complaint with Fortis Health or with the Secretary of the Department of Health and Human Services. All complaints must be in writing. You will not be retaliated against for filing a complaint. If you would like to request to access or amend your personal health information, to request restrictions on use or disclosure, to request confidential communications, or to request an accounting of disclosures, please visit our website at **www.fortishealth.com** or contact our Customer Service Department at the number listed below and ask for the appropriate form. Each form must be signed by you or your legally authorized representative. Each of the forms provides additional information relating to your rights, including the cost that may be involved to process your request.

**Changes to This Notice**
We reserve the right to make changes to this notice and to make the revised or changed notice effective for protected health information we already have about you as well as any information we receive or create in the future. Any changes to this notice will be posted on our website, and if we make substantial material changes to the notice, we will distribute the revised notice to you or your plan sponsor via mail. You may view a copy of this notice at any time at our website **www.fortishealth.com** or you may receive another copy of the notice by calling our Customer Service Department. For Fortis Insurance Company and Fortis Benefits Insurance Company call 1-800-800-1212. For John Alden Life Insurance Company call 1-800-328-4316.

Form 28280 (4/14/2003)

**FORTIS INSURANCE COMPANY**
501 West Michigan
Milwaukee, WI 53203
A Stock Company



**FORTIS**
Solid partners, flexible solutions™

### ILLINOIS
### LIFE AND HEALTH INSURANCE GUARANTY
### ASSOCIATION LAW

Residents of Illinois who purchase health insurance, life insurance, and annuities should know that the insurance companies licensed in Illinois to write these types of insurance are members of the Illinois Life and Health Insurance Guaranty Association. The purpose of this Guaranty Association is to assure that policyholders will be protected, within limits, in the unlikely event that a member insurer becomes financially unable to meet its policy obligations. If this should happen, the Guaranty Association will assess its other member insurance companies for the money to pay the covered claims of policyholders that live in Illinois (and their payees, beneficiaries, and assignees) and, in some cases, to keep coverage in force. The valuable extra protection provided by these insurers through the Guaranty Association is not unlimited, however, as noted below.

### ILLINOIS LIFE AND
### HEALTH INSURANCE GUARANTY ASSOCIATION

### DISCLAIMER

The Illinois Life and Health Insurance Guaranty Association provides coverage of claims under some types of policies if the insurer becomes impaired or insolvent. COVERAGE MAY NOT BE AVAILABLE FOR YOUR POLICY. Even if coverage is provided, there are substantial limitations and exclusions. Coverage is generally conditioned on continued residence in Illinois. Other conditions also preclude coverage.

You should not rely on availability of coverage under the Life and Health Insurance Guaranty Association Law when selecting an insurer. Your insurer and agent are prohibited by law from using the existence of the Association or its coverage to sell you an insurance policy.

The Illinois Life and Health Insurance Guaranty Association or the Illinois Department of Insurance will respond to any questions you may have which are not answered by this document. Policyholders with additional questions may contact:

Illinois Life and Health Insurance Guaranty Association
8420 West Bryn Mawr Avenue
Chicago, IL 60631
(312) 714-8050

Illinois Department of Insurance
320 West Washington Street
4th Floor
Springfield, IL 62767
(217) 782-4515

### Summary of General Purposes And
### Current Limitations of Coverage

The Illinois law that provides for this safety-net coverage is called the Illinois Life and Health Insurance Guaranty Association Law ("LAW") (215 ILCS 5/531.01, et seq.). The following contains a brief summary of the Law's coverages, exclusions, and limits. This summary does not cover all provisions, nor does it in any way change anyone's rights or obligations under the Law or the rights or obligations of the Guaranty Association. If you have obtained this document from an agent in connection with the purchase of a policy, you should be aware that its delivery to you does not guarantee that your policy is covered by the Guaranty Association.

a) Coverage:

The Illinois Life and Health Insurance Guaranty Association provides coverage to policyholders that reside in Illinois for insurance issued by members of the Guaranty Association, including:

1) life insurance, health insurance, and annuity contracts;

2) life, health or annuity certificates under direct group policies or contracts;

3) unallocated annuity contracts; and

4) contracts to furnish health care services and subscription certificates for medical or health care services issued by certain licensed entities. The beneficiaries, payees, or assignees of such persons are also protected, even if they live in another state.

b) Exclusions from Coverage:

1) The Guaranty Association does not provide coverage for:

A) any policy or portion of a policy for which the individual has assumed the risk;

B) any policy of reinsurance (unless an assumption certificate was issued);

C) interest rate guarantees which exceed certain statutory limitations;

D) certain unallocated annuity contracts issued to an employee benefit plan protected under the Pension Benefit Guaranty Corporation and any portion of a contract which is not issued to or in connection with a specific employee, union or association of natural persons benefit plan or a government lottery;

E) any portion of a variable life insurance or variable annuity contract not guaranteed by an insurer; or

F) any stop loss insurance.

2) In addition, persons are not protected by the Guaranty Association if:

A) the Illinois Director of Insurance determines that, in the case of an insurer which is not domiciled in Illinois, the insurer's home state provides substantially similar protection to Illinois residents which will be provided in a timely manner; or

B) their policy was issued by an organization which is not a member insurer of the Association.

c) Limits on Amount of Coverage:

1) The law also limits the amount the Illinois Life and Health Insurance Guaranty Association is obligated to pay. The Guaranty Association's liability is limited to the lesser of either:

A) the contractual obligations for which the insurer is liable or for which the insurer would have been liable if it were not an impaired or insolvent insurer, or

B) with respect to any one life, regardless of the number of policies, contracts or certificates:

i) in the case of life insurance, $300,000 in death benefits but not more than $100,000 in net cash surrender or withdrawal values;

ii) in the case of health insurance, $300,000 in health insurance benefits, including net cash surrender or withdrawal values; and

iii) with respect to annuities, $100,000 in the present value of annuity benefits, including net cash surrender or withdrawal values, and $100,000 in the present value of annuity benefits for individuals participating in certain government retirement plans covered by an unallocated annuity contract. The limit for coverage of unallocated annuity contracts other than those issued to certain governmental retirement plans is $5,000,000 in benefits per contract holder, regardless of the number of contracts.

2) However, in no event is the Guaranty Association liable for more than $300,000 with respect to any one individual.

***** INSURED COPY *****

**FORTIS INSURANCE COMPANY**
501 West Michigan
Milwaukee, WI 53203
A Stock Company

**∴ FORTIS**
Solid partners, flexible solutions™

REMOVAL OF THIS RIDER IS NOT AUTOMATIC.   YOU MUST SUBMIT A SUPPLEMENTAL
APPLICATION TO HAVE THE RIDER RECONSIDERED AFTER
January 15, 2008

SPECIAL EXCEPTION RIDER

It is hereby understood and agreed that the Certificate to which this rider is attached is amended to provide that the policy does not cover anything of which:

███████████████████  ▲██████████ INCLUDING BUT NOT LIMITED TO
ANY DIAGNOSTIC PROCEDURES, TREATMENT, SURGERY, UNDERLYING CAUSES OR
COMPLICATIONS THEREOF

of Vivian M Jarrett                         , Spouse

is the sole, contributory, primary, or secondary cause; anything in the Certificate to the contrary notwithstanding.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, agreements or limitations of the Coverage other than as above stated.

Attached to and hereby made a part of Certificate No.  0058353015 issued by the Fortis Insurance Company of Milwaukee, Wisconsin, to William L Jarrett this 15 day of January   , 2005.

*CRPal*

Secretary

Rider 17787                              SPECIAL EXCEPTION RIDER