**E-FILED**
Tuesday, 03 July, 2007  05:00:32 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| WILLIAM JARRETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.  3:06-cv-03143-RM-BGC |
| | ) | |
| FORTIS INSURANCE COMPANY, | ) | |
| an Insurance corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

NOW COMES Plaintiff, WILLIAM JARRETT, (hereinafter JARRETT), by and through his attorneys, SCOTT & SCOTT, P.C., pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1(D)(2), and responding in opposition to the Motion of Defendant, FORTIS INSURANCE COMPANY (hereinafter FORTIS) for Summary Judgment, hereby state as follows:

    <u>(a)</u>    <u>INTRODUCTION</u>.

There are genuine issues of material fact as to whether JARRETT'S condition of coronary artery disease was a pre-existing condition within the meaning of the Certificate of Insurance issued by FORTIS such that summary judgment is improper.  Accordingly, the Court should deny the Motion for Summary Judgment so that a trier of fact may determine whether, in fact, such pre-existing condition provision is operative.

**(b)(1)   RESPONSE TO UNDISPUTED MATERIAL FACTS**.

JARRETT does not dispute the following material facts as set forth in FORTIS'

Motion for Summary Judgment:

1.      Conceded.

2.      Conceded.

3.      Conceded.

4.      Conceded.

5.      Conceded.

6.      Conceded.

7.      Conceded.

8.      Conceded.

9.      Conceded.

10.     Conceded.

11.     Conceded.

12.     Conceded.

14.     Conceded.

15.     Conceded.

16.     Conceded.

17.     Conceded.

18.     Conceded.

19.     Conceded.

**(b)(2)  DISPUTED MATERIAL FACTS**:

13.    JARRETT disputes FORTIS' Statement of Undisputed Fact number 13 only to the extent that it uses the word "severe," which such word was not used by JARRETT to characterize the pains which he had experienced, nor does such word appear in the medical records in relation to such pains.

**(b)(3)   IMMATERIAL FACTS.**

None.

**(b)(4)   ADDITIONAL MATERIAL FACTS.**

The following additional material facts are taken from JARRETT'S deposition testimony.  Specific references are made to the page of the deposition transcript upon which such facts appear and copies of such pages are attached hereto as Group Exhibit "A".

1.    At the time that JARRETT submitted his application for insurance to FORTIS, JARRETT was insured for health insurance purposes with American Republic Insurance Company and was not actively looking to replace such coverage. (pp. 15, 19).

2.    JARRETT was approached by an individual by the name of Deborah Loveless who solicited the sale of a health insurance policy through FORTIS to JARRETT and JARRETT believed her to be selling on behalf of FORTIS. (pp. 19, 22-24).

3.    Prior to December of 2004, other than required physicals by the National Hot Rod Association, JARRETT had not seen a physician since at least 1998 and during such time did not have any health concerns or problems. (pp. 35-36).

4.    During the episodes of chest pain occurring in the three to four months prior to JARRETT'S hospitalization, such chest pains went away when JARRETT stopped exerting himself.  (p. 47).

5.      The chest pains that JARRETT had on and off for the three or four months prior to his hospitalization were not the same type that he was feeling when he went to the Emergency Room and were significantly worse when he presented to the Emergency Room. (p. 52).  See also Emergency Department Report attached hereto as Exhibit "B".

6.      A prior episode wherein JARRETT experienced severe nausea and vomiting was unrelated to the episode of chest pain which caused him to present at the Emergency Room.  (p. 57).

7.      JARRETT had never been treated for any kind of heart problem and had never before been hospitalized for any reason. (pp. 65-66, 76-77).

8.      FORTIS had initially denied coverage of JARRETT'S medical expenses, claiming that JARRETT had been previously treated for a cardiac condition.  (p. 66).

9.      As part of his business, JARRETT lifts motors and transmission and generally exerts himself.  He never felt that any of the past episodes of chest pain were related to a heart problem.  (pp. 68-69).

The following additional material facts are derived from the Enrollment Form for Medical Insurance for Individuals and Families completed by JARRETT, a copy of which is attached hereto as Exhibit "C" and the response of FORTIS to JARRETT's Request to Admit, a copy of which is attached hereto as Exhibit "D".

10.      In its enrollment form, FORTIS asked JARRETT if whether, within the last ten (10) years, had he had any diagnosis of, received treatment for, or consulted with a physician concerning the heart or circulatory system including, but not limited to, high blood pressure, heart attack, heart murmur, chest pain, irregular heartbeat, varicose veins, phlebitis or elevated cholesterol, to which JARRETT truthfully answered "no".  (Ex. C, p. 3, Item b).

4

11.     In the enrollment form, FORTIS did not ask JARRETT whether at any time in the past twelve months he had experienced signs and symptoms such as chest pain, pressure or squeezing, chest pain radiating into one or both arms, shortness of breath or nausea. (Exhibit C, p. 3 and exhibit D, #3).

12.     FORTIS did not require any type of physical examination of JARRETT during its enrollment process (Exhibit D, #4).

13.     Despite having receiving underwriting authorization, prior to issuance of its medical certificate FORTIS did not request information related to JARRETT from any healthcare provider (Exhibit D, #5).

14.     The term "condition" is not defined in the medical certificate issued by FORTIS to JARRETT (Exhibit D, #6).  See JARRETT'S Certificate of Insurance attached to FORTIS' Motion.

15.     The term "symptoms" is not defined in the medical certificate issued by FORTIS to JARRETT.   (Exhibit D, #7) Also see JARRETT'S Certificate of Insurance attached to FORTIS' Motion.

16.     The phrase "ordinarily prudent person" is not defined in the medical certificate issued by FORTIS to JARRETT.   (See Exhibit D, #8).  Also see JARRETT'S Certificate of Insurance attached to FORTIS' Motion.

**(c) ARGUMENT.**

It would be disengenuiness on JARRETT'S part to argue that the cardiac condition for which he sought treatment on January 21, 2005, did not exist prior to the date of the effective coverage of the policy of insurance in question.  However, that does not end the inquiry in this case.  A pre-existing illness (condition) is defined in the subject policy as:

"any condition that was diagnosed or treated (to include the taking of prescription drugs) by a Physician within 24 months prior to the effective date of coverage, or produced symptoms within 12 months prior to the effective date of coverage that would have caused an ordinarily prudent person to seek medical diagnosis or treatment."

Based upon the pleadings, deposition, admissions and documentary evidence submitted thus far in this proceeding, it is incontrovertible that JARRETT was not diagnosed or treated by a physician within 24 months prior to the effective date of coverage for any condition, let alone a cardiac condition. Therefore, the issue which must be determined is whether a condition produced symptoms in JARRETT within 12 months prior to January 15, 2005, that would have caused an ordinarily prudent person to seek medical diagnosis or treatment.

FORTIS sets forth in its Motion that the question of whether JARRETT'S pre-coverage symptoms would have caused an ordinarily prudent person to seek medical diagnosis or treatment can be properly decided as a matter of law. In support of that statement, FORTIS cites Golden Rule Insurance Company v. Atallah, 45 F.3d 512 (1st Cir. 1995) and Clark v. Golden Rule Ins. Co., 887 F.2d 1276 (5th Cir. 1989). Both such cases are easily distinguishable on their facts from the case at bar. Specifically, the Defendant in Golden Rule v. Atallah had experienced a slow but steady decline over a number of years prior to the time when she was diagnosed with a brain tumor. The Court made specific mention of the changes in her personal behavior and personal grooming habits over a period of years. Moreover, she had sought medical attention to try to determine the nature of her condition at least 14 months prior to receiving her diagnosis. Likewise, in Clark v. Golden Rule, the Plaintiff had a long history of exceedingly high cholesterol and triglyceride levels and failed to reveal such conditions on an application for medical insurance, which he completed nearly six years after first seeking treatment for those conditions. Ultimately,

6

cardiac catheterization revealed severe blockage in three arteries of his heart and coronary bypass surgery was performed.  While the Court agreed that this was a pre-existing condition and that the coronary artery disease produced symptoms which would have caused an ordinarily prudent person to seek diagnosis or treatment, the court went further and remanded the case to the District Court to determine whether the policy should be rescinded based upon misrepresentations made by the insured in his application for insurance.

It is important to note that in this matter FORTIS has not claimed any misrepresentation or omission of material fact on the part of JARRETT.  In its Response to the Request to Admit, FORTIS admitted that their "declination of Plaintiff's claims for benefits was based upon the pre-existing nature of the condition for which treatment was received and for which expenses were incurred, rather than upon any misrepresentation on Plaintiff's enrollment form".  As opposed to the insured parties in Atallah (Id.) and Clark (Id.), JARRETT did not have a long history of signs or symptoms, nor had he ever sought treatment for any cardiac-related condition.  The medical records and JARRETT'S deposition testimony evidence that JARRETT had chest pain and pain in his left shoulder on occasion in the three or four months prior to January 15, 2005.  JARRETT testified at deposition that such episodes only came with exertion and went away with rest.  He testified that he attributed such pain to the nature of his employment which included heavy lifting. JARRETT denied that the prior episodes of chest pain were accompanied by shortness of breath, sweating or nausea.  He further testified that the symptoms which occurred on January 21, 2005, were "different" than those which had previously occurred and as reflected on the Emergency Department Report attached hereto, such symptoms were significantly worse than those which occurred prior thereto.

"An insurance policy is a written contract that memorializes an agreement or "meeting of the minds" between the insurer and the insured."   Charlotte A. Pitcher v. Principal Mutual Life Insurance Company, 93 F.3d 407 (7th Cir. 1996).  JARRETT should be given the benefit of his bargain.  He was not in need of insurance when he was approached by an individual selling policies of health insurance through FORTIS.  He made no misrepresentations on his application for enrollment.  FORTIS did not ask him questions regarding any symptoms he may have suffered which in any way could have been related to a cardiac condition.  FORTIS did not seek JARRETT'S prior medical records.  FORTIS did not require a physical examination of JARRETT.

JARRETT did everything that was required of him in order to effectuate the policy of insurance, including paying the premiums due thereon.  On the other hand, FORTIS did absolutely nothing, such that the contract of insurance was illusory.  Summary Judgment will allow FORTIS to sell policies of insurance and accept premiums payments therefor; perform absolutely no due diligence in ascertaining its risk, and then when called upon to uphold its end of the bargain, deny coverage based on matters not even within the insured's knowledge.

"Failure of an insured to disclose information about his health which is beyond the ken of an ordinary layman is not required if he has not been so informed of a condition by his doctor."  Kohlmeier v. Shelter Insurance Company, (1988) 170 Ill.App.3d 643, 525 N.E.2d 94, 121 Ill.Dec. 288.  With all due respect to Dr. Brumbaly, his Affidavit in support of FORTIS' Motion for Summary Judgment is not dispositive of the issues in this matter.  Dr. Brumbaly is board certified in internal medicine and had the benefit of reviewing all of JARRETT'S medical records in reaching his opinions that the prior symptoms suffered by JARRETT would have caused an ordinarily prudent person to seek medical treatment.

Moreover, Dr. Brumbaly has been employed by the insurance industry for the past (15) years. JARRETT, on the other hand, is a mechanic who believed that the pains which he suffered prior to his admission to the hospital were nothing out of the ordinary and resulted from heavy lifting as part of his employment. As such, there remain genuine issues of material fact as to whether the symptoms suffered by JARRETT prior to January 15, 2005, would have caused an ordinarily prudent person to seek medical diagnosis or treatment.

FORTIS also claims it is entitled to summary judgment on JARRETT'S claim for extra-contractual damages set forth in his Complaint. It is JARRETT'S position that such determination is not ripe. Before determining whether JARRETT is entitled to damages beyond contractual damages, it must first be determined whether the denial of coverage was wrongful, which would then result in the award of contractual damages in favor of JARRETT. If, in fact, it is determined that the denial was wrongful, then in light of the totality of the circumstances in this matter, a determination can be made whether such denial was vexatious and unreasonable. If the Court is inclined to summarily decide the issue of extra-contractual damages, JARRETT believes that the facts and admissions on file and FORTIS' complete lack of any diligent inquiry in this matter certainly leave remaining genuine issues of material fact as to whether its denial of coverage was vexatious and unreasonable, such that summary judgment is improper.

Finally, FORTIS argues in its Motion that it is entitled as a matter of law to the declaratory relief it seeks in its Counterclaim. JARRETT does not believe that any specific response is due to such argument as such claim will either be summarily denied or summarily granted as a consequence of the Court's ruling on the other summary judgment issues raised in FORTIS' motion.

WHEREFORE, Plaintiff, WILLIAM JARRETT, prays this Honorable Court enter an Order denying summary judgment in favor of FORTIS INSURANCE COMPANY as to both the JARRETT's Complaint and the Counterclaim for Declaratory Judgment, and for such other, further and different relief as the court deems just.

Respectfully submitted,

WILLIAM JARRETT, Plaintiff,

BY:____/s/  James R. Enlow_____
        SCOTT & SCOTT, P.C.,

PREPARED BY:
James R. Enlow (06199891)
SCOTT & SCOTT, P.C.
Attorneys at Law
611 East Monroe Street; Suite 200
Springfield, IL  62701
(217) 753-8200

STATE OF ILLINOIS                    )
                                     ) ss
COUNTY OF SANGAMON                   )

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that an exact copy of the above and foregoing instrument was served upon the following parties by electronic transmission through the Case Management/Electronic Case Filing System of the U.S. District Court to:

William G. Beatty                 beattyw@jbltd.com
                                  malachowskil@jbltd.com

The undersigned hereby further certifies that an exact copy of the above and foregoing instrument was served upon the parties of record by depositing the same in the U.S. Mail, Springfield, Illinois, in an envelope securely sealed, postage fully prepaid and legibly addressed to:

Mr. William G. Beatty
Johnson & Bell, Ltd.
Attorneys at Law
33 West Monroe Street, Suite 2700
Chicago, IL  60603

on this 3rd day of July, A.D., 2007.

_____/s/ Susan L. Greenwalt_____

Subscribed and sworn to before me this 3rd day of July, A.D., 2007.

_____/s/ Janet M. Smith_____
NOTARY PUBLIC

1          IN THE UNITED STATES DISTRICT COURT

        FOR THE CENTRAL DISTRICT OF ILLINOIS

2              SPRINGFIELD DIVISION

3   WILLIAM JARRETT,              )
                                  )
4              Plaintiff,         )
                                  )
5   vs.                           )    No. 3:06-CV-03143-RM-BGC
                                  )
6   FORTIS INSURANCE COMPANY,     )
                                  )
7              Defendant.         )

8

9

10

11

12

13

14              DEPOSITION OF

15              WILLIAM JARRETT

16        TAKEN ON:  APRIL 30, 2007

17

18

19

20        Sara Jane Mayberry, CSR

21          Illinois #084-003369

22

23

24

25


EXHIBIT
4

```
1              MR. BEATTY:  Yeah.

2              MR. ENLOW:  I think you meant December '05.

3              THE WITNESS:  Did I say --

4              MR. ENLOW:  Yeah.

5              THE WITNESS:  See, I'm bad with dates.

6              MR. BEATTY:  No, that's -- that's fine.

7              MR. ENLOW:  I don't want it to be later on we had

8      multiple policies running at the same time.

9              THE WITNESS:  No.

10             MR. ENLOW:  I'm sorry.

11        Q    (By Mr. Beatty) Thank you.  All right.  Sir, I'd

12     like to kind of call your attention back to the date in

13     which you were running your own business under the name of

14     Bill's Safety and Automotive down in Taylorville.  It

15     appears from the information that I have that for at least

16     a period of time you were insured for health insurance

17     purposes with a company named American Republic.  Does that

18     sound correct?

19        A    Yes.

20        Q    Okay.  Do you know when you were first insured

21     with American Republic?

22        A    I believe in '98.

23        Q    Okay.  Now, when you were insured with American

24     Republic, was that strictly an individual policy or was

25     that a policy that you purchased through your employment,
```

1     A    Yes.

2     Q    And it says effective date of that American

3  Republic and then it says 1998, just as you've told me?

4     A    Uh-huh.  Yes.

5     Q    And then it says termination date, upon approval.

6  I think that's -- is that what that says?

7     A    Upon approval, yes.

8     Q    And does that mean upon approval of the Fortis

9  policy?

10    A    On approval of Fortis, yes.

11    Q    Okay.  Can you tell me why in December of 2004

12  you were looking to make a switch from American Republic?

13    A    I really wasn't looking to make a switch.

14    Q    Oh.

15    A    I was approached by Debra Loveless, which is the

16  agent on the front side here.  She's the selling agent.

17  She had -- she had solicited me for the insurance actually

18  several months prior to the -- the date of -- of December.

19    Q    Okay.

20    A    And to be quite candidly, I -- I wasn't

21  interested at the time.  Number one, a couple of times she

22  came in -- I worked in the shop.  I mean, I just didn't sit

23  behind a desk.  So, therefore, I was -- I just didn't have

24  the time to even inquire about it.  But she was persistent.

25  She did come back several times.  And then she approached

1    aware of?

2        A    That -- that I could not say.

3        Q    Okay.

4        A    I don't -- I don't recall, no.

5        Q    When she approached you, sir, did she offer you

6    insurance other than Fortis?

7        A    No.

8        Q    Okay.  There is -- at the top of Exhibit Number

9    1, there is a space where it says agent information.  It's

10   on the first page toward the top.  Do you see that, sir?

11       A    Yes.

12       Q    And it says agency name and -- and then there's a

13   word Entrust?

14       A    Right.

15       Q    E-N-T-R-U-S-T?

16       A    Right.

17       Q    And have you heard of them before?

18       A    No.

19       Q    Okay.  Do you know what Entrust is?

20       A    No.

21       Q    Okay.  And then there it says agent name and

22   Fortis number and it's Debra Loveless and it appears to --

23   there appears to be a number after that, and then the phone

24   number and then a FAX number, and then it says general

25   agent is located in the State of IL for Illinois.  Do you

```
1

2              (Whereupon, a recess was taken, after which

3    the following proceedings were conducted.  Defendant's

4    Deposition Exhibit Numbers 2 through 6 were marked by the

5    Court Reporter and have been attached hereto.)

6

7         Q    (By Mr. Beatty) Back on the record.  Okay?

8         A    Okay.

9         Q    Putting aside the perhaps two NHRA physicals that

10   you underwent, between 1998 and December of 2004 when this

11   enrollment form, Exhibit Number 1 to your deposition, was

12   completed, had you seen a doctor for any reason?

13        A    No.

14        Q    In 1998, did you consider Dr. Gill your family

15   doctor?

16        A    Yes.

17        Q    Okay.  Did you -- and what I'd like to do is I

18   want to go from 1998 forward and just ask if you had any

19   other doctors besides Dr. Gill during 1998.

20        A    No.

21        Q    Okay.  During 1999, did you see any doctors at

22   all?

23        A    No.

24        Q    And again, we're setting aside the NHRA

25   physicals.  Okay?
```

1      A      Okay.

2      Q      Other than those, in 1999, did you see any

3  other -- any doctors?

4      A      '99?

5      Q      Yeah.

6      A      No.

7      Q      How about the year 2000?

8      A      No.

9      Q      2001?

10     A      No.

11     Q      2002?

12     A      No.

13     Q      2003?

14     A      No.

15     Q      Up through the end of 2004?

16     A      No.

17     Q      Okay.  During those intervening years between

18  1998, when it indicates you had your last physical, and

19  2004, when the application or enrollment form was filled

20  out, did you have any health concerns or problems?

21     A      No.

22     Q      Okay.  While the application was being filled

23  out, did Miss Loveless say anything to you about

24  pre-existing conditions or what that meant?

25     A      No.

1    of similar chest pains in the past three to four months?

2         A    Yes.

3         Q    Okay.  And then it says occurred with exertion

4    every time.  When -- in the past, sir, during those three

5    to four months period -- during that three to four month

6    period before your emergency room visit, you had had

7    similar episodes of chest pain?

8         A    Under heavy exertion.

9         Q    Okay.  And it says occurred with exertion every

10   time?

11        A    Yeah.

12        Q    Okay.  And when you stopped the exertion, did the

13   chest pain usually go away?

14        A    Yeah.

15        Q    Okay.  What else, if anything, did they do for

16   you in the emergency room?

17        A    In the emergency room, they -- they just -- they

18   done bloodwork, they took my blood pressure, naturally,

19   put -- what do you want to call it?

20        Q    Did they do an EKG?

21        A    They did, yeah.  They did an EKG.

22        Q    They put the sticky things on the chest?

23        A    Yeah.  They did an EKG.  They did all that -- all

24   that kind of stuff.

25        Q    Okay.  Did they then decide to admit?

 1   from you?

 2        A    Yes.

 3        Q    Okay.  He asked you questions about how you were

 4   feeling and how long it's -- how long it's been going on

 5   and why you were there; is that correct?

 6        A    Yes.  Yeah.

 7        Q    Okay.  And there is a section where it says

 8   history of present illness.  And what's the sticker on

 9   that?  Is that Exhibit what, sir?

10        A    6.

11        Q    6?

12        A    Yes, sir.

13        Q    Fair enough.  All right.  And it says that you

14   were -- that you were in the emergency room with what's

15   called substernal chest pressure, and it talks about a

16   squeezing type of pain with some radiation into the left

17   shoulder.  Is that what you recall telling Dr. Shelton?

18        A    Yes.

19        Q    Okay.  And Dr. Shelton goes on to say that he,

20   meaning you, sir, has had it off and on for three to four

21   months, usually with exertion, usually better with rest.

22   Is that what you told Dr. Shelton?

23        A    Yes.

24        Q    Okay.  And the chest pain that you had had off

25   and on for three to four months with exertion, was that the

1    same type of pain that you were feeling when you went to

2    the emergency room?

3         A    Not really.

4         Q    Okay.  How was it different?

5         A    Just -- it's hard to describe.  Just -- I -- I

6    didn't feel quite the same.

7         Q    Okay.  But you had told Dr. Shelton, as you had

8    told Dr. K, that you had had chest pain on and off for

9    three to four months, usually with exertion?

10         A    Yes.

11         Q    Okay.  And what did Dr. Shelton tell you about

12    what your course of treatment was going to be?

13         A    Well, that's when he told me that the best thing

14    would be to do -- would be to do a heart cath, and at that

15    point, he would be able to tell me if, in fact, there was

16    anything wrong or if there was nothing wrong, but based on

17    the information that he had from the ER, he said I think

18    that it will just be an in and out procedure.  We'll go in,

19    look, you'll be fine, we'll -- you'll go home.

20         Q    Okay.  Was it your understanding that the purpose

21    of the heart cath, as you called it, was to determine

22    whether or not there were blockages of any coronary

23    arteries?

24         A    Yes.

25         Q    Okay.  And did you consent to that procedure?

1    and vomiting of relatively brief duration.  Do you know

2    what he's talking about there?

3         A    Yeah, because, I mean, they ask you everything.

4         Q    Sure.

5         A    And you try and help them out as best you can

6    with the knowledge, but that particular incident didn't

7    have anything to do with -- with any kind of chest pain or

8    any of that.

9         Q    Okay.

10        A    It was due to something else.

11        Q    Okay.  So that episode of nausea, as far as you

12   know, didn't have anything to do with this?

13        A    No.  No.

14        Q    All right.  But then it goes on to say that on

15   January 21, 2005, he came to the emergency room because of

16   significant symptoms of the same kind he has had

17   previously.  Do you see that?

18        A    Yes.

19        Q    And it also says that he was admitted to the

20   hospital after nitroglycerin was found to relieve his

21   discomfort.  Do you remember getting nitroglycerin?

22        A    Yes.  They did give it to me, yes.

23        Q    They did give it to you under your tongue?

24        A    No.

25        Q    How did they give it to you?

1    myself, just basically stating that -- that they should pay

2    the bills.

3        Q    Okay.  Is that your signature on that Exhibit 7?

4        A    Yes.

5        Q    Okay.  And skipping ahead a little bit, it says

6    you have turned down all bills due to investigation on your

7    part and say this was a pre-existing condition, and then

8    you go on to say this was not pre-existing.  Did I read

9    that correctly?

10       A    Yes.

11       Q    Okay.  So Fortis Insurance Company had told you

12   that the reason why they were not paying the bills is

13   because they considered the bills to relate to a

14   pre-existing condition?

15       A    Yes.

16       Q    And you said that this was not a pre-existing

17   condition?

18       A    Correct.

19       Q    Okay.  And what I need to know, sir, is the basis

20   for your belief or your contention that it's not a

21   pre-existing condition.

22       A    Basically, because, number one, I was never ever

23   treated for any kind of -- any kind of heart problem.

24       Q    Right.

25       A    I'd never been in the hospital a day in my life

1    until the day I went in for -- for this.  That's the only

2    time I was ever in the hospital for anything.

3         Q    Uh-huh.

4         A    So based on that, I just could not understand

5    why -- how there could be a pre-existing problem.

6         Q    And as I understand it, Mr. Jarrett, some of the

7    correspondence that you had received from Fortis indicated

8    that they believed that you had been diagnosed or treated

9    for a condition before you went into the hospital?

10        A    Yes.

11        Q    Before the effective date of your coverage?

12        A    Yes.

13        Q    Okay.

14        A    They said that I had been treated?

15        Q    Yes.

16        A    (Negative gesture)

17        Q    And, in fact, you had not been treated?

18        A    Never.

19        Q    You had not seen a physician nor had you gone to

20   a hospital for anything related to your heart with -- you

21   know, at any time before --

22        A    No.

23        Q    -- the hospital emergency room visit of January

24   21, 2005.  Is that -- that's your contention, right?

25        A    Yes, that's correct.

1    have caused an ordinarily prudent person to seek medical
2    diagnosis or treatment, that that is also pre-existing
3    condition?
4        A    Yes.
5        Q    Okay.  So you don't have to have diagnosis or
6    treatment in order for a condition to be pre-existing,
7    correct?
8        A    The way it reads; yes.
9        Q    Yes.  You have to have a symptom during the year
10   preceding the effective date of coverage that would have
11   caused an ordinarily prudent person to seek medical
12   diagnosis or treatment?
13       A    Yes.
14       Q    Okay.  And you had told Dr. K as well as Dr.
15   Shelton that for three to four months prior to your
16   emergency room visit in January of 2005, that you had had
17   complaints of -- you had -- you had experienced chest pain
18   upon exertion?
19       A    Yes.
20       Q    Okay.  But as I also understand it, when you had
21   experienced those chest pains during that three to four
22   month period prior to January 21 of 2005, you had not gone
23   to the doctor?
24       A    No.
25       Q    Okay.  When you had experienced those chest pains

1    during that three to four month period prior to January 21

2    of 2005, was there any reason why you didn't go to the

3    doctor?

4         A    Didn't seem bad enough.

5         Q    Okay.

6         A    I mean, I'm -- like I said, I was -- I was in my

7    fifties. I lift motors, I lift transmissions. I exert.

8    Just, I mean, never felt like that I ever was having any

9    kind of a heart problem, you know.

10        Q    Okay.

11        A    If you jumped up and lifted up this table, you

12   might be short of breath, mightn't you?

13        Q    Probably so.

14        A    Okay. That's what I'm getting at.

15        Q    All right. You had told Dr. K and also Dr.

16   Shelton that the pain that you were experiencing on the

17   evening of January 21, 2005 was of the same kind that you

18   had had previously, correct?

19        A    Similar, yes.

20        Q    Okay. Did Dr. Shelton or Dr. Pyle tell you how

21   long they thought, or either one of them thought, that your

22   arteries had been blocked or occluded?

23        A    No.

24        Q    Okay. Did they express any opinion to you about

25   how long this process takes to get a one hundred percent

1      A    Yes.

2      Q    Okay.  Do you know where Dr. Pyle got that

3  information?

4      A    Probably from me.

5      Q    Okay.  And do you remember what you told Dr. Pyle

6  about your history with doctors?

7      A    I just told him the truth.  I just don't -- I

8  don't -- I just never had the need for doctors.

9      Q    Okay.

10     A    I wasn't -- I never was really sick, so I just --

11     Q    Okay.

12     A    You know.

13     Q    Okay.  And it says you don't -- you don't see

14  doctors, you don't go to doctors, correct?

15     A    Yeah.

16     Q    Okay.  And in your -- as a matter of fact, your

17  application seems to bear that out and your testimony today

18  seems to bear that out as well, that besides the NHRA

19  physicals that you had, that you had not been to a doctor

20  since 1998?

21     A    Yes.

22     Q    Okay.  During the years between 1998 and your

23  admission to the hospital here, besides the chest pains

24  that we had talked about, had you had any other health

25  concerns during that period of time?

1       A    No.

2       Q    Anything more severe than a cough or cold or

3   something like that?

4       A    No.

5       Q    Okay.  You had mentioned that you take -- was it

6   Advil or --

7       A    Yes.

8       Q    Okay.  And is that just for general muscle aches

9   and pains that we tend to get in our fifties?

10      A    Getting old, yes.

11      Q    Okay.  All right.  Anything more specific than

12  that that you took the medication for?

13      A    No.

14      Q    All right.

15      A    No.

16           MR. BEATTY:   Thank you, sir.  That's all I have.

17           MR. ENLOW:  Bill, you have the right to read the

18  transcript, and the options you're given are to waive

19  signature or to reserve signature and read it.  The purpose

20  of reading it is to see that everything was taken down

21  correctly.  You cannot change answers.  You can only see if

22  there's a typographical error.

23           THE WITNESS:    Sure.

24           MR. ENLOW:  Which I can tell you that they rarely

25  make typographical errors.  My recommendation to you is to

E-FILED
Tuesday, 03 July, 2007  05:02:17 PM
Clerk, U.S. District Court, ILCD

| ST. JOHN'S HOSPITAL Springfield, IL (217) 544-6464 | NAME: | Jarrett, William L |
|---|---|---|
| | ROOM: | 0554AA |
| | DOB: | 04/15/1952 |
| | MRN: | 00277641 |
| EMERGENCY DEPARTMENT REPORT | ACCOUNT #: | 002776411004 |
| | ADMITTED | 01/21/2005 |
| Adm: Mathew Kallookulangara, M.D. | DISCHARGED: | |
| Date/Time Dictated: | 01/21/2005  9:02 P | |
| Transcribe Date/Time: | 01/22/2005  2:13 P | mrn |
| Page 1 of 3 | | |

cc:    Nate Blaustein, M.D.

## DATE AND TIME OF EXAMINATION
01/21/2005, at 1818.

## CHIEF COMPLAINT
Chest pain.

## HISTORY OF PRESENT ILLNESS
This is a 52-year-old who presents to the emergency department with complaints of sternal chest pain which has been intermittent in nature, however, got significantly worse today. Sternal in location, associated with diaphoresis and nausea. The patient states it was a pressure-like sensation radiating to both shoulders. The patient denies any fever or chills, was in his usual state of health prior to this event. The patient denies any abdominal pain. He states that the pain waxes and wanes. There are no relieving features although it is exacerbated with exertion.

## PAST MEDICAL HISTORY
Significant for cardiovascular disease.

## PAST SURGICAL HISTORY
None.

## MEDICATIONS
None.

## ALLERGIES
No known drug allergies.

## SOCIAL HISTORY
The patient denies alcohol use, illicit drug use and tobacco use.

## FAMILY HISTORY
Negative for cardiovascular disease or diabetes.

## REVIEW OF SYSTEMS

EMERGENCY DEPARTMENT
REPORT COPY:

EXHIBIT
B

| | NAME: | Jarrett, William L |
|---|---|---|
| ST. JOHN'S HOSPITAL | ROOM: | 0554AA |
| Springfield, IL | DOB: | 04/15/1952 |
| (217) 544-6464 | MRN: | 00277641 |
| EMERGENCY DEPARTMENT REPORT | ACCOUNT #: | 002776411004 |
| | ADMITTED | 01/21/2005 |
| Adm: Mathew Kallookulangara, M.D. | DISCHARGED: | |
| Date/Time Dictated: | 01/21/2005 9:02 P | |
| Transcribe Date/Time: | 01/22/2005 2:13 P | mrn |
| Page 2 of 3 | | |

All other systems were reviewed and are negative or noncontributory to the chief complaint.

## PHYSICAL EXAMINATION

On presentation, blood pressure is 175/92, pulse 82, respirations 18 and temperature 97.1°. Pulse ox is 100%, normal in room air, by my interpretation.
CONSTITUTIONAL AND PSYCHIATRIC: The patient is well-developed, well-nourished, alert and nontoxic in appearance.
EYES: Inspection of the conjunctivae and lids reveal no acute abnormality. Pupils are equal and reactive. Extraocular muscles are intact.
NECK: The neck is supple. No masses. No tenderness.
RESPIRATORY: Normal respiratory effort. Auscultation reveals normal breath sounds bilaterally.
CARDIOVASCULAR: Auscultation reveals a regular rate and rhythm. No abnormal sounds or murmurs.
GASTROINTESTINAL: The abdomen is soft and nondistended. No hepatosplenomegaly or hernias noted.
MUSCULOSKELETAL: The patient has full range of motion, stability, muscle strength and tone of upper and lower extremities.
SKIN: There are no acute rashes, lesions or indurations noted.
NEUROLOGIC: Cranial nerves II through XII are grossly intact.

## MEDICAL DECISION MAKING

This patient had an IV established, was given aspirin, Lopressor, Lovenox. His 12-lead EKG showed inverted T waves in the inferolateral leads. The patient's chest x-ray was normal. He was placed on a cardiac monitor showing normal sinus rhythm, rate approximately 80, without ectopy. The patient's CK, MB and troponin were normal. He will be admitted to the hospital.

## FINAL IMPRESSION
Acute coronary syndrome.

## DISPOSITION

Initially, I was going to admit him straight to Cardiology, however, initial creatinine came back at 2.7 which turned out to be a lab error, however, that prompted medical evaluation by Internal Medicine, thus an admission to their service.

## FINAL IMPRESSION
Acute coronary syndrome.

## DISPOSITION

EMERGENCY DEPARTMENT
REPORT COPY:

| | NAME: | Jarrett, William L |
|---|---|---|
| ST. JOHN'S HOSPITAL | ROOM: | 0554AA |
| Springfield, IL | DOB: | 04/15/1952 |
| (217) 544-6464 | MRN: | 00277641 |
| EMERGENCY DEPARTMENT REPORT | ACCOUNT #: | 002776411004 |
| | ADMITTED | 01/21/2005 |
| Adm: Mathew Kallookulangara, M.D. | DISCHARGED: | |
| Date/Time Dictated: | 01/21/2005  9:02 P | |
| Transcribe Date/Time: | 01/22/2005  2:13 P | mrn |
| Page 3 of 3 | | |

Admission to the hospital.

01/22/2005
12:55
735752


Document SIGNED by Physician
Nate Blaustein, M.D. 01/24/2005 06:29

_____

Nate Blaustein, M.D.




EMERGENCY DEPARTMENT
REPORT COPY:

E-FILED
Tuesday, 03 July, 2007 09:00:28 PM
Clerk, U.S. District Court, ILCD

**ENROLLMENT FORM FOR** *12/13*
**MEDICAL INSURANCE FOR INDIVIDUALS AND FAMILIES**

*Augustynowic*

MGA
Z7000193001
ENTRUST INC

**FORTIS**
Solid partners, flexible solutions®

PLEASE PRINT IN BLACK INK

## AGENT INFORMATION

Agency Name and Fortis Number *Entrust*
Agent Name and Fortis Number *Debra Loveless*   *ZZ60X*   Phone # *(217) 523-2055*
Agent Fax Number *(217) 523-7161*   General Agent is located in the state of *IL*

## TYPE OF ACTIVITY  check appropriate box

☒ New Enrollee

☐ Upgrading Coverage
Existing Policy #_____

☐ **Change to an existing policy. Policy #**_____
  ☐ Adding Dependent
  ☐ Reinstatement of Coverage
  ☐ Applying for removal of special exception rider
  ☐ Applying for removal/reduction of special class premium
  ☐ Other_____

## PERSON(S) TO BE INSURED

| | Name Last | First | M.I. | Sex | Age | Birthdate Mo/Day/Yr | State of Birth | Height | Weight | Social Security # | Tobacco User Refer to p. 4, #28 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. (Primary) | Jarrett | William | L. | M. | 52 | 4-15-52 | IL | 5'11 | 220 | 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 | ☐ Yes ☒ No |
| 2. (Spouse) | Jarrett | Vivian | m. | F | 52 | 12-02-52 | IL | 5'8" | 182 | 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 | ☐ Yes ☒ No |

**3. DEPENDENT'S NAME**

| Last | First | M.I. | Relationship | Sex | Age | Full Time Student Yes | No | Birthdate Mo/Day/Yr | Height | Weight | Social Security # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

4. Resident Address *125 Walnut  P.O. Box 922*   *Kincaid*   *IL*   *62540*
    STREET                  CITY                STATE      ZIP

5. Does any proposed insured live outside the above household?  ☐ Yes  ☒ No
   If yes, explain_____
   (IN CASE OF A MINOR, CUSTODIAL PARENTS SIGNATURE WILL BE REQUIRED TO ATTEST TO MEDICAL HISTORY)

6. Home Phone Number *217*   *237-4738*   Best time to call *Evening - after 3*
                     AREA CODE    NUMBER

7a. Occupation (Primary) *Mechanic*   ☒ Full-Time ☐ Part-time  Hours worked per week *40*
    Company Name *Bill's Safety + Automotive*  Work Phone Number: *217-824-9113*
    Duties: *Runs Shop*
    Self Employed: ☒ Yes ☐ No   Covered by Worker's Compensation: ☐ Yes ☒ No

7b. Occupation (Spouse) *Manage flower Shop*  ☐ Full-Time ☒ Part-time  Hours worked per week *65*
    Company Name *Whitledge flowers*   Work Phone Number: *217-824-3270*
    Duties: *manage*
    Self Employed: ☐ Yes ☒ No   Covered by Worker's Compensation: ☐ Yes ☒ No

## IF REQUESTING LIFE INSURANCE COVERAGE

8. Beneficiary for Primary Insured_____
                              FULL NAME

   Contingent Beneficiary_____   RELATIONSHIP _____
                              FULL NAME
   (The Primary Insured is the beneficiary of any Spouse or Child(ren) Life Insurance.)   RELATIONSHIP _____

1

**EXHIBIT**
*C*

## POLICY INFORMATION
**If Signed Proposal/Quote is provided this section does not need to be completed**

### PREMIUM AMOUNT

**Plan Name:** _____

**Plan Type:**
- ☐ Physician/Hospital PPO
- ☐ PPO X-tra
- ☐ Value Plan
- ☐ Traditional (non-PPO)
- If PPO, Network Selected: _____
- ☐ One Deductible

**Plan Deductible:** _____  **Rate of Payment:** _____

**Lifetime Maximum:** _____

**Prescription Drug Card Deductible:** _____

**MSA:** ☐ FORTIS MSA    ☐ MSAVER    ☐ OTHER

**Optional Coverage:**
- ☐ Doctor's Office Copayment
- ☐ Maternity* (N/A in Arkansas and Oklahoma)
- ☐ Accident Medical Expense: First Dollar Amount $ _____
- ☐ Life Insurance for Primary Insured: $ _____
  - ☐ Life Insurance Spouse: $ _____
  - ☐ Life Insurance Children
- ☐ Dental and Vision Card

The Dental and Vision Card is a discount program, not an insurance product. Indicate any plan or coverage changes from original illustration, sign and initial.

| Premium Amount | |
|---|---|
| Primary Insured | $ _____ |
| Spouse | $ _____ |
| Children | $ _____ |
| Rx Drug Card | $ _____ |
| D.O.C. | $ _____ |
| Maternity | $ _____ |
| AME | $ _____ |
| Life | $ _____ |
| Dental & Vision Card | $ _____ |
| Lifetime Maximum Buy Up | $ _____ |
| Total Premium | $ _____ |
| One Time Processing Fee* | $ 20.00 |

*N/A in all states

## BILLING

9. ☐ Quarterly ☐ Semi-Annual ☐ Annual ☒ Bank Draft (Complete attached form) ☐ Existing Account # _____

Send premium notices to: ☒ Insured ☐ Other (Print name, street number, city, state & zip) _____

## OTHER COVERAGE IN FORCE OR APPLIED FOR

10. Are any of the proposed insureds covered by, or has application been made for any type of medical insurance?
☒ Yes (Complete section below) ☐ No

| Proposed Insured's Name | Company Name | Company Phone Number | Group/Individual/COBRA | Type of Coverage | Effective Date | Termination Date |
|---|---|---|---|---|---|---|
| American Republic | William Jarrett | | Ind. | Hosp./Surg | 1998 | upon approval |

11. Were all proposed insureds covered under the prior plan listed above? ☒ Yes ☐ No (If no, list those not covered) _____

12. Will this proposed coverage replace or change any existing health insurance? ........................ ☒ Yes ☐ No
13. Are any of the proposed insureds covered by Medicaid? ........................ ☐ Yes ☒ No
14. Will any proposed insured become eligible for any other form of medical insurance in the next six months? ....... ☐ Yes ☒ No
15. Have any of the proposed insureds ever been declined, postponed, charged an extra premium or had a portion of coverage excluded for life, disability, or medical insurance or had such coverage rescinded? ............... ☐ Yes ☒ No
If yes, give details _____

## HAZARDOUS ACTIVITIES & DRIVING

16. Have any of the proposed insureds ever participated in organized racing including but not limited to, automobile, motorcycle or powerboat racing or any of the following activities: skydiving, ultralight flying, scuba diving, hang gliding, rock or mountain climbing? ☒ Yes ☐ No

| If yes, indicate who and which activity | When/How Often | Do you plan continued participation? |
|---|---|---|
| William    Drag Race | Quit 2001 | ☐ Yes ☒ No |
| | | ☐ Yes ☐ No |

17. Have any of the proposed insureds been cited for driving while intoxicated in the past 5 years or had 2 or more moving violations in the past 2 years? ☐ Yes ☒ No
If yes, indicate type of violation. _____ Date/s _____

2

## HEALTH STATEMENT

**IMPORTANT! PLEASE GIVE COMPLETE DETAILS OF EACH YES ANSWER ON PAGE 5 "ADDITIONAL MEDICAL DETAILS".**

**WITHIN THE LAST 10 YEARS HAS ANY PROPOSED INSURED:**

| | | Yes | No |
|---|---|---|---|
| 18. | **HAD ANY DIAGNOSIS OF, RECEIVED TREATMENT FOR, OR CONSULTED WITH A PHYSICIAN CONCERNING:** | | |
| a) | The lungs or respiratory system including but not limited to hayfever or other allergies, sinus infections, asthma, bronchitis, tuberculosis, pneumonia or emphysema? | ☑ | ☐ |
| b) | The heart or circulatory system including but not limited to high blood pressure, heart attack, heart murmur, chest pain, irregular heartbeat, varicose veins, phlebitis or elevated cholesterol? (provide last blood pressure reading and cholesterol level if known) | ☐ | ☑ |
| c) | The digestive system including but not limited to ulcer, gastritis, heartburn, intestinal disorder, colitis, gallbladder, hemorrhoids, hernia, disorder of the pancreas, spleen, or liver including but not limited to, hepatitis, jaundice or cirrhosis? | ☑ | ☐ |
| d) | The nervous system including but not limited to epilepsy, seizures, unconsciousness, convulsions, vertigo, headaches, paralysis, multiple sclerosis, cerebral palsy, Parkinson's disease, stroke or mini-stroke, TIA or brain attack? | ☐ | ☑ |
| e) | Mental disease or nervous disorder including but not limited to any emotional disorder, anxiety, depression, attention deficit disorder, eating disorder, or psychiatric treatment or counseling? | ☐ | ☑ |
| f) | Congenital disorder, birth defects or developmental disorders including but not limited to Down Syndrome, mental retardation, autism, cleft palate, club foot, or congenital heart defects? | ☐ | ☑ |
| g) | The genitourinary system including but not limited to any kidney disorder, kidney stones, cystitis, prostatitis, bladder infections, or sexually transmitted disease? | ☐ | ☑ |
| h) | Diabetes, high or low blood sugar or any disorder of the thyroid gland or other glandular disorder? | ☐ | ☑ |
| i) | The muscular, skeletal or connective tissue disorder including but not limited to arthritis, lupus (SLE), temporomandibular joint disease (TMJ), any back or spine disorder or treatment of any muscular or neuromuscular disorder or any manipulation therapy? | ☐ | ☑ |
| j) | Blood or lymph disorders including but not limited to anemia or lymphadenopathy? | ☐ | ☑ |
| k) | Cancer? Provide location, type of cancer and treatment received | ☐ | ☑ |
| l) | Tumor, cyst or growth of any kind; any breast or skin disorders? Provide location, state if treated or removed and date | ☐ | ☑ |
| m) | Any disorder of the eyes, ears, (including ear infections or ear tubes), nose or throat. Tonsils or adenoids, any speech or hearing impairment? | ☐ | ☑ |
| n) 1. | Any disorder of the reproductive organs, including but not limited to disorders of the penis, testes, vagina, ovaries and cervix, uterus, diagnosed or treated for infertility or irregular menstruation? | ☐ | ☑ |
| 2. | To the best of your knowledge, are you, your spouse or any dependent now pregnant? | ☐ | ☑ |
| 3. | Is any person not named on this enrollment form now pregnant by any person to be insured? | ☐ | ☑ |

**IF EITHER N-2 OR N-3 IS ANSWERED YES, MEDICAL COVERAGE CANNOT BE ISSUED.**

| | QUESTIONS 4-6 FOR FEMALE APPLICANTS: | Yes | No |
|---|---|---|---|
| 4. | Complications of pregnancy, including but not limited to caesarean section delivery or miscarriage? | ☐ | ☑ |
| 5. | DATE OF LAST PAP SMEAR _10-03_  RESULTS _Normal_ | | |
| 6. | Have you been instructed to have a repeat pap smear or any follow-up treatment or tests as a result of your last pap smear? | ☐ | ☑ |
| 19. | Been diagnosed as having or been treated for Acquired Immune Deficiency Syndrome (AIDS) by a member of the medical profession? | ☐ | ☑ |
| 20. | Been diagnosed as having or been treated for any immune deficiency disorder by a member of the medical profession? | ☐ | ☑ |
| 21. | Experienced any of the following: Signs and symptoms of an immune deficiency disorder may include lymphadenopathy (swollen lymph nodes), loss of appetite, weight loss, chronic fatigue, fever, oral thrush, skin rashes, unexplained infections, dementia, depression, or other psychoneurotic disorders with no known cause? | ☐ | ☑ |
| 22. | Had surgery or has diagnostic testing, treatment or surgery been recommended or scheduled that has not been completed? | ☐ | ☑ |
| 23. | Does any person have any fixation/prosthetic devices present including but not limited to plates, screws, pins, implants (including breast implants), shunts, pacemakers or valve replacements? | ☐ | ☑ |
| 24. | Had an electrocardiogram, chest x-ray, or blood test or any other diagnostic testing of any kind or been hospital confined in the past 10 years? If yes, give name of physician or hospital and results. | ☐ | ☑ |
| 25. | Been a member of Alcoholics Anonymous or had any treatment, including but not limited to, counseling for alcoholism or alcohol abuse or been advised by a physician to discontinue or decrease alcohol consumption? | ☐ | ☑ |
| 26. | Used sedatives, tranquilizers, cocaine or other hallucinogenic or narcotic drugs, or received treatment for drug abuse or chemical dependency? | ☐ | ☑ |
| 27. | To the best of your knowledge, does any person to be insured have any mental or physical impairment, disease or deformity not indicated above? | ☐ | ☑ |



## HEALTH STATEMENT (continued)

**IMPORTANT! PLEASE GIVE COMPLETE DETAILS OF EACH YES ANSWER ON PAGE 5 "ADDITIONAL MEDICAL DETAILS".**

|   |   | Yes | No |
|---|---|---|---|

28. Have you or your spouse (if to be insured) smoked cigarettes or used tobacco in any form or nicotine substitute within the past year?............................................................................................  Primary Proposed Ins. ☐ ☐  Spouse ☐ ☐

28a. Have you or your spouse EVER smoked cigarettes or used tobacco products? If yes, indicate who, amount per day and year quit. _Vicky- 71- Quit 74  1/3 pKa day_ ........  ☑ ☐

29. Is any proposed insured currently taking or taken within the past 3 months, any medication or receiving medical treatment of any kind? Provide details of treatment including name and dosage of all medications...............................................  ☑ ☐

## REQUESTING THE REMOVAL OF A SPECIAL CLASS PREMIUM OR RIDER

30. Has there been any medical treatment for, or have you consulted with a physician concerning the condition(s) which has been ridered or rated since the covered person's effective date? ☐ Yes ☒ No   If yes, provide details_____

## REGULAR PHYSICIAN

31. Regular physician or medical practitioner for each proposed insured: (If none, provide last doctor seen, date, reason & results)

Primary Proposed Insured's Physician _Dr. Gill D.    600 N. Main St._

Address _(217) 824-8191          Taylorville, Il. 62568_

Date Last Seen _1998_ Reason & Results _Physical — Fine_

Spouse's Physician _Dr. Younkin J.         (217) 545-5117_

Address _415 N. 9th St      Springfield, Il. 62702_

Date Last Seen _10/03_ Reason & Results _Physical — Normal_

Child's Name_____ Physician_____

Address_____

Date Last Seen_____ Reason & Results_____

Child's Name_____ Physician_____

Address_____

Date Last Seen_____ Reason & Results_____

Child's Name_____ Physician_____

Address_____

Date Last Seen_____ Reason & Results_____

Child's Name_____ Physician_____

Address_____

Date Last Seen_____ Reason & Results_____

4

## ADDITIONAL MEDICAL DETAILS
(Attach a separate sheet if additional space is needed. Date and sign any additional sheet.)

| | Provide dates, type of treatment, and results. | Name of Doctor or Hospital and Complete Address and Phone Number. |
|---|---|---|
| Person Vicky  Question No. 18A <br> Condition: Sinus Infection | 2-04  Amoxicillon <br> 1-03  2 x a day for 10 days <br> 1-02  Zyrtec <br> 1 x a day for 10 days | Dr. Keil <br> 600 W. main st. <br> Taylorville, Il 62568 <br> (217) 824-8191 |
| Person Vicky  Question No. 18C <br> Condition: Spasmatic Bowel | 4-99  Hysomine <br> 1x a day <br> on going | Dr. Younkin <br> 415 W. 9th St. <br> STE 600 <br> Springfield, Il 62702 <br> (217) 545-5117 |
| Person Vicky  Question No. 29 <br> Condition: Spasmatic Bowel | See above 18c | See above 18c |
| Person  Question No. <br> Condition: | | |
| Person  Question No. <br> Condition: | | |
| Person  Question No. <br> Condition: | | |
| Person  Question No. <br> Condition: | | |
| Person  Question No. <br> Condition: | | |
| Person  Question No. <br> Condition: | | |
| Person  Question No. <br> Condition: | | |

I represent to the best of my knowledge and belief, that all statements and answers on this enrollment form are complete and true. The enrollment form and any amendments shall be the basis for the contract. I also agree that:

Except as otherwise provided in the Conditional Receipt, the insurance, if approved by Fortis Insurance Company, will be in force only when issued by Fortis Insurance Company. The first full premium must be paid. Coverage will become effective on the later of: A) The date of the enrollment form; B) The requested Effective Date. A change in the health of the proposed insured(s) after the completion of the enrollment form and before the delivery of the contract may affect my eligibility for insurance with the company. The contract may only be effective prior to the contract delivery subject to the terms of the Conditional Receipt.

In order to determine my (our) eligibility for insurance, I authorize any licensed physician; medical practitioner; hospital; clinic; any medically related facility; insurance company; the Medical Information Bureau; employer; or consumer reporting agency to give to Fortis Insurance Company (or to any consumer reporting agency authorized by Fortis Insurance Company) any information regarding me or my family as to employment, other insurance coverage, personal information; and medical care, advice or treatment.

I agree that a photographic copy of this authorization shall be valid for two years from the date signed.

I acknowledge receiving the Fair Credit Reporting Act Pre-Notification, the notification regarding the Medical Information Bureau, the Abbreviated Notice of Insurance Information Practices and the Outline of Coverage for Health Insurance, if required.

We, the undersigned Proposed Insured(s) and agent acknowledge that the Proposed Insured(s) has read the completed enrollment form. We understand and acknowledge that any fraudulent statement or material misrepresentation on the enrollment form and/or any amendments may result in claim denial or contract rescission, subject to the time limit on certain defenses or incontestability provisions of the contract.

_____
Signature of Primary Proposed Insured

Date Signed: 12-10-04    Time Signed: 10:50 ☒ A.M. ☐ P.M.    City & State: Taylorville, IL

_____
Signature of Spouse or Other Insured
(If proposed to be insured)

_____
Signature(s) of Other Dependents 18 or Over
(If proposed to be insured)

_____
Guardian's Signature

Requested Effective Date: January 15, 05

Premium Amount Sent $ VOID ck.

One Time Processing Fee Sent* $ 20.00
*N/A in all states

Conditional Receipt Taken?  ☐ Yes  ☒ No

**ATTENTION: (Agent)**

I have reviewed this enrollment form to ensure that all required items have been completed.

To the best of my knowledge there is ☒ is not ☐ a replacement of Medical Insurance involved in this transaction.

Are you aware of any mental or physical impairment, disease or deformity of any proposed insured which is not disclosed on the enrollment form?  ☐ Yes  ☒ No

If yes, please explain _____

_____
Licensed Resident Agent's Signature

Debra Loveless   2760X
Print Agent Name & Agent Number or Business Number

_____ Initial here if you witnessed the signing of this form by the Proposed Insured(s).

6

## Fortis Insurance Company Authorization for Check-O-Matic Billing

**Choose the following option that applies:**

☒ To begin Check-O-Matic withdrawals

☐ To add this policy to an existing Check-O-Matic account with Fortis Insurance Company.
Note: Please provide the existing Check-O-Matic number and/or associated policy number.

Existing COM Number_____

Associated Policy Number_____ FL

**Desired withdrawal day:** (1-28) 1̶5̶  15
Note: We recommend a withdrawal date equal to or within 5 days of your policy issue day.

**ACCOUNT INFORMATION:** Complete only if different than information on check:

**PAYOR'S BILLING ADDRESS**

Payor's Name _____

Address _____

City_____ State_____ ZIP_____

I (we) hereby authorize Fortis Insurance Company, hereinafter called COMPANY, to initiate debit entries to the account indicated below and the depository named below, herein after called DEPOSITORY, to debit the same to such account.

This authority is to remain in full force and effect until COMPANY and DEPOSITORY has received written notification from me (or either of us) of its termination in such time and in such manner as to afford COMPANY and DEPOSITORY a reasonable opportunity to act on it.

_____  12/10/04
(Signature of Payor)                    (Date Signed)



Bill's Safety & Automotive  05-02
Bill Jarrett
Ph. 217-894-9113
506 South Spresser
Taylorville, IL 62568

70-1515-711                    3286

PAY TO THE
ORDER OF_____  $_____

_____  DOLLARS

**THE PALMER BANK**
TAYLORVILLE, IL 62568

FOR _____                    №_____

⑆071115157⑆ 437 08 5⑆ 3286

## Health Advocates Alliance Membership Application

**USAA customers are not required to complete this section.**

Health Advocates Alliance is a membership organization that promotes good health among its members and their communities. Membership in the Alliance is required in order to be eligible for health insurance coverage. Membership privileges include the right to participate in all programs offered or sponsored by the Association. For additional information and benefits provided by the Association please see the Health Advocates Alliance Brochure, Form JI-1033.

I hereby request enrollment in the Health Advocates Alliance. I understand that nominal dues are required for membership in the Association; if participating in a sponsored insurance program, then my annual dues may be collected in installments along with my insurance premiums. I also understand that membership dues are non-refundable, and my failure to remit membership dues will result in loss of eligibility to participate in any of the Association sponsored programs or benefits.

_William L. Jarrett_
Member Name (please print)

_____  12/10/04
Member Signature                    Date

Form 26594                    7

### *** IMPORTANT ***

**NEW HIPAA Regulation:** Please have your client sign this form along with the completed application/enrollment form. If we do not receive this signed form, the underwriting process could be delayed.

**Underwriting Authorization**


**FORTIS**
Solid partners, flexible solutions℠

Name of Proposed Insured(s): _William L. Jarrett_
_Vivian M. Jarrett_

Address: _125 Walnut P.O. Box 922_
_Kincaid, Il. 62540_

I hereby authorize any health care provider or medically related facility, pharmacy or pharmacy related facility, the Medical Information Bureau, Inc., consumer reporting agency, insurance or reinsurance company or employer having information about me or my minor children to provide all such information as may be requested to Fortis Health, its legal representative or any medical records retrieval service Fortis Health may engage, including, but not limited to, EMSI.

This authorization includes any and all information you may have about me, including, but not limited to, information regarding diagnosis, testing, treatment and prognosis of my physical or mental condition as well as alcohol abuse treatment, drug abuse treatment, psychiatric treatment, pharmacy prescriptions, HIV testing and treatment, STD testing and treatment, sickle cell testing and treatment, lab data and EKG's. This information may also be disclosed to any medical records company engaged by Fortis Health, including but not limited to EMSI and its agents. Although federal regulations require that we inform you of the potential that information disclosed pursuant to this authorization may be subject to redisclosure by the recipient and no longer be protected by such regulation, all information received by Fortis Health pursuant to this authorization will be protected by federal and state privacy laws and regulations. A copy of this authorization will be valid as an original.

I understand that this authorization is required in order to enable Fortis Health to make eligibility or enrollment determinations relating to me and/or my minor children or for Fortis Health's underwriting or risk rating determinations. If I refuse to sign or revoke this authorization, Fortis Health may refuse to consider my application for enrollment.

I understand that I may revoke this authorization at any time by notifying Fortis Health in writing of my desire to revoke. Such revocation must be sent by certified mail to the following address: Privacy Office, Fortis Health, P.O. Box 3050, 501 West Michigan, Milwaukee, WI 53201-3050. Such revocation will not be valid if Fortis Health has taken action in reliance on the authorization.

Unless an earlier date is required by law, this authorization expires upon the earliest of the following events: denial of my application, declination of enrollment, or, if insured, when I am no longer an insured of Fortis Health.

| | |
|---|---|
| Signature of Primary Proposed Insured or representative* | 12-10-04 <br> Date |
| X Signature of Spouse or Other Proposed Insured(s) or representative* | 12-10-04 <br> Date |

Signature of Other Dependents 18 or over (if proposed to be insured)     Date

\* If you are the individual's representative and are not the parent or legal guardian of a minor, you must attach documentary evidence of your authority to act as the individuals representative for this authorization to be valid.

**PLEASE RETAIN A COPY FOR YOUR RECORDS**

Form 28291

**E-FILED**
Tuesday, 03 July, 2007 05:03:57 PM
Clerk, U.S. District Court, ILCD

WGB/lmm/#1556468                                                                        6975-06008

## IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| WILLIAM JARRETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:06-cv-03143-RM-BGC |
| | ) | |
| FORTIS INSURANCE COMPANY, | ) | Judge Richard Mills |
| | ) | Magistrate Judge Byron G. Cudmore |
| Defendant. | ) | |

## <u>RESPONSE OF DEFENDANT TO PLAINTIFF'S REQUEST TO ADMIT</u>

NOW COMES the defendant, TIME INSURANCE COMPANY, formerly known as (and

sued herein as) Fortis Insurance Company, and for its responses to the Request to Admit

heretofore propounded by the plaintiff, here states as follows:

1.      Deborah Loveless solicited JARRETT for the purposes of selling him a policy of

medical insurance issued by FORTIS.

**ANSWER:**   This defendant is without sufficient knowledge to admit or deny
paragraph 1 insofar as the plaintiff's coverage was sold through an independent agent, or broker,
and therefore this defendant does not know if the broker solicited the plaintiff or if the plaintiff
solicited the broker relative to the sale of the coverage in question.

2.      On December 10, 2004, the date that JARRETT signed his Enrollment Form for

Medical Insurance for Individuals and Families (Enrollment Form), JARRETT was covered by

medical insurance through another company.

**ANSWER:**   This defendant is without sufficient knowledge to admit or deny
paragraph 2, but states that the plaintiff, in response to the question on his Enrollment Form as to
whether any other insurance coverage was in force or applied for, identified American Republic
as plaintiff's insurer for "Hosp./Surg" coverage from 1998 until "approval" of his coverage with
the defendant.



EXHIBIT

tabbies®

D

3.     In its Enrollment form, FORTIS does not ask a prospective insured whether at any time in the past such prospective insured had experienced signs and symptoms such as chest pain, pressure or squeezing, chest pain radiating into one or both arms, shortness of breath, or nausea.

**ANSWER:**    This defendant denies paragraph 3 to the extent that the Enrollment Form asked the plaintiff to disclose any diagnosis, treatment or consultation for "chest pain" along with any and all other conditions of the heart or circulatory system within the preceding ten years.

4.     FORTIS did not require any type of physical examination of JARRETT during its enrollment process.

**ANSWER:**    This defendant admits the allegations set forth in paragraph 4.

5.     Despite having received underwriting authorization, prior to issuance of its Medical Certificate FORTIS did not request information related to JARRETT from any health care provider.

**ANSWER:**    This defendant admits the allegations set forth in paragraph 5.

6.     The term "condition" is not defined in the Medical Certificate issued by FORTIS to JARRETT.

**ANSWER:**    This defendant admits the allegations set forth in paragraph 6; however the term "pre-existing condition" is defined within the Medical Certificate.

7.     The term "symptoms" is not defined in the Medical Certificate issued by FORTIS to JARRETT.

**ANSWER:**    This defendant admits the allegations set forth in paragraph 7.

8.     The phrase "ordinarily prudent person" is not defined in the Medical Certificate issued by FORTIS to JARRETT.

**ANSWER:**    This defendant admits the allegations set forth in paragraph 8.

9.    In the instant litigation, FORTIS is not contending that JARRETT made any omissions or misstatements in the enrollment form.

**ANSWER:**    This defendant admits the allegations set forth in paragraph 9 insofar as the defendant's declination of the plaintiff's claims for benefits was based upon the preexisting nature of the condition for which treatment was received and for which expenses were incurred, rather than upon any misrepresentation on plaintiff's Enrollment Form.

10.    In the 24 months prior to January 15, 2005, JARRETT was not diagnosed or treated by a physician for any cardiac condition.

**ANSWER:**    This defendant is without sufficient knowledge to admit or deny the allegations set forth in paragraph 10 insofar as the plaintiff's complete prior medical history is within the realm of the plaintiff's own knowledge rather than that of the defendant.

11.    Conditions or injuries other than those are cardiac related, can cause discomfort in an individual's chest and left should and cause nausea and vomiting.

**ANSWER:**    This defendant objects to paragraph 11 insofar as it calls for a statement of medical opinion rather than an admission of an evidentiary fact.

Respectfully submitted,


**s/ William G. Beatty**
William G. Beatty Bar Number: 03121542
Attorney for Defendant
    Time Insurance Company f/k/a
    Fortis Insurance Company
Of counsel
Johnson & Bell, Ltd.
33 West Monroe Street, Suite 2700
Chicago, IL 60603
Telephone: (312) 372-0770
Fax: (312) 372-2881
E-mail: beattyw@jbltd.com

- 3 -